UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------------------------------------------X

T.L.. and D.L., on behalf of their child, B.L.,

Plaintiffs,

-against-

DEPARTMENT OF EDUCATION OF THE
CITY OF NEW YORK a/k/a THE BOARD OF
EDUCATION OF THE CITY SCHOOL DISTRICT
OF THE CITY OF NEW YORK,

Defendant.

-------------------------------------------------------------------X

**FILED**
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.

★ JUL 08 2010 ★

CV **BROOKLYN OFFICE**

**CV 10 - 3125**

**TOWNES, J.**
**BLOOM, M.J.**

## IDEA COMPLAINT

Plaintiffs T.L. and D.L., on behalf of their child, B.L. (hereinafter the "parents"), by their

attorney, NEAL HOWARD ROSENBERG, sue the defendant, DEPARTMENT OF EDUCATION

OF THE CITY OF NEW YORK a/k/a THE BOARD OF EDUCATION OF THE CITY SCHOOL

DISTRICT OF THE CITY OF NEW YORK, (hereinafter the "DOE") and in support thereof, allege

as follows:

### NATURE OF THE PROCEEDING

1.    The proceeding is an appeal pursuant to the Individual with Disabilities Act

(hereinafter "IDEA"), 20 U.S.C. § 1415 (i) (2) (a) from a final decision of the New York State

Review Officer decision dated March 12, 2010.2.   Relief is requested because, as is more fully

set forth herein, said decision of the New York State Review Officer is in violation of the IDEA,

and the laws of theState of New York which require that children with disabilities to receive a

free and appropriate education.   The decision of the State Review Officer is attached as Exhibit

1

"A".

2.        Through her advocate, the parents filed the due process complaint in this matter

on or about January 15, 2009. The impartial hearing in this matter commenced on May 18, 2009

and concluded on November 27, 2009 after 5 days of testimony. The issue developed at the

hearing was whether the parents were entitled to tuition reimbursement as a result of the DOE

not offering a free and appropriate education when recommending a placement for B.L. In her

decision, the impartial hearing officer found that the DOE did not establish that it offered the

student an appropriate program and placement for the 2008 2009 school year. The IHO further

found that the Winston Prep program was appropriate for the student and met his special

education needs for the 2008-2009 school year. Finally, the IHO found that there was nothing in

the record to preclude tuition reimbursement on equitable grounds . The IHO directed the DOE

to reimburse the parent for the cost of the student's placement at Winston Prep for the 2008-2009

school year in the amount of $43,500.00. (Exhibit "B")

4.        Thereafter, the DOE timely filed a petition for review at the New York State

Office of State Review. On March 12, 2010 , the New York State Review Officer ("SRO")

improperly and erroneously held that the District had offered a FAPE for the 2008-2009 school

year despite the fact that the Plaintiffs had demonstrated that the Individualized Education

Program (IEP) placement of a collaborative team teaching ("CH") class with a 14:1 staffing

ratio and the related services of counseling and speech/language therapy was not sufficient to

meet B.L.'s needs and that DOE's program recommendation was a significant change from the

previous year's recommendation of a special class with a 12:1:1 staffing ratio in a community

school. The DOE's IEP recommended program and placement failed to address the B.L.'s

educational that required a small classroom setting. Accordingly, under the Carter/Burlington

2

test, the SRO should have dismissed the District's appeal and tuition reimbursement should have been awarded to B.L.'s parents for the 2008/09 school year. As a result of the adverse SRO decision dated March 12, 2010, a *de novo* appeal is herein being filed. (Exhibit "A")

### THE PARTIES

5. Plaintiffs are the parents of B.L. who resides within New York City. The DOE is charged by law with responsibility for the operation, management and control pursuant to IDEA and New York law for providing a FAPE to all children who reside within the City of New York, including B.L. The DOE is within the jurisdiction of this Court.

### JURISDICTION AND VENUE

6. This court has jurisdiction over the subject matter of this proceeding pursuant to IDEA, 20 U.S.C. §1415, (i) (2) (A). In addition, the Court has jurisdiction pursuant to 28 U.S.C. § 1331.

7. Venue lies in this District pursuant to 28 U.S.C. § 1391 (b) (2) as the DOE is located in New York County.

### STATEMENT OF FACTS

A. **DOE denied FAPE because the recommended program of a Collaborative Team Teaching ("CH") class with a 14:1 staffing ratio and placement at Cobble Hill School of American Studies was not reasonably calculated to produce educational progress.**

8. B.L. was born on May 8, 1993 and lives in Brooklyn, New York. The student functions in the average range of intellectual ability.

9. Socializing is very difficult for the student; he has difficulty making friends. B.L. has difficulty reading social cues.

10. B.L.'s processing speed is significantly delayed. He has difficulties in terms of

3

be inappropriate for the student.

15.    At the end of the IEP meeting, the CSE team was aware that the parent was not in agreement with the program recommendation.

16.    In a letter dated July 23, 2008, the DOE provided the final recommendations for the student, including a placement in a CTT class in Cobble Hill School of American Studies (the "recommended placement").

17.    In a letter dated August 15, 2008, the parent informed the DOE that she would enroll the student in Winston Prep for the 2008-2009 school year.

18.    The parent visited the recommended placement in October 2008.

19.    Any delay in the visiting the school was due to the fact that the parent was recovering from surgery in September.

20.    At the recommended placement, the parent observed a History class.

21.    There were approximately 15-20 students in the CTT class, and a general education teacher and a special education teacher.

22.    The special education teacher only remained in the class for approximately 20 minutes; he spoke to a group of 4 students and then left.

23.    The parent did not find the recommended placement to be appropriate for the student. The class was too large and disruptive for her son to learn.

24.    The parent spoke with Gail Trimmer, the compliance coordinator of special education at the recommended placement.  The parent described the student to Trimmer. Trimmer said that a CH class would not be appropriate for the student.

25.    The CTT class at the recommended placement would only be held in the subjects of math, science, English and social studies.

5

26.     The CTT class would not apply to required electives such as Spanish, art, music, technology and law. Rather, these classes would be taught in general education classes with no special education teacher. Art and music were required for graduation as were a total of seven electives.

27.     For the 2008-2009 school year, Spanish classes at the recommended placement contained between 25 and 30 students.

28.     Within a CTT class, 14 students is the cap for the special education students, not for the class as a whole. At the beginning of the 2008-2009 school year, the CTT class at the recommended placement contained 22 students. At the time of the hearing in this matter, the class contained 25 students.

29.     In a letter dated October 10, 2008, the parent submitted an additional notice to the DOE that she had visited the recommended placement and did not find it to be appropriate for the student for the reasons stated above. In the same letter, further written notice was provided to the DOE that the student would attend Winston Prep for the 2008-2009 school year and that the parent would request an impartial hearing.

30.     The DOE clearly failed to meet its burden to demonstrate that it offered to provide the student with a FAPE on the ground that, inter alia, the June 10, 2008 IEP does not adequately describe the student's present level of cognitive, social/emotional and academic functioning needs. Global and vague statements do not provide a meaningful description of the student's abilities or needs, nor provide sufficient specificity regarding the deficits that need to be addressed (see Exh. C at p. 3-4).

31.     B.L. needed to be in a smaller classroom and he would not have succeeded in a class with twenty students, even if there were two teachers in the class: one general

6

education and one special education.  B.L. needed to be in a small class where the teacher could keep him focused and on track and provide consistent one to one assistance.

**B.  The DOE Failed to Comply with the Procedural Requirements of the IDEA and New York State Law.**

32.  CSE's procedural violations created a loss of educational opportunity for B.L., thereby denying J.H. FAPE.

33.  At the IEP meeting, the CSE failed to include the participation of a related service provider who provided the student with speech/language therapy.

34.  The IEP did not include a statement of the student's present level of academic achievement and functional performance with respect to his speech and language needs.(This is also a substantive violation as well.)

35.  The IEP did not include data from standardized testing regarding the student's instructional levels in the core subjects of reading, writing and math.(This is also a substantive violation as well.)

36.  The IEP did not include academic and functional goals that were specific and measurable.(This is also a substantive violation as well.)

37.  The IEP did not include academic and functional goals relating to the student's speech and language needs.(This is also a substantive violation as well.)

38.  The June 10, 2008 IEP does not describe the student's present levels of academic performance. Teachers' estimates alone are not sufficient to provide baseline data on the student's present level of academic performance.  Without developing an appropriate description of the student's present functioning, the June 10, 2008 CSE failed to develop appropriate and specific goals and objectives for the student. (This is also a substantive violation as well.)

7

39.     The IHO properly determined that the DOE did not provide any valid, individualized reasons for making a significant change in the student's program from a self-contained special education class to a lesser restrictive program of CTT . The IHO also correctly determined that the existing evaluations did not support CTT program recommendations . Under New York Law, if the CSE recommends a modification of a child's current placement it must do so pursuant to a written evaluation, furnished to the parent, setting forth the reasons for such modifications. To initiate a change in placement a District must provide: (1) a description of each evaluation procedure, assessment or report the agency used as a basis, and (2) description of other options considered by the CSE team, and a reasons those options were rejected. The DOE failed to comply with these requirements.(This is also a substantive violation as well.)

40.     The June 10, 2008 IEP is further inappropriate as its academic and functional goals are vague and overbroad. (This is also a substantive violation as well.)

41.     Lastly, the DOE  failed to implement the IEP. (This is also a substantive violation as well.)

**C.     The Parent's Placement of B.L. at Winston Prep Was Appropriate Because B.L. Made Significant Educational Progress**

42.     Winston Prep is a small private school for students with learning difficulties.

43.     Winston Prep determines how each student learns best and develops individually tailored curricula to achieve success. Winston Prep faculty develops personal academic programs and teaches in small groups.

44.     For the 2008-2009 school year at Winston Prep, B.L. took the following classes: Math, Science, History, Literature, Writing, Language Skills, Focus, Physical Education and Art classes. Winston Prep had a 12:1 staffing ratio.

8

45.     The students in a Winston Prep class tended to have largely homogeneous issues, which allowed the teacher to work both individually with students and with the group as a whole Similar to B.L., the students in his class had deficits in the areas of expressive language and attention/focusing.

46.     Progress reports written by Winston Prep teachers presented specific goals and methodologies to address B.L.'s key deficit areas, including: reading (e.g. inferential skills), written expression, organizational skills, study and homework skills and social functioning.

47.     B.L.'s literature course featured developing independent reading and critical thinking skills through studying classics. Reading comprehension was a relative strength for B.L. His literature teacher estimated his reading level to be at about the twelfth grade level.

48.     B.L. completed at-home reading assignments and answered comprehension in a journal. B.L. developed analytical reading skills and practiced essay writing through the use of cognitive mapping and linear outlining.

49.     B.L. learned to strengthen organization, time management and study skills though a weekly and monthly syllabus and graphic organizers.

50.     B.L. also learned to facilitate the writing process and organization through note taking, brainstorming, outlining, rough drafts and editing. He reinforced study and homework skills through the use of time management, binder organization and homework completion.

51.     B.L.'s deficits in pragmatic language were addressed in and out of the classroom . B.L. improved his expressive language through participating in structured class discussions in his Literature course. B.L. further improved his expressive language through methodologies utilized in his Writing and Language Skills classes, including: focusing on

9

receptive and expressive language.

52. The one to one attention B.L. received in his classes at Winston Prep helped him to succeed academically and socially. B.L.'s daily one to one time with his Focus Teacher helped the student to succeed.

53. The student showed progress during the 2008-2009 school year at Winston Prep. As the school year progressed, the student improved in submitting assignments and in answering questions in class. His attention and focus in class improved. Progress report comments from the student's teachers included the following: B.L. is able to give interesting and informative presentations that show his research and knowledge. has taken a positive turn and has since been producing quality work and has maintained consistency with all assignments. B.L. is increasingly confident as a student.

54. For the 2008-2009 school year, the student's grades were in the B range; he did not fail any classes. At Winston Prep, the student is earning credits toward a high school diploma and is on track to graduate.

55. Winston Prep was an appropriate special education placement for the student for the 2008-2009 school year

**D. Equitable Circumstances Support the Parents Award of Tuition Reimbursement for the 2008-2009 School Year at Winston Prep.**

56. Equity supports an award of tuition reimbursement because the parents expressed their concerns regarding the recommended placement at the June 10, 2008 CSE review and submitted the August 15, 2008 letter, through an advocate. The parents disagreed with the program recommendation at the CSE review meeting and provided sufficient notice of her intent to enroll the student at Winston Prep for the 2008-2009 school year at the Department's expense. The DOE took no steps to revisit the appropriateness of the recommended program. In the event

10

that equity does not fully support an award of tuition reimbursement, then the Court should only slightly reduce the amount of tuition reimbursement.

**E.     The State Review Officer's finding and fact and conclusions of law are improper and erroneous.**

57.     On March 12, 2010 , the SRO inappropriately and erroneously rendered a decision adverse to B.L.'s parent. The SRO held that the DOE should not reimburse B.L.'s parent because the placement offered by the DOE was appropriate. The Court is respectfully referred to paragraphs numbered 8 through 41 inclusive as to the reasons why the SRO reversal of the IHO decision was clearly improper and erroneous.

58.     Finally, the SRO erred when he ignored the many procedural deficiencies of the IEP discussed above. The Court is respectfully referred to paragraphs numbered 8 through 41 inclusive.

WHEREFORE, it is respectfully requested for the aforementioned reasons that a judgment be made and entered reversing the decision of the Office of State Review, declaring for the aforementioned reasons that IDEA has been violated, that the DOE failed to offer a FAPE to B.L. for the 2008-2009 school year, and that the DOE be ordered to reimburse the parents for tuition paid and for related costs and attorney fees and costs and disbursement and any other relief that is just and equitable.

Dated:  New York, New York
        July 6, 2010

                                        Respectfully submitted,


                                        _____
                                        NEAL H. ROSENBERG (NR7827)
                                        Attorney for Plaintiff
                                        9 Murray Street, Suite 4W
                                        New York, N.Y. 10007
                                        (212) 732-9450

11

# EXHIBIT "A"



# The University of the State of New York

### The State Education Department
### State Review Officer
www.sro.nysed.gov

No. 10-001

**Application of the NEW YORK CITY DEPARTMENT OF EDUCATION for review of a determination of a hearing officer relating to the provision of educational services to a student with a disability**

**Appearances:**

Michael Best, Special Assistant Corporation Counsel, attorney for petitioner, G. Christopher Harriss, Esq., of counsel

Educational Advocacy Service, attorneys for respondents, Jennifer A. Tazzi, Esq., of counsel

## DECISION

Petitioner (the district) appeals from the decision of an impartial hearing officer which found that it failed to offer an appropriate educational program to respondents' (the parents') son and ordered it to reimburse the parents for their son's tuition costs at the Winston Preparatory School (Winston Prep) for the 2008-09 school year. The appeal must be sustained.

At the time of the impartial hearing, the student was attending Winston Prep, a school for adolescents with learning difficulties (Tr. p. 87). Winston Prep has not been approved by the Commissioner of Education as a school with which districts may contract to instruct students with disabilities (see 8 NYCRR 200.1[d], 200.7). The student was also receiving counseling once per week from a private provider outside of Winston Prep (Tr. p. 253). The student had been previously given a diagnosis of an attention deficit hyperactivity disorder (ADHD) and was reportedly described as having visual processing deficits, difficulty completing tasks within a time limit, and difficulty with organizing and applying rote information to more complex processing tasks (Dist. Ex. 7 at pp. 1, 7). In addition, the student struggled with social cues and with advocating for himself (Tr. p. 136). The student's eligibility for special education programs and services as a student with an other health impairment (OHI) is not in dispute in this appeal (see 34 C.F.R. § 300.8[c][9]; 8 NYCRR 200.1[zz][10]).

An undated private neurodevelopmental evaluation report indicated that when the student was almost 13 years old, he underwent a private comprehensive evaluation conducted by both a developmental pediatrician and a school psychologist on April 5, 7, and 17, 2006 (Dist. Ex. 7 at p. 1).[1] According to the private evaluation report, the purpose of the neurodevelopmental evaluation was to determine the student's developmental status at the time and to "better define his educational and therapeutic needs" (id. at pp. 1, 10). The private evaluation report indicated that at the time of the evaluation, the student received medication for attention difficulties and was enrolled in seventh grade at a private school (id. at p. 1). The report further reflected that the student attended a general education classroom taught by a regular education teacher, in which a special education consultant teacher was "available" (id.). The private evaluation report also noted that when bored, frustrated or overwhelmed, the student experienced behavioral difficulties in school (id.). In addition, the private evaluator reported that the student made academic progress at an appropriate rate (id.). The private evaluation report also indicated that the student's mother felt at that time that the student might benefit from a different learning environment (id.). One of the private evaluators indicated in the report that she had the opportunity to speak with the private school staff on a number of occasions and like the student's mother, she was of the opinion that the student's then current private school was a "poor fit" for him as it lacked a number of resources including a psychologist, and therefore did not meet the student's needs (id. at pp. 1, 8).

The private evaluating school psychologist administered various formal and informal evaluation measures (Dist. Ex. 7 at p. 1). Administration of the Wechsler Intelligence Scale for Children – Fourth Edition (WISC – IV) yielded a full scale IQ score of 105 in the average range, a verbal comprehension composite score of 104 in the average range, a perceptual reasoning composite score of 119 in the high average range, a working memory composite score of 107 in the average range, and a processing speed composite score of 75 in the low range (id. at pp. 1, 3-5, 7). Results from administration of the Woodcock – Johnson Tests of Achievement – Third Edition (WJ – III ACH) revealed the student's "very strong" skills in all academic areas except in writing fluency, a task that required the student to quickly write short sentences about a picture (id. at pp. 5, 12). The private evaluators indicated that the student was challenged most when required to work on tasks within a set time limit, and indicated that the student's difficulty on the WJ – III ACH was congruent with his poor performance on the processing speed subtests of the WISC – IV (id. at p. 5). Additional formal measures of receptive and expressive vocabulary yielded average results (id. at pp. 6, 16).

Overall, the private evaluators described the student as functioning in the average range of intellectual ability, although his skills ranged from high average to low (Dist. Ex. 7 at p. 7). Significant difficulty was seen in the area of processing speed and the private evaluators surmised that the student appeared to have a visual processing deficit (id.). According to the private evaluators, the student demonstrated strength in his ability to recall information presented orally as well as his ability to solve mathematical calculations (id.). The private evaluation report described the student's academic skills in the areas of reading, writing, mathematics, spelling, understanding directions, and memory as "within age appropriate limits" (id.). In

---

[1] Although this exhibit was grouped with the district exhibits, it was labeled as "Parent Exh. 7" (Dist. Ex. 6 at p. 1). For purposes of this decision, the exhibit will be referred to as "Dist. Ex. 7."

2

addition, the private evaluation report indicated that the student's greatest challenge involved his ability to complete tasks within time limits (id.). The private evaluators also determined that the student was generally better at learning verbal material than visual material (id.). Strength was noted in the student's ability to learn narratives and in learning and retaining verbal information without an organizing context (id.). The student's ability to learn visual information was within average limits, but he appeared to have difficulty organizing and applying rote skills to more complex processing tasks (id.). The private evaluators also reported that the student's visual motor skills were within the average range and his visual spatial skills and fine motor control were age appropriate (id.). The private evaluation report indicated that the student appeared to have some attention weaknesses within academic contexts when compared to his peers, characterized by teacher reports as physical restlessness, and had some weakness in cognitive skills and attention (id.). Additionally, the private evaluators noted that the student tended to pick at his nails or fingers when he became frustrated (id.). Furthermore, although the student was described as working at a "somewhat slow pace" during the evaluation, his motivation and focus were described as "fairly consistent" throughout the testing process in a 1:1 setting (id.). The student's performance on a computerized attention task was also described as "good" (id.). The private evaluators indicated that based on the neurodevelopmental evaluation, the student generally seemed to be functioning well, although he required some additional intervention to help him achieve his full potential (id. at p. 8).

Among other things, the private evaluators recommended that the student remain on medication for attention difficulties (Dist. Ex. 7 at p. 9). They also recommended various classroom modifications including the provision of verbal information to support visual information, provision of auditory cues, evaluation for visual tracking, provision of extended time limits on all standardized tests, and testing in a separate location (id. at pp. 8-9). The evaluators further recommended that the student be placed in a school with "small classes and specialized resources" to meet his needs, and suggested a few schools including Winston Prep (id. at p. 9).

A social history dated September 18, 2007, completed by a district social worker/educational evaluator when the student was in ninth grade, indicated that the student had been attending Winston Prep since the 2006-07 school year (eighth grade) (Tr. p. 244; Dist. Ex. 6 at p. 1).[2,3] According to the social history report, the student's mother indicated that the student did not have an individualized education program (IEP), nor did he receive related services during the previous school year (Dist. Ex. 6 at p. 1). The social history report further indicated that an IEP was developed for the student for ninth grade (2007-08) on the same day that the social history was completed (id.).[4] According to the social history report, the student's mother reported that the student had made progress at Winston Prep in both his school performance and attitude at school (id. at pp. 1-2). The report noted that the student experienced difficulty expressing himself in writing, had difficulty summarizing important points from his reading, and

---

[2] A review of the social history indicates that the student's mother acted as the informant (Dist. Ex. 6).

[3] This exhibit was included with the district exhibits; however, it was labeled as "Parent Exh. 6" (Dist. Ex. 6 at p. 1). For purposes of this decision, the exhibit will be referred to as "Dist. Ex. 6."

[4] A copy of the student's IEP for the 2007-08 school year is not included in the hearing record.

had organizational problems (id. at p. 1). The report further indicated that the student got distracted easily and received medication to help him focus (id.). In addition, the student's mother noted that although the student had some friends with whom he got along well, socializing was "not always easy" for the student and he required supervision during social situations so that he could be prompted to connect with others in a socially mature manner (id.). The student's mother also indicated that she had seen progress in the student's performance and attitude at school; however, the student tended to be "nervous" about his school performance, despite some improvement in controlling his anxiety (id. at p. 2). According to the report, the student's mother indicated her desire for the student to remain at Winston Prep at that time (id.). The social history report also indicated that the district was provided with a current medical report and that due process rights were "re-discussed" with the student's mother (id.). The social history report further noted that the student's mother was "very involved" in the student's education and the student's family had also worked with an educational advocacy service (id.).

On April 15, 2008, the student's mother signed an enrollment agreement with Winston Prep for the student's 2008-09 school year (Tr. p. 245; Parent Ex. N). The agreement stated that a deposit was required when the document was returned to the school and stipulated that "there [would] be no allowance for absence of early withdrawal" (id.). The agreement further stated that if it became necessary to withdraw the student at any time after the agreement was signed, the parent or guardian continued to be responsible for the balance of the entire tuition and fees (id.).

On June 10, 2008, the Committee on Special Education (CSE) convened for the student's annual review and to develop his program for the 2008-09 school year (Dist. Ex. 3; Parent Ex. C).[5] The following individuals attended the June 2008 CSE meeting: a district special education teacher who also acted as the district representative, a district regular education teacher, and a district school psychologist (Tr. pp. 177-78; Dist. Ex. 3 at pp. 1-2). In addition, the parents, the student's Winston Prep "Focus" teacher, and the parents' educational advocate[6] participated in the meeting via telephone (Dist. Ex. 3 at p. 2). The June 2008 CSE recommended continuing the student's eligibility for special education services as a student with an OHI as well as ten-month programming (Tr. pp. 202-03; Dist. Ex. 3 at p. 1). The June 2008 CSE also recommended a change in the student's placement from a "special class"[7] to a collaborative team teaching (CTT)

---

[5] Dist. Ex. 3 consists of 14 pages. Parent Ex. C consists of 12 pages. Pages 1-12 of Dist. Ex. 3 and Parent Ex. C are duplicative; however, Dist. Ex. 3 at pp. 13-14 included a transition plan developed by the CSE that indicated the student's projected long term adult outcomes based on the student's preferences, needs and interests (compare Dist. Ex. 3, with Parent Ex. C). For purposes of this decision, citation to the June 2008 IEP will reflect Dist. Ex. 3.

[6] The hearing record reflects that at some point during the CSE meeting, the student's mother requested that the parents' educational advocate be contacted and the educational advocate joined the June 2008 CSE meeting by telephone at the time the CSE was discussing its recommendations for the student (Tr. pp. 180-81, 235, 239). The hearing record further reflects that the June 2008 CSE was unaware that the educational advocate would be participating in the meeting until the student's mother requested that the advocate be contacted (Tr. p. 181).

[7] As noted supra, the hearing record does not include any IEPs prior to the June 2008 IEP.

4

class (14:1) with related services of counseling one time per week for 40 minutes in a group of three and individual speech-language therapy two times per week for 40 minutes (Tr. pp. 222-23; Dist. Ex. 3 at pp. 2, 12).[8] The June 2008 CSE reviewed and agreed to recommendations for counseling and speech-language services, and reviewed and discussed annual goals and short-term objectives with respect to the student's needs in peer interactions, task attention, completion of and independence in various school related assignments, pragmatic language skills, reading comprehension on a critical and inferential level, and informational writing (Tr. pp. 242-44; Dist. Ex. 3 at pp. 3-9). The June 2008 CSE recommended the following program modifications: the use of graphic organizers and prompts and reminders (Dist. Ex. 3 at p. 3). In addition to testing accommodations of extended time (double) and a separate location, the June 2008 CSE added directions read and reread (id. at pp. 2, 12). The June 2008 IEP also included a transition plan that reflected the student's projected long term adult outcomes based on his preferences, needs, and interests (id. at pp. 13-14). The June 2008 IEP also reflected that the CSE considered a general education class with special education teacher support services (SETSS) and related services, and a special class in a community school with related services (id. at p. 11). However, the CSE rejected both those alternatives because, as to the former, the June 2008 CSE determined that a general education class with SETSS and related services would not provide sufficient support to the student, and as to the latter, the June 2008 CSE determined that a special class in a community school with related services was too restrictive for the student (id.). The hearing record reflects that although they did not object to the goals and related service recommendations, the parents and their educational advocate did not agree with the June 2008 CSE's recommendation for placement in a CTT class because the student "ha[d] ADHD," required "a lot of refocus," and he "might not be able to do his work in a CTT class" (Tr. pp. 203, 223, 242-43). The June 2008 IEP reflected that the projected initiation date of the recommended services was September 2, 2008 and that the IEP would next be reviewed on June 30, 2009 (Dist. Ex. 3 at p. 2).

By Final Notice of Recommendation (FNR) dated July 23, 2008, the district advised the parents of the specific district school where the student's June 2008 IEP would be implemented (Parent Ex. D). The July 2008 FNR also stated that if the parents wished to further discuss the CSE's recommendations and arrange for another meeting, they could contact the district staff person listed on the FNR (id.).

In a letter dated August 15, 2008 to the CSE chairperson, signed by the student's mother and the parents' advocate, the student's mother advised the district, among other things, that she had visited the recommended placement and did not find it to be appropriate (Parent Ex. E). According to the student's mother and the parents' advocate, the August 2008 letter would serve

---

[8] "Collaborative team teaching," also referred to in State regulation as "integrated co-teaching services," means "the provision of specially designed instruction and academic instruction provided to a group of students with disabilities and nondisabled students" (8 NYCRR 200.6[g]). School personnel assigned to an integrated co-teaching class shall minimally include a special education teacher and a regular education teacher (8 NYCRR 200.6[g][2]). The Office of Vocational and Educational Services for Individuals with Disabilities issued an April 2008 guidance document entitled "Continuum of Special Education Services for School-Age Students with Disabilities," which further describes integrated co-teaching services (see http://www.vesid.nysed.gov/specialed/publications/policy/schoolagecontinuum.pdf).

as the 10-day notice required by law (id.).[9]   The student's mother and her advocate further advised that that the parents planned to enroll the student in Winston Prep for the 2008-09 school year (id.). Although the student's mother and her advocate indicated that the parents would make every effort to observe the placement offered by the district, they further advised that in the event that the recommended placement was not deemed appropriate, the parents would request an impartial hearing in order to secure tuition reimbursement for the student's 2008-09 school year at Winston Prep (id.).

The hearing record reflects that the student continued at Winston Prep for the 2008-09 school year (tenth grade); however, the student did not receive related services at Winston Prep (Tr. pp. 244, 252). The student's mother testified that beginning in fall 2008, the student received once weekly counseling from a provider outside of Winston Prep (Tr. p. 253). An undated Winston Prep "Fall 2008 Report" regarding the student reflected the private school's plan regarding objectives and methodologies to be used with the student to meet established objectives in the student's "Focus" class and in the subject areas of essential reading, writing and language skills, geometry, biology, United States history: 1900-1950, art and ideas, and physical education during the 2008-09 school year (Parent Ex. I at pp. 1-6). The Focus teacher's general description of the student indicated that the student began his "sophomore year" at Winston Prep by displaying a "sincere desire to learn" (id. at p. 1). The report noted that formal and informal assessment, review of previous reports, and collaboration with family and teachers revealed the student's particular areas of strength in visual and verbal analytical skills (id.). Weaknesses were noted in the student's attention, impulse control, and organization (id.). The report also indicated that the student's challenges in these areas undermined the effectiveness of the student's otherwise strong memory and slowed his processing speed (id.). The student's reading comprehension was described as "strong," although the student tended to be more concrete and displayed difficulty with inferential and predictive reading skills (id.). In addition, the report reflected that the Focus teacher planned to put an emphasis on the student's reading comprehension, written expression, and academic and social problem solving (id.). Multiple objectives for the student listed within the academic areas of essential reading, writing and language skills, geometry, biology, history, art and ideas, and physical education were consistent with the broader objectives targeted for him by the Focus teacher (see id. at pp. 1-6).

The hearing record also reflects that per the educational advocate's request, the student's mother initially contacted the proposed district school at the end of September 2008 (Tr. pp. 250-51). The student's mother visited the recommended CTT class on October 6, 2008, and returned to the proposed school on October 8, 2008 to meet with the special education teacher of the recommended class (Tr. pp. 231-32, 254).[10]

---

[9] The Individuals with Disabilities Education Act (IDEA) allows that reimbursement may be reduced or denied if parents do not provide notice of the unilateral placement either at the most recent CSE meeting prior to removing the student from public school, or by written notice ten business days before such removal, "that they were rejecting the placement proposed by the public agency to provide a free appropriate public education [FAPE] to their child, including stating their concerns and their intent to enroll their child in a private school at public expense" (20 U.S.C. § 1412[a][10][C][iii][I]; see 34 C.F.R. § 300.148[d][1]).

[10] The hearing record reflects that the district's school year began on September 2, 2008, approximately one month prior to the student's mother's visit to the proposed school and class (Tr. p. 232).

By letter dated October 10, 2008, through their advocate, the parents advised the district that the student's mother had visited the recommended placement and did not find it appropriate for the student (Parent Ex. G). According to the parents' advocate, the student's mother had determined that there were too many children in the class to enable the student to gain any educational benefit (id.). Additionally, the parents' advocate stated that the student's mother observed several instances of problem behaviors "without the adults in the class able to control outbursts and such" (id.). Although the parents' advocate indicated that this letter should not be considered a request for an impartial hearing, she further advised that the student would be attending Winston Prep and that the parents would be requesting an impartial hearing "in the near future" (id.).

An undated Winston Prep "Winter Progress Report 2008" regarding the student reflected that the student had "made steady gains" toward each targeted area addressed in his "Focus" class (Dist. Ex. 5 at p. 1).[11] The report indicated that goals in reading comprehension and fluency, written language, and academic problem solving and study skills were addressed in the Focus class during the semester (id.). The Focus teacher described the student as having remained "open to instruction" (id.). In addition, the teacher indicated that at that time, the student "work[ed] diligently at assigned tasks" and used feedback on a steady basis (id.). The report noted that the student took initiative to insert topics of interest into discussions, writing or research, and had started to develop a "better understanding of reading and delving deeper into exploring the nuances of the written word" (id.). The Focus teacher indicated in the report that although the student's work was strong, he tended to struggle with work that challenged his abilities and needed repeated prompting to remain focused and on task (id.). The report also highlighted the student's performance in his academic subject areas of "[c]ourage, [m]orality, and [f]amily in [l]iterature," language skills, writing, integrated mathematics, physics, medieval and renaissance history, commercial art, and physical education (id. at pp. 2-5).

An undated Winston Prep "Winter Progress Report 2009" regarding the student indicated that the student often required prompting to remain on task and that his performance had been "inconsistent" (Parent Ex. J at p. 1). According to the report, "throughout Focus [the student] has given strong indication of a potential for excellence, but then his resistance to work and following through with advocacy has brought his overall performance down considerably" (id.). The Focus teacher indicated that although the student was open to instruction and provided "meta-cognitive insight" to help the teacher develop assignments for him, it was difficult to assess why the student did not follow through in asking for help (id.). The student tended to "hide" his weaknesses from the teacher, something the Focus teacher described as a

---

[11] Although the hearing record includes an undated description of Winston Prep, the portion of the exhibit that describes the Focus program is illegible (Parent Ex. B at p. 1). However, testimony by a Winston Prep dean reflects that the role of the Focus teacher is to be a "point person" or "case manager" that the student's other teachers go to frequently for periodic updates about the student (Tr. pp. 96, 105). The Focus teacher supplements what other teachers are doing with the student and focuses on particular areas of difficulty, independent of the student's other classes (Tr. p. 106). Testimony by the student's 2008-09 Focus teacher indicated that he saw the student for 30-45 minutes per day depending on the schedule (Tr. p. 135). His role was to develop an understanding of the student and share that understanding with the student's team, including all of the student's concept teachers and everyone else involved with him, to create an effective environment for the student, and to maximize the student's educational experience at Winston Prep (Tr. p. 134). The Focus teacher further indicated that he would act as a liaison for the parents to communicate with Winston Prep (id.).

"considerable defense shield that [wa]s not easily penetrated" (id.). Goals and teaching strategies targeted written language, academic problem solving, and study skills (id.). The report also highlighted the student's performance in his academic subject areas of essential reading, writing and language skills, geometry, biology, history, art, and physical education (id. at pp. 2-5).

On January 15, 2009, through their educational advocate, the parents filed a due process complaint notice (Parent Ex. A). As relief, they requested, among other things, an order for tuition reimbursement for the student's tuition at Winston Prep for the 2008-09 school year (id. at p. 3). Initially, the parents noted that the June 2008 CSE's recommendation of a 14:1 CTT class reflected a change from the CSE's recommendation of a special 12:1+1 class with support services for the previous school year (2007-08) (id. at p. 1). Next, the parents claimed that although the student's mother visited the CSE's recommended placement, it proved to be inappropriate for the student's needs (id. at p. 2). According to the parents, the recommended placement was not reasonably calculated to confer educational benefits on the student (id.). The parents further alleged that the 14:1 classroom was too large and would not allow their son to receive the individual attention that he required in order to be appropriately educated (id.). The parents also noted that during the student's mother's observation, she observed several instances of "problem behaviors" by the students without the teacher being able to control such outbursts (id.).

In addition, the parents alleged that the June 2008 IEP was "procedurally improper and substantively incorrect" and resulted in a defective program recommendation and a denial of a free appropriate public education (FAPE) to the student for the following reasons: (1) the June 2008 CSE failed to secure the attendance of a speech-language provider at the meeting; (2) the June 2008 CSE failed to include a statement of the student's present levels of academic achievement and functional performance with respect to the student's speech-language needs; (3) the June 2008 CSE failed to include baseline data regarding the student's performance on objective tests with respect to reading, writing, and math; (4) the June 2008 CSE failed to develop appropriate and specific goals designed to meet each of the student's educational needs, including goals related to the student's speech-language needs; and (5) the June 2008 CSE failed to develop appropriate academic and functional goals designed to meet each of the student's educational needs that were specific and measurable (Parent Ex. A at p. 2). The parents also indicated that in the event that the district maintained that it offered the student a FAPE, they "reserve[d] the right to challenge the appropriateness of their son's entire IEP including, but not limited to, the appropriateness of the drafted annual goals" (id.). The parents maintained that the student should continue to attend Winston Prep as an appropriate placement for him (id. at pp. 2-3).

On January 16, 2009, the district responded to the parents' due process complaint notice (Dist. Ex. 2). The district noted that the June 2008 CSE recommended a 14:1 CTT classroom with related services and that the CSE's decision was made based upon a psychoeducational evaluation, a classroom observation, teacher progress reports and teacher estimates, an April 2006 private neurodevelopmental evaluation, and a medical record (id. at pp. 2-3). According to the district's response, the June 2008 CSE considered a general education program with related services as well as a general education program with SETSS, but determined that both programs would not have been supportive enough for the student (id. at p. 3). Likewise, the district alleged

8

that the June 2008 CSE considered a special class for the student but determined that it was too restrictive (id.). Lastly, the district maintained that the recommended placement was reasonably calculated to enable the student to obtain meaningful educational benefits (id.).

On May 18, 2009, an impartial hearing convened and concluded on July 23, 2009, after four days of testimony (IHO Decision at p. 2). In a decision dated December 4, 2009, the impartial hearing officer first found that the June 2008 CSE's recommendation of a CTT classroom for the 2008-09 school year for the student represented a change to a less restrictive setting; however, she further noted that there was nothing in the reports considered by the CSE that warranted moving the student to such a setting (id. at p. 4). The impartial hearing officer added that the private neurodevelopmental evaluation relied upon by the June 2008 CSE specifically recommended that the student be placed in smaller classes, further noting that aside from a social history update, no new evaluations had been conducted, and that the student had been making progress in his small classes at Winston Prep (id.). The impartial hearing officer determined that although the student's cognitive functioning was in the average to above average range, his slow processing speed, impulsivity, distractibility and social skills deficits required that the student be placed in a small class setting (id.). Under the circumstances, the impartial hearing officer determined the student's "extremely delayed processing speed" would have made it impossible for the student to function in a CTT setting, further noting that the student's "ADHD issues (impulsivity and difficulty remaining on tasks) and social skills deficits would have compounded the problem" (id. at p. 5). Accordingly, the impartial hearing officer concluded that the district's recommendation that the student be placed in a full time CTT program for the 2008-09 school year was not reasonably calculated to enable the student to make meaningful educational progress (id.).

Notwithstanding the district's objection to the impartial hearing officer's consideration of the appropriateness of the district's recommended placement on the basis that the issue was beyond the scope of the impartial hearing, the impartial hearing officer first determined that the parents' due process complaint notice specifically referenced the student's placement (IHO Decision at p. 5). Next, the impartial hearing officer concluded that although the student's June 2008 IEP recommended that the student be placed in CTT classes for all periods, the recommended placement would not have provided the student with that level of support (id.). Concluding that the recommended placement would not have implemented the June 2008 CSE's recommendation for full-time placement in CTT classes, the impartial hearing officer found that the recommended placement would have provided the student with CTT classes for English, math, science, and social studies (id. at pp. 5-6). Although the impartial hearing officer noted that the student's regular education teachers would have been provided with a copy of the student's IEP and would have had the opportunity to consult with a special education teacher upon request, the impartial hearing officer found that this was a "much lower level of support than the support mandated by the IEP" (id. at p. 6). In light of the foregoing, the impartial hearing officer determined that the district did not establish that it offered the student an appropriate program during the 2008-09 school year (id.).

With respect to the parents' unilateral placement of the student at Winston Prep, the impartial hearing officer found that the student was placed in small classes there, in which the other students in his classes had similar functional levels and similar academic and management

needs (IHO Decision at p. 6). She further noted that the student had the daily 1:1 support of a Focus teacher, whose role was to monitor the student and provide him with individualized support in his key areas of deficit, as reflected by the goals listed in the progress reports, which addressed reading, writing, organizational skills, study and homework skills, and social functioning (id. at pp. 6-7). In addition, the impartial hearing officer found that the Focus teacher implemented specific methods and strategies to address these areas of weakness (id. at p. 7). She further found that the Winston Prep progress reports revealed that the student's teachers implemented "very specific methodologies and supports in order to address his unique special education needs" (id. at pp. 6-7). With respect to the Winston Prep progress reports, the impartial hearing officer explained that each of the student's teachers listed the goals on which they were working and the specialized instruction/methods being used to address the student's deficit areas (id.). Moreover, the impartial hearing officer found that the progress reports combined with the testimony of Winston Prep staff established that the student made academic, social and behavioral progress during the 2008-09 school year at Winston Prep, further noting that the student passed all of his classes during the 2008-09 school year and was on track to earning his high school diploma (id.). In light of the foregoing, the impartial hearing officer found that Winston Prep met the student's special education needs during the 2008-09 school year (id.).

Lastly, the impartial hearing officer concluded that there was nothing in the hearing record that would preclude reimbursement on equitable grounds (IHO Decision at p. 7). Contrary to the district's claim that the parents never intended to send the student to a public school for the 2008-09 school year, the impartial hearing officer found that the "unrebutted and credible testimony of [the student's] mother" established that they would have sent him to a public school had an appropriate program been offered (id.). She further concluded that the parents fully cooperated with the CSE (id.). Next, the impartial hearing officer also determined that the student's mother promptly advised the CSE that she disagreed with the recommendation for placement in a CTT program (id. at p. 8). Additionally, the impartial hearing officer noted that upon receipt of the FNR, the parents provided the district with written notice that they were rejecting the CSE's proposed placement, and that they would be unilaterally placing their son at Winston Prep and seeking tuition reimbursement (id.). The impartial hearing officer also noted that the student's mother visited the proposed district placement and sent an additional notice that she had observed the program and found that it was inappropriate for the student (id.). Having determined that the parents prevailed on all three prongs of the Burlington/Carter analysis, the impartial hearing officer ordered the district to reimburse them for the cost of the student's placement at Winston Prep for the 2008-09 school year (id.).[12]

The district appeals and requests an order annulling the impartial hearing officer's decision to the extent that it ordered the district to reimburse the parents for the student's placement at Winston Prep. The district maintains that it offered the student a FAPE during the 2008-09 school year in the least restrictive environment (LRE). Specifically, the district first

---

[12] Sch. Comm. of Burlington v. Dep't of Educ., 471 U.S. 359 (1985); Florence County Sch. Dist. Four v. Carter, 510 U.S. 7 (1993). These two cases are typically referred to together as the "Burlington/Carter" analysis for tuition reimbursement.

contends that the June 2008 CSE's recommendation that the student attend a CTT class would have nurtured the student's academic strengths and would have offered the student frequent interaction with typically developing peers. Second, the district claims that the student would have received related services comprised of counseling and speech-language therapy, which would have addressed the student's social/emotional and language deficits. Third, the district asserts that it made a timely offer to the student of a seat in a school that would have been able to implement the student's IEP during the 2008-09 school year.

Next, the district alleges that the impartial hearing officer erred to the extent that she made findings unrelated to any specific allegations contained in the parents' due process complaint notice. In particular, the district argues that the impartial hearing officer exceeded the scope of the issues raised by the parents in the due process complaint notice by finding that the lack of special education teachers in every class at the proposed placement rose to the level of a denial of a FAPE to the student. Alternatively, the district argues that regardless of whether the issue was properly raised by the parents in their due process complaint notice, a FAPE was offered to the student. The district contends that the regular education teachers for the few non-CTT classes in which the student would have been enrolled worked closely with the special education teachers to implement their students' IEPs. The district also asserts that the student's principal areas of deficit would have been addressed by both a regular and a special education teacher in his English and social studies CTT classes had he been enrolled in the recommended placement. In light of the foregoing, the district alleges that the student's June 2008 IEP would have been substantively implemented at the recommended placement for the 2008-09 school year.

Next, the district asserts that Winston Prep was not an appropriate placement for the student and was overly restrictive given the student's needs. First, the district alleges that although the student had significant deficits in the areas of speech-language and social/emotional functioning, the student did not receive any related services at Winston Prep. In addition, the district contends that although the hearing record reflects that the student would have benefited from exposure to typically developing peers, Winston Prep did not offer any mainstreaming opportunities. Lastly, the district asserts that the student made little academic progress in numerous areas at Winston Prep during the 2008-09 school year.

Regarding equitable considerations, the district maintains that the equities do not favor an award of relief to the parents. First, the district alleges that the parents' 10-day notice letter failed to afford the district appropriate notice that the parents were rejecting the proposed program. Moreover, the district argues that the parents had no intention of enrolling their son in a district school for the following reasons: (1) pursuant to their April 2008 enrollment agreement with Winston Prep, the parents had committed themselves to payment of the student's tuition for the 2008-09 school year well before the CSE had convened to develop the student's program for that year; and (2) there is no indication in the hearing record that the parents advised the June 2008 CSE that they were considering Winston Prep and/or were obligated to pay the full tuition there per the enrollment agreement.

The parents submitted an answer in which they maintain that the impartial hearing officer's decision should be upheld. First, the parents allege that the district failed to offer the

instruction with sufficient support services to permit the child to benefit educationally from that instruction" (Rowley, 458 U.S. at 203). However, the "IDEA does not itself articulate any specific level of educational benefits that must be provided through an IEP" (Walczak v. Florida Union Free Sch. Dist., 142 F.3d 119, 130 [2d Cir. 1998]; see Rowley, 458 U.S. at 189). The statute ensures an "appropriate" education, "not one that provides everything that might be thought desirable by loving parents" (Walczak, 142 F.3d at 132, quoting Tucker v. Bay Shore Union Free Sch. Dist., 873 F.2d 563, 567 [2d Cir. 1989] [citations omitted]; see Grim, 346 F.3d at 379). Additionally, school districts are not required to "maximize" the potential of students with disabilities (Rowley, 458 U.S. at 189, 199; Grim, 346 F.3d at 379; Walczak, 142 F.3d at 132). Nonetheless, a school district must provide "an IEP that is 'likely to produce progress, not regression,' and . . . affords the student with an opportunity greater than mere 'trivial advancement'" (Cerra, 427 F.3d at 195, quoting Walczak, 142 F.3d at 130 [citations omitted]; see P. v. Newington Bd. of Educ., 546 F.3d 111, 118-19 [2d Cir. 2008]; Perricelli, 2007 WL 465211, at *15). The IEP must be "reasonably calculated to provide some 'meaningful' benefit" (Mrs. B. v. Milford Bd. of Educ., 103 F.3d 1114, 1120 [2d Cir. 1997]; see Rowley, 458 U.S. at 192). The student's recommended program must also be provided in the LRE (20 U.S.C. § 1412[a][5][A]; 34 C.F.R. §§ 300.114[a][2][i], 300.116[a][2]; 8 NYCRR 200.1[cc], 200.6[a][1]; see Newington, 546 F.3d at 114; Gagliardo v. Arlington Cent. Sch. Dist., 489 F.3d 105, 108 [2d Cir. 2007]; Walczak, 142 F.3d at 132; E.G. v. City Sch. Dist. of New Rochelle, 606 F. Supp. 2d 384, 388 [S.D.N.Y. 2009]; Patskin v. Bd. of Educ., 583 F. Supp. 2d 422, 428 [W.D.N.Y. 2008]).

An appropriate educational program begins with an IEP that accurately reflects the results of evaluations to identify the student's needs (34 C.F.R. § 300.320[a][1]; 8 NYCRR 200.4[d][2][i]; Tarlowe v. Dep't of Educ., 2008 WL 2736027, at *6 [S.D.N.Y. July 3, 2008]), establishes annual goals related to those needs (34 C.F.R. § 300.320[a][2]; 8 NYCRR 200.4[d][2][iii]), and provides for the use of appropriate special education services (34 C.F.R. § 300.320[a][4]; 8 NYCRR 200.4[d][2][v]; see Application of the Dep't of Educ., Appeal No. 07-018; Application of a Child with a Disability, Appeal No. 06-059; Application of the Dep't of Educ., Appeal No. 06-029; Application of a Child with a Disability, Appeal No. 04-046; Application of a Child with a Disability, Appeal No. 02-014; Application of a Child with a Disability, Appeal No. 01-095; Application of a Child Suspected of Having a Disability, Appeal No. 93-9). Subsequent to its development, an IEP must be properly implemented (8 NYCRR 200.4[e][7]; Application of a Child with a Disability, Appeal No. 08-087).

The New York State Legislature amended the Education Law to place the burden of production and persuasion upon the school district during an impartial hearing, except that a parent seeking tuition reimbursement for a unilateral placement has the burden of production and persuasion regarding the appropriateness of such placement (Educ. Law § 4404[1][c], as amended by Ch. 583 of the Laws of 2007). The amended law took effect for impartial hearings commenced on or after October 14, 2007; therefore, it applies to the instant case (see Application of the Bd. of Educ., Appeal No. 08-016).

Turning to the instant matter, the impartial hearing officer concluded that the June 2008 CSE's recommendation that the student be placed in a full-time CTT program for the 2008-09 school year was not reasonably calculated to enable the student to make "meaningful educational progress" and therefore, the student was denied a FAPE (IHO Decision at p. 5). Conversely, the

13

district argues on appeal that the June 2008 CSE's recommendation of a CTT classroom in conjunction with the related services of counseling and speech-language therapy would have offered the student a FAPE in the LRE. For the reasons expressed below, after a careful review of the hearing record, I find that the hearing record supports a finding that the June 2008 CSE's recommendation was reasonably calculated to confer educational benefits on the student.

Initially, a review of the challenged IEP reveals that it accurately depicted the student's needs at the time that the IEP was developed. Testimony by the district's witness who participated in the June 2008 CSE and acted as both the district representative and the special education teacher (district representative) indicated that the CSE reviewed the April 2006 private neurodevelopmental evaluation report, Winston Prep Focus teacher reports, and the student's entire educational file and history (Tr. pp. 177-78). The June 2008 IEP reflected the student's present levels of academic performance and learning characteristics consistent with results reported in his last evaluation (the April 2006 neurodevelopmental evaluation report) and current teacher estimates (compare Dist. Ex. 7 at pp. 4-8, 11-16, with Dist. Ex. 3 at p. 3). Consistent with testimony by the district representative, the June 2008 IEP indicated that at that time, the student functioned in the average range of intelligence, with variability among skill areas (Tr. pp. 183, 186; Dist. Ex. 3 at p. 3). The June 2008 IEP noted that the student's perceptual reasoning skills were in the above average range and verbal comprehension and working memory skills were in the average range, while by comparison processing speed skills were "extremely weak" in the impaired range (Dist. Ex. 3 at p. 3). The June 2008 IEP further reflected that the student's visuomotor integration skills, memory skills within the verbal and visual domains, and receptive and expressive language skills were intact (id.). Additionally, the June 2008 IEP indicated that the student's academic fluency was poor, commensurate with his weak processing speed skills (id.). The June 2008 IEP further described the student's reading as "slow but accurate" (id.). According to teacher estimates at the time of the June 2008 CSE meeting, the student was at a "grade level" instructional level in decoding, an eighth grade instructional level in reading comprehension, a ninth grade instructional level in written language, and at or above a grade level instructional level in math (id.). The June 2008 IEP noted the student's difficulty with inferential thinking and that fact based writing was easier for the student (id.). Testimony by the district representative regarding the student's then present levels of academic performance and learning characteristics was consistent with the information included in the June 2008 IEP (Tr. pp. 186-91).

The June 2008 IEP also reflected that the student had been offered a diagnosis of ADHD, for which he took medication, and had controlled asthma for which he took medication as needed (Dist. Ex. 3 at pp. 4-5). Regarding the student's social and emotional needs, the June 2008 IEP indicated that the student reportedly struggled with reading social cues and that his social skills were weak (Tr. pp. 187-88; Dist. Ex. 3 at p. 4). The June 2008 IEP also noted that the student tended to be reserved, inattentive and distractible, but he reportedly was becoming more self-reflective and open to discussing his feelings (Dist. Ex. 3 at p. 4). In addition, the June 2008 IEP reflected that the student's organization and time management skills remained problematic for him (id. at p. 3). Lastly, the June 2008 IEP indicated that the student's behavior did not seriously interfere with instruction and could be addressed by a regular and/or special education classroom teacher; therefore, a behavioral intervention plan (BIP) was not developed (id. at p. 4).

14

The June 2008 CSE also incorporated strategies, supports and testing modifications into the student's IEP that were designed to meet the student's identified needs.  For example, to address the student's academic management needs, the June 2008 CSE recommended that the student receive supports such as graphic organizers, prompts and reminders to structure and organize his writing, to address his organization and time management difficulties, and to address his attention difficulties (Tr. pp. 190-91; Dist. Ex. 3 at p. 3).  The June 2008 IEP reflected the CSE's recommendation to change the student's testing modifications by adding directions read and reread (Tr. p. 204; Dist. Ex. 3 at p. 2).  Testimony by the district representative indicated that this change was made because the purpose of having directions read and reread during a test was "generally to focus the student," and make sure that the student understood the directions, and had an opportunity to ask questions about the test directions (Tr. pp. 204-05).

Turning next to the annual goals enumerated in the challenged IEP, a review of the annual goals and short-term objectives shows that they were aligned with the student's present levels of performance and needs, and the short-term objectives delineated multiple sub-skills that when combined, would likely result in the student achieving the broader skills stated in the annual goals (see Dist. Ex. 3 at pp. 6-9).  An IEP must include a statement of measurable annual goals, including academic and functional goals designed to meet the student's needs that result from the student's disability to enable the student to be involved in and make progress in the general education curriculum; and meet each of the student's other educational needs that result from the student's disability (see 20 U.S.C. § 1414[d][1][A][i][II]; 34 C.F.R. § 300.320[a][2][i]; 8 NYCRR 200.4[d][2][iii]).  For example, one annual goal addressed the student's need to read texts written on his instructional reading level and comprehend what he read on a critical inferential reasoning level (id. at p. 7).  The goal's corresponding short-term objectives focused on the student describing two main characters in each of two texts including character traits and motives; explaining the main idea of five short teacher selected texts; predicting a possible next event occurring after reading five texts; predicting the effect given a cause in five texts, drawing to conclusions in each of five texts, and underlining the pertinent information in the text that led to these conclusions; correctly stating the moral of four fables, and justifying the moral with evidence from each fable; comparing two characters or events in two different texts and using evidence from the text as support; summarizing two texts, both in writing and then verbally, including only the most essential details (id.).  Another goal addressed the student's need to improve his informational writing (id. at p. 8).  The goal's corresponding short-term objectives focused on the student taking notes on a given topic from an informational source, jotting down pertinent words, short phrases relevant to topic; complete a graphic organizer (i.e., semantic map, and outline) for a written piece, organizing the information into correct sections; removing unessential points of information from the outline; writing a rough draft of two essays and two reports using the graphic organizers developed by the student, including appropriate topic sentences and concluding statements; editing two essays and two reports being written for variety of sentence constructions; taking ten sentences chosen by the teacher from a rough draft of a narrative being written, and re-writing for greater clarity and elaboration; editing a rough draft of two essays and two reports for spelling errors; editing a rough draft of two essays and two reports for grammar errors; editing a rough draft of two essays and two reports for punctuation and capitalization errors, and writing a final draft of two essays and two reports using student/teacher corrections on previous rough drafts (id.).  Furthermore, another annual

15

goal addressed the student's need to maintain and continue to develop appropriate peer interactions as demonstrated by the ability to recognize social cues and discuss social interactions (id. at pp. 6, 9). The goal's corresponding short-term objectives focused on the student using socially appropriate language during social interactions with peers; initiating a positive interaction with another student; using appropriate body language and facial expressions; recognizing various facial expressions suggesting different emotions, in order to facilitate social interactions; and developing and implementing three social reasoning and problem solving skills (id. at p. 6). Additional annual goals and their corresponding short-term objectives addressed the student's needs to improve task attention, completion and independence in various school related assignments, and to continue to improve pragmatic language skills (id. at pp. 6, 9).

The district representative testified that she had reviewed the recommended goals and short-term objectives included in the June 2008 IEP, and indicated that the short-term objectives were very focused to assist the student in being able to "tackle more sophisticated books and material on age and grade level," skills that he would need to move on in high school (Tr. pp. 194-95). She also noted that some goals could be used by classroom teachers as well as related service providers (Tr. p. 196). Furthermore, the district representative testified that the student's Focus teacher from Winston Prep participated by telephone for the entire CSE meeting (Tr. p. 205). She added that information regarding the student's academic present levels of performance and learning characteristics provided by the Focus teacher was included in the IEP (Tr. p. 206; Dist. Ex. 3 at p. 3). The district representative testified that in addition, the June 2008 CSE discussed and developed goals for the student based on the specifics that the student's Focus teacher provided during the CSE meeting (Tr. p. 207). The district representative opined that the goals and short-term objectives were appropriate for the student and stated that none of the CSE participants indicated during the meeting that there were other areas that needed to be addressed (Tr. pp. 194, 196-99).[13] In view of the foregoing, the hearing record reflects that at the time that it was created, the June 2008 IEP accurately portrayed the student's needs and contained annual goals and short-term objectives designed to address those needs, which were developed with meaningful parental participation (Tr. pp. 16, 207, 239-44).

Moreover, the hearing record also supports the district's contention that the June 2008 CSE recommended related services that would have appropriately addressed the student's speech-language needs and social/emotional functioning. Testimony by the district representative indicated that in order to address the student's academic and social/emotional difficulties, the CSE recommended related services of counseling,[14] as well as speech-language therapy to address some of the more abstract language processing skills that the student needed to work on in reading and writing (Tr. p. 188).[15] First, regarding counseling, the district

---

[13] As noted above, the student's mother testified that she did not object to the recommended goals (Tr. pp. 242-43).

[14] The witness's testimony indicated that counseling had also been recommended in a previous IEP (Tr. p. 188).

[15] Testimony by the student's mother indicated that she did not object to the recommended related services and thought that the June 2008 CSE's recommendations for counseling and speech-language therapy were appropriate for the student (Tr. pp. 242-44).

representative testified that the June 2008 IEP included counseling goals (Tr. p. 191). She opined that in a small group of students (3:1), the student would be able to work out some of his social difficulties with a guidance counselor, a psychologist, or a social worker (Tr. p. 192). The district representative further indicated that the behavioral concerns regarding the student's maturity as well as his need to develop good peer relationships as discussed by student's Focus teacher who participated in the CSE meeting, would be best addressed in a small group facilitated by someone who specialized in behavioral and social difficulties (such as one of the aforementioned professionals available at the proposed placement) with students that had those kinds of needs (id.).

Additionally, the June 2008 CSE recommended individual speech-language therapy two times per week for the student because according to the district representative, "he was so close on some of the academic areas in terms of being able to reach his grade level that we wanted to give him very focused help in some of the language processing, more abstract language processing, issues that might be affecting his reading and writing" (Tr. pp. 192-93).

Furthermore, a review of the hearing record reflects the student's long standing need for related services. The April 2006 private neurodevelopmental evaluation report revealed that one of the evaluators was of the opinion that the student's private school at the time was a "poor fit" for him as it lacked a number of resources including a psychologist, and that the private school did not meet the student's needs (Dist. Ex. 7 at pp. 1, 8). At the time of the impartial hearing, testimony by the dean from Winston Prep indicated that the student did not receive any related services at the private school (Tr. p. 104).[16] Moreover, the student's Focus teacher for the 2008-09 school year opined that the student had social/emotional and pragmatic language deficits that needed to be addressed (Tr. pp. 156-57).

Next, I will address the district's contention that the student's IEP would have been substantively implemented at the recommended placement.

Before reaching the merits of this claim, I must first address a threshold matter. Notwithstanding its assertion that the proposed placement would have appropriately implemented the student's June 2008 IEP, the district first alleges that the impartial hearing officer erred by finding that the lack of a special education teacher in every class at the recommended placement would have resulted in a denial of a FAPE to the student, an issue which was not identified in the due process complaint notice. An impartial hearing officer must confine her determination to issues raised in the parents' due process complaint notice (see 20 U.S.C. § 1415[c][2][E], [f][3][B]; 34 C.F.R. §§ 300.508[d][3], 300.511[d]; 8 NYCRR 200.5[i][7][i], [j][1][ii]; Application of the Bd. of Educ., Appeal No. 08-085; Application of the Dep't of Educ., Appeal No. 08-056; Application of a Child with a Disability, Appeal No. 07-051; Application of a Child with a Disability, Appeal No. 07-047; Application of a Child with a Disability, Appeal No. 06-139; Application of a Child with a Disability, Appeal No. 06-065; Application of a Child with a Disability, Appeal No. 04-019; Application of a Child with a

---

[16] See Werner, 363 F. Supp. 2d at 660 (holding that the parents failed to sustain their burden of demonstrating the appropriateness of a private placement where the hearing record did not demonstrate that the placement provided special education services designed to address the student's area of need).

17

Disability, Appeal No. 03-095; Application of a Child with a Disability, Appeal No. 02-024; Application of a Child with a Disability, Appeal No. 01-024; Application of a Child with a Disability, Appeal No. 99-060). Here, although the parents did not raise this issue in the due process complaint notice, a review of the hearing record reveals that it was addressed during the impartial hearing and the district did not raise any objection as a result thereof (see Tr. pp. 20, 31, 33-34, 68-69; Parent Ex. A). Further review of the hearing record reflects that the district also raised this issue during the impartial hearing (see Tr. pp. 20, 31, 33-34, 68-69). Therefore, the district's claim that the impartial hearing officer exceeded the scope of her review is not persuasive. Accordingly, I will review the matter. Having considered this issue, as set forth in greater detail below, I disagree with the impartial hearing officer and find that the student's special education needs would have been addressed in his CTT core academic classes and in his general education elective classes,[17] and that the lack of a special education teacher in the student's elective classes did not rise to a denial of FAPE in this case.

Here, the district asserts that the few regular education teachers that the student would have had at the recommended placement worked closely together to implement their students' IEPs. In her description of a tenth grade CTT class at the recommended placement, the assistant principal testified that a regular education teacher and a special education teacher collaboratively planned and co-taught the class (Tr. p. 30). She also noted that she was familiar with the tenth grade CTT teachers for the 2008-09 school year (id.). The assistant principal testified that the CTT setting was provided for the subjects of math, science, English, and social studies (Tr. pp. 31, 33). The students in the tenth grade CTT class were together for all classes taught in the CTT setting, and usually were together if they were scheduled for the same electives (Tr. pp. 36-37). She also explained that for other required or elective classes such as Spanish, there would be a general education tenth grade class in which the student would be provided with support (Tr. p. 34). For example, the assistant principal testified that the regular education teacher for Spanish would have a copy of every special education student's IEP and would meet regularly with the special education department to structure lessons and to assist special education students in meeting their IEP goals (id.). In regard to this student's elective classes such as Spanish, physical education and music, the compliance coordinator testified that the student would be in general education classes (Tr. pp. 69-70). The compliance coordinator also indicated that the regular education teachers communicated with the special education teacher about the special education students in their classes on a regular basis (Tr. p. 76). All of the regular education teachers had copies of the special education students' IEPs and discussed with the special education teacher accommodations or any other management needs to which a student was entitled (Tr. p. 77). Based on the foregoing, the hearing record supports the district's assertion that the student would have been provided with personalized instruction with sufficient support to permit him to benefit educationally from instruction by ensuring the substantial implementation of the June 2008 CSE's recommendations in the few non-CTT classes that the student would have attended.

Moreover, the hearing record supports the district's claim that the June 2008 CSE's recommendation that the student attend a CTT class would have nurtured the student's academic

---

[17] According to the hearing record, elective subjects such as art, music, law and technology are required for graduation (Tr. p. 33).

strengths and offered him frequent interaction with typically developing peers, thereby conveying educational benefits to him. Testimony by the district representative who participated in the June 2008 CSE indicated that the CSE believed that a CTT class with related services was appropriate for the student (Tr. p. 183).[18] According to the district representative, the June 2008 CSE wanted the student to be exposed to a general education curriculum because it saw a profile of a student with "average, if not in some areas even higher, superior intelligence in certain areas of academics," as well as some "IQ breakdowns" that were in the very high performing range (id.). The district representative further explained that if he were in a CTT class, the student would have had access to general education students, something that she opined would be beneficial for him because he had areas that needed to be developed with other students who were on his level and who had the same interests, abilities and potential to understand material that was both grade appropriate and age appropriate (Tr. pp. 184-85). The district representative also noted that the student would not benefit from a program where everyone else was on a lower level than he was, as he would not be stimulated in an environment where everyone else was working on much lower levels (Tr. p. 185). The district representative further testified that the student's social/emotional development would benefit from a CTT class because he would have role models to interact with and learn from socially (id.). In addition, the district representative opined that the student's needs would be met in a CTT environment because there was a certified special education teacher who would travel with and work with a group of up to 14 students (Tr. p. 200). The special education teacher would modify any instruction to support the students in the CTT class, in conjunction with the regular education teacher, whom the hearing record described as "a second person to provide the stimulation in the curriculum on level" (id.). In light of the foregoing, the hearing record reflects that the June 2008 CSE had a sufficient basis upon which to make their recommendation that the student be placed in a CTT classroom for the 2008-09 school year.

Furthermore, the assistant principal testified that the school had "a lot of special education students," and that all of the teachers at the school were trained in reading IEPs, in differentiating instruction, and in classroom management (Tr. p. 27). The assistant principal noted that she supervised teachers individually and in groups, observed classrooms and instruction, and monitored curriculum and the implementation of curriculum (id.). She reported that all teachers received at least two formal observations that were preceded by multiple informal instructional observations, and that she met with teachers "almost every day" (id.). The assistant principal testified that the proposed high school also had related service providers and offered speech-language therapy and counseling services (Tr. p. 28). In the event that the student had attended the proposed high school in September 2008, speech-language therapy and counseling services would have been available to him (Tr. p. 29). The assistant principal testified that related service providers and classroom teachers communicated about students informally, "almost every day" because the related service providers instructed students within the classroom as well as outside of the classroom (id.). She stated that the related service providers assisted the teachers in how to modify instruction for students and may work with the teacher within the classroom and model lessons specifically geared toward helping a student (Tr.

---

[18] Additional testimony by the district representative indicated that by the conclusion of the June 2008 CSE meeting, the CSE team was aware that the parents and their educational advocate did not agree with the CSE's program recommendation for the student (Tr. pp. 203-04, 212).

because lessons were differentiated according to the abilities and interests in the classroom and the teacher was able to respond to students' needs more readily (Tr. pp. 54-55). She stated that the classroom curriculum addressed State standards and it was "adapted and modified" according to each student's IEP (Tr. p. 55).

The compliance coordinator further testified that teachers formally and informally assessed students at the beginning of the school year using a baseline assessment tool, interest inventories, and modality styles, as well as district assessments, observations, journal entries, portfolios, and conferences (Tr. pp. 56-57). She also testified that it was important for the teacher to assess the student at the beginning of the school year so that the teacher would know where the student was at the time, as well as what the teacher needed to teach the student, and to determine groupings of students in order to move students to the next level (Tr. p. 58). Weekly informal assessments were conducted on an ongoing basis to determine if students had reached their goals (Tr. pp. 57, 62). The compliance coordinator's testimony was consistent with the district representative's testimony regarding the CTT classes offered during the 2008-09 school year at the proposed placement in English, math, social studies, and science (Tr. p. 58). Her testimony was also consistent with the testimony by the district representative in regard to her understanding of the student's deficit areas, her opinion of the appropriateness of the annual goals and short-term objectives included in the student's June 2008 IEP, and implementation of classroom modifications and related services to address the student's needs (Tr. pp. 59-68). In light of the foregoing, the hearing record supports the district's assertion that the student's principal areas of deficit would have been addressed by a general and special education teacher and in turn, that the student's IEP would have been substantively implemented in the recommended placement (see Application of the Dep't of Educ., Appeal No. 08-105).

Having decided that the impartial hearing officer erred in determining that the district failed to offer the student a FAPE, I need not address the parties' remaining contentions, including the issue of whether Winston Prep was appropriate, and accordingly the necessary inquiry is at an end (see M.C. v. Voluntown, 226 F.3d 60, 66 [2d Cir. 2000]; Walczak, 142 F.3d at 134; Application of a Child with a Disability, Appeal No. 05-038; Application of a Child with a Disability, Appeal No. 03-058).

I have considered the parties' remaining contentions and need not address them in light of my decisions herein.

THE APPEAL IS SUSTAINED.

Dated:     Albany, New York
           March        , 2010
                 / 2

PAUL F. KELLY
STATE REVIEW OFFICER

21

# EXHIBIT "B"

# FINDINGS OF FACT AND DECISION

| | |
|---|---|
| Case No. | 120133 |
| SED ID No. | 42296 |
| Student's Name: | Benjamin Levy |
| Date of Birth: | May 8, 1993 |
| District: | 2 |
| Hearing Requested by: | Parents |
| Dates of Hearings: | May 18, 2009<br>May 21, 2009<br>June 24, 2009<br>July 23, 2009 |
| Record Close Date: | November 27, 2009 |
| Hearing Officer: | Mindy G. Wolman, Esq. |

Findings of Fact and Decision
Case No. 120133

2

On January 15, 2009, the parents (the "Parents") of Benjamin L. filed a request for an impartial hearing under the Individuals with Disabilities Education Act, 20 U.S.C. section 1415(f) and Section 4404(1) of the New York State Education Law. I was appointed as impartial hearing officer in the within proceeding on March 11, 2009, after the recusal of the impartial hearing officer originally appointed to hear this case. The matter came on for hearings on May 18, 2009, May 21, 2009, June 24, 2009, and July 23, 2009.

Lists of the persons who appeared at the hearings, the documentary evidence submitted, and the compliance date extensions are appended to this Order.

## BACKGROUND AND POSITIONS OF THE PARTIES

Benjamin is 16 years old and is classified as a student with a disability under the "other health impairment" disability category. His classification and eligibility for special education supports and services is not in dispute. The Parents unilaterally placed Benjamin at Winston Preparatory School ("Winston" or "Winston Prep") for the 2008-2009 school year. The within proceeding involves their request for reimbursement for the cost of that unilateral placement.

The Parents contend that the New York City Department of Education ("DOE") failed to offer Benjamin an appropriate program and placement for the 2008-2009 school year, that the Winston Prep program was appropriate (it met Benjamin's special education needs), and that equitable factors support their claim for reimbursement. The student's mother testified at the hearing. The Parents also presented the testimony of a dean and a teacher from Winston. The Parents' documentary evidence includes the hearing request, information about Winston (including the contract and data regarding payment and attendance), an Individualized Education Program ("IEP"), correspondence, progress reports, and the schedule and profile for Benjamin's class at Winston. The Parents request that I direct the DOE to reimburse them for the Winston Prep tuition, in the amount of $43,500.00, for the 2008-2009 school year.

The DOE contends that its Committee on Special Education ("CSE") offered Benjamin an appropriate program and placement for the 2008-2009 school year, that the Winston Prep program was not appropriate, and that equitable factors do not support the Parent's reimbursement claim. The DOE offered the testimony of the assistant principal from the CSE's recommended placement and of a special education teacher/compliance coordinator assigned to the CSE. The DOE's

documentary evidence included the hearing request, the DOE response, an IEP, the CSE's Final
Notice of Recommendation ("FNR"), a progress report, a social history update, a
neurodevelopmental evaluation and the contact/payment information. The testimony and
documentary evidence will be discussed more fully below.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

The IDEA provides that children with disabilities are entitled to a Free Appropriate Public
Education ("FAPE") (20 U.S.C. § 1400 [d][1][A]. A FAPE consists of specialized education and
related services embodied in an IEP (34 C.F.R. § 300.13). A FAPE is offered when (a) the board of
education complies with the procedural requirements set forth in the IDEA; and (b) the IEP is
developed through the IDEA's procedures and is reasonably calculated to enable the student to
receive educational benefits (Bd. of Educ. of the Hendrick Hudson Cent. Sch. Dist. v. Rowley, 458
U.S. 176, 206-07 [1982]).

A board of education may be required to pay for educational services obtained for a child
by the child's parent, if the services offered by the board of education were inadequate or
inappropriate, the services selected by the parent were appropriate, and equitable considerations
support the parent's claim. (School Committee of the Town of Burlington v. Department of
Education, Massachusetts, 471 U.S. 359 [1985]; Florence County School District Four et al. v.
Carter by Carter, 510 U.S. 7 [1993]; see also Frank G. and Dianne G. v. Bd. of Educ. of Hyde
Park, 459 F.3d 356 [2d Cir. 2006], cert denied, Board of Educ. of Hyde Park Cent. School Dist. v.
Frank G., 2007 WL 2982269 [Oct. 15, 2007].

The DOE has the burden of establishing that it provided Benjamin with a FAPE.
Benjamin is diagnosed has having Attention Deficit Hyperactivity Disorder ("ADHD"), a
processing disorder, and possible visual tracking deficits (Parent Exh. 7). Benjamin is unable to
process information quickly and has difficulty in staying focused. As of his most recent assessment
(April 2006), Benjamin' cognitive functioning (with the exception of his processing speed) was in
the average to high average range. Benjamin was attending Winston Prep at the time that the CSE
met to make program recommendations for the 2008-2009 school year. In making its
recommendations, the CSE relied on a 2006 neurodevelopmental evaluation, an updated social

Findings of Fact and Decision                                                    4
Case No. 120133

history, and Winston Prep progress reports.[1] According to testimony presented at the hearing held
herein, the CSE's recommendation that Benjamin be placed in a Collaborative Team Teaching
("CTT") was based on the report that his intellectual functioning was in the average to high
average range. The DOE maintains that the recommended program was in the least restrictive
environment ("LRE"), and that Benjamin would have benefitted by the exposure to appropriate
role models in the general education setting. The CTT recommendation for the 2008-2009 school
year represented a change to a less restrictive setting. The CSE's recommendations for the prior
year had been for placement in a 12:1 special class (Parent Exh. A at 1). However, there was
nothing in the documentation and reports considered by the CSE that warranted moving Benjamin
to a less restrictive setting. To the contrary, the neurodevelopmental evaluation relied on by the
CSE specifically recommended that Benjamin be placed in small classes (DOE Exh. 7). There
were no new evaluations (other than a social history update). Benjamin had been making progress
in his small classes at Winston Prep. Nothing in the Winston Prep Progress Reports or Social
History supported the CSE's determination to change Benjamin to less restrictive setting. Even
though Benjamin's cognitive functioning was in the average to above average range, his slow
processing speed, impulsivity, distractibility, and social skills deficits required that he be placed in
a small class setting.

Processing speed "refers to how fast information travels to the brain" (DOE Exh. 7 at 4).
Processing speed delays can adversely effect both short-term memory and long-term retrieval
(DOE Exh. 7 at 4). In the 2006 neurodevelopmental evaluation, the evaluator noted that:

> Students experiencing a general Processing Speed disability often
> have learning difficulties in all academic areas, due to their inability
> to process all types of information quickly. Specific difficulties may
> include: reading, reading speed, ability to stay focused while reading,
> math, completing a series of problems, written language, writing
> speed, mechanics, clarity (with time pressure), delays in responding,
> slow speech, coping with implied or expressed time pressures,
> difficulty maintaining attention to tasks, exceeding time limits during

---

[1] The DOE's Response to the Due Process Complaint (DOE Exh. 2) also refers to a classroom observation and
psychoeducational evaluation, but these documents were not included in the documentary evidence.

Findings of Fact and Decision
Case No. 120133

5

> tests, trouble with social pressures to respond 'faster'" (DOE Exh. 7 at 5).

At the time of the 2006 neurodevelopmental evaluation, Benjamin's processing speed was in the 5th percentile (DOE Exh. 7). His extremely delayed processing speed would have made it impossible to function in a CTT setting. His ADHD issues (impulsivity and difficulty remaining on tasks) and social skills deficits would have compounded the problem. The CSE's recommendation that Benjamin be placed in a full-time CTT program for the 2008-2009 school year was not reasonably calculated to enabled Benjamin to make meaningful educational progress.

The DOE objected to my considering the issue of whether or not the CSE's recommended placement at the Cobble Hill School of American Studies ("Cobble Hill") was appropriate. It contends that the issue was not properly raised in the due process complaint and thus is beyond the scope of this hearing. However, as I noted at the hearing, the due process complaint specifically refers to the Cobble Hill placement (Parent Exh. A at 1). The due process complaint avers that:

> The parents believe that the recommended placement is not reasonably calculated to confer educational benefits on Benjamin. After observing the CSE recommended placement, the parents believe that a class with a 14:1 student to staff ratio is too large and will not allow their son to receive the individual attention that he requires in order to be appropriately educated. In addition, while observing the placement, Mrs. Levy observed several instances of problem behaviors by the students without the teacher being able to control such outbursts. After Mrs. Levy's observation of the placement, the parents provided written notice to the DOE of their findings, of the fact that Benjamin would be enrolled in [Winston Prep] and that they would be requesting an impartial hearing in the near future. (Parent Exh. A at 2)

The due process complaint thus addressed both the CSE's June 10, 2008 IEP and the July 23, 2008 recommendation for placement at Cobble Hill. As such, I reject the DOE's contention that I may not consider whether the Cobble Hill placement was an appropriate placement for Benjamin.

The June 10, 2008 IEP indicated that Benjamin should be placed in CTT classes for "all periods" (DOE Exh. 3 at 10). Cobble Hill would not have provided Benjamin with that level of support. It would not have implemented the CSE's recommendation for full time placement in

CTT classes. Instead, the Cobble Hill CTT program would have provided Benjamin with CTT
classes for English, Math, Science, and Social Studies. The remaining three to four periods per day,
which would have included physical education and required electives, would have been in large
general education classes without a special education teacher or any other special education
support. Reportedly, Benjamin's general education teachers at Cobble Hill would have been
provided with a copy of his IEP and would have had the opportunity to consult with a special
education teacher upon request. This is a much lower level of support than the support mandated
by the IEP (a general education teacher and a special education teacher in every class).

Based on the foregoing, I find that the DOE did not establish that the CSE's
recommendations for the 2008-2009 school year were reasonably calculated to meet Benjamin
special education needs. The CSE's recommendation to place him in a CTT program was not
reasonably calculated to allow him to make meaningful educational progress. Even if the full-time
CTT program could have met Benjamin's special education needs during the 2008-2009 school
year, the Cobble Hill CTT program would not have provided him with the full-time CTT program
mandated by his IEP. Having found that the DOE did not establish that it offered this student and
appropriate program and placement for the 2008-2009 school year, I find that the Parents have met
the first of the three Burlington/Carter criteria for tuition reimbursement..

The Parents have the burden of proving that the placement that they chose for their son was
appropriate (that it met his special education needs). In order to meet this standard, the unilateral
parental placement need not employ special education teachers or have its own IEP for the student.

Benjamin was placed in small (12:1) classes at Winston Prep. The other students in his
classes had similar functional levels and similar academic and management needs. Benjamin had
the daily 1:1 support of a FOCUS teacher, whose role was to monitor Benjamin and provide him
with individualized support in his key deficit areas. The FOCUS teacher also served as a
coordinator with the rest of Benjamin's "educational team" (the other Winston Prep teachers) and
as liaison with the Parents in order to "maximize the educational experience" and "help create the
most effective [educational] environment" for him (Tr. 6/24/09 at 134). The Winston Prep
Progress Reports (Parent Exhs. I and J) reveal that Benjamin's teachers implemented very specific

methodologies and supports in order to address his unique special education needs. His FOCUS teacher specifically addressed Benjamin's key deficit areas, as reflected by the goals listed in the Progress Reports (reading, writing, organizational skills, study and homework skills, and social functioning). The FOCUS teacher implemented specific methods and strategies to address these areas of weakness (Parent Exhs. I and J). In the Winston Progress reports, each of Benjamin's teachers listed the goals they were working on and the specialized instruction/methods being used to address Benjamin's deficit areas (Parent Exh. I and J). The Progress Reports and the testimony of Winston Prep staff established that Benjamin made academic, social and behavioral progress during the 2008-2009 school year at Winston Prep (Tr. 6/24/09; Parent Exhs. I and J). Benjamin passed all of his classes during the 2008-2009 school year and is on track toward earning his high school diploma.

Based on the foregoing, I find that the Winston Prep program met Benjamin's special education needs for the 2008-2009 school year. The Parents have therefore met the second of the three Burlington/Carter criteria for tuition reimbursement.

The determination of whether or not equitable factors support a parent's claim for tuition reimbursement hinges, in large part, on whether or not a parent cooperated with the CSE. Tuition reimbursement may be denied when a parent has (by action or inaction) interfered with the CSE evaluation, program development and placement process.

There is nothing in the Record that would preclude reimbursement on equitable grounds. The DOE contends that the Parents never intended to send Benjamin to a public school for the 2008-2009 school year. However, the unrebutted and credible testimony of Benjamin's mother establishes that they would have sent him to public school had an appropriate program been offered. Moreover, even if this were not the case, parental subjective intent does not constitute an equitable bar to tuition reimbursement. Parents must cooperate with the CSE, but their subjective intent in so doing is irrelevant.

The appropriate inquiry regarding parental cooperation with the CSE is whether a parent's actions, or inactions, interfered with the CSE's program development and placement process. The Parents in this proceeding fully cooperated with the CSE. Benjamin's mother attended the CSE meeting, participated in the social history update, and provided the CSE with the Winston Prep

Findings of Fact and Decision
Case No. 120133

8

Progress Reports and a privately obtained neurodevelopmental evaluation. Benjamin's mother also promptly advised the CSE that she disagreed with its recommendation for placement in a CTT program. She made this clear at the CSE meeting on June 10, 2008. After receiving the CSE's Final Notice of Recommendation (DOE Exh. 4), the Parents provided the CSE with written notice that they were rejecting the CSE's proposed placement, and that they would be unilaterally placing their son at Winston Prep and seeking tuition reimbursement. Benjamin's mother was unable to visit the CSE's proposed placement in September of 2008 because she had surgery. She did, however, visit the school, observe the CTT class, and speak with school staff in October of 2008. She sent an additional written notice to the CSE indicating that she had observed the program and found that it was inappropriate for her son (Parent Exh. G). The notice indicated that the Parents were rejecting the Cobble Hill placement and specified the reasons for that rejection (Parent Exh. G).

Based on the foregoing I find that equitable factors support the Parents' claim for tuition reimbursement. The Parents have therefore met all three prongs of the Burlington/Carter analysis and are entitled to an order directing the DOE to reimburse them for the cost of Benjamin's 2008-2009 placement at Winston Prep. The Record in this proceeding includes the Winston Prep contract (Parent Exh. N), proof of payment in the form of an affidavit (Parent Exh. O) and copies of canceled checks and withdrawals slips (Parent Exh. P), and proof of attendance (Parent Exh. M). There is therefore no need for the Parents to submit any additional documentation prior to receiving reimbursement from the Department of Education.

**ORDER**

**IT IS HEREBY ORDERED** that the New York City Department of Education is directed to reimburse the Parents for the cost of Benjamin's placement at Winston Preparatory School for the 2008-2009 school year in the amount of $43,500.00; payment shall be remitted to the Parents in that amount within (30) days of the date hereof.

Dated: December 4, 2009

MINDY G. WOLMAN
Impartial Hearing Officer

Hearing Office
Distribution Date: 12/7/09

Findings of Fact and Decision                                                                    9
Case No. 120133

## PLEASE TAKE NOTICE

Within 35 days of the date of this decision, the parent and/or the Board of Education of the City of New York has a right to appeal the decision to the State Review Officer of the New York State Education Department under Section 4404 of the Education Law and the Individuals with Disabilities Education Act.

"The notice of intention to seek review shall be served upon the school district not less than 10 days before service of a copy of the petition for review upon such school district, and within 25 days from the date of the decision sought to be reviewed. The petition for review shall be served upon the school district within 35 days from the date of the decision sought to be reviewed. If the decision has been served by mail upon petitioner, the date of mailing and the four days subsequent thereto shall be excluded in computing the 25- or 35-day period." (8NYCRR279.2[b])  Failure to file the notice of intention to seek review is a waiver of the right to appeal this decision.

Directions and sample forms for filing an appeal are included with this decision. Directions and forms can also be found in the Office of State Review website: www.sro.nysed.gov/appeals.htm.

Findings of Fact and Decision
Case No. 120133

10

## NAMES AND TITLES OF PERSONS WHO APPEARED ON MAY 18, 2009

Tse Levy                     Mother
Joan A. Harrington           Advocate                        Parents
Joshua Feuer, Esq.           Attorney                        Department of Education
Suzanne Thomas*              Assistant Principal             Department of Education
  (By Telephone)

## NAMES AND TITLES OF PERSONS WHO APPEARED ON MAY 21, 2009

Tse Levy                     Mother
Joan A. Harrington           Advocate                        Parents
Joshua Feuer, Esq.           Attorney                        Department of Education
Gail Trimmer*                Compliance Coordinator          Department of Education
  (By Telephone)

## NAMES AND TITLES OF PERSONS WHO APPEARED ON JUNE 24, 2009

Tse Levy                     Mother
Joan A. Harrington           Advocate                        Parents
Joshua Feuer, Esq.           Attorney                        Department of Education
Carole Schacter*             IEP Coordinator                 Department of Education
  (By Telephone)
Robert Bodall*               Dean and Teacher                Parents
  (By Telephone)
Mayer Weiner*                Focus Teacher                   Parents
  (By Telephone)

## NAMES AND TITLES OF PERSONS WHO APPEARED ON JULY 23, 2009

Tse Levy*                    Mother
Joan A. Harrington           Advocate                        Parents
Joshua Feuer, Esq.           Attorney                        Department of Education

*Individuals who gave testimony

Findings of Fact and Decision
Case No. 120133                                                                11

## DOCUMENTS ENTERED INTO THE RECORD

| Exh. | Description | Party |
|------|-------------|-------|
| A. | Impartial Hearing Request, 1/15/09, 4 pp. | Parents |
| B. | School Description, undated, 3 pp. | Parents |
| C. | Individualized Education Program, 6/10/08, 12 pp. | Parents |
| D. | Final Notice of Recommendation, 7/23/08, 1 p. | Parents |
| E. | Letter from Parent, 8/15/08, 1 p. | Parents |
| F. | Delivery Confirmation, 8/15/08, 1 p. | Parents |
| G. | Letter from Rachel Shamah, 10/10/08, 1 p. | Parents |
| H. | Fax Confirmation, 10/10/08, 1 p. | Parents |
| I. | Student Progress Report, Fall 2008, 6 pp. | Parents |
| J. | Student Progress Report, Winter 2009, 5 pp. | Parents |
| K. | Class Profile, undated, 3 pp. | Parents |
| L. | Class Schedule, 2008-2009, 1 p. | Parents |
| M. | Attendance Record, 2008-2009, 4/24/09, 1 p. | Parents |
| N. | Enrollment Contract 2008-2009, 4/22/08, 1 p. | Parents |
| O. | Affidavit of Payment, 4/24/09, 1 p. | Parents |
| P. | Copies of cancelled checks and withdrawal slips, 2008-2009, 3 pp | Parents |
| 1. | Hearing Request, 1/15/09, 3 pp. | Department of Education |
| 2. | Due Process Response, 1/16/09, 3 pp. | Department of Education |
| 3. | Individualized Education Program, 6/10/08, 14 pp. | Department of Education |
| 4. | Final Notice of Recommendation, 7/23/08, 1 p. | Department of Education |
| 5. | School Progress Report, Winter 2008, 5 pp. | Department of Education |
| 6. | Social History Update, 9/18/07, 2 pp. | Department of Education |
| 7. | Neurodevelopmental Evaluation, 4/17/06, 16 pp. | Department of Education |
| 8. | School Affidavit, 4/7/09, 1 p. | Department of Education |

Findings of Fact and Decision
Case No. 120133

12

## COMPLIANCE DATE EXTENSIONS

| Date Granted | Party Requesting | Reason | New Decision Date |
|---|---|---|---|
| 3/24/09 | Joint | Scheduling Conflicts | 4/29/09 |
| 4/1/09 | Joint | Scheduling Conflicts | 5/29/09 |
| 5/18/09 | Joint | Availability of Witnesses | 6/29/09 |
| 6/24/09 | Joint | Extensive Testimony/Issues | 7/28/09 |
| 7/23/09 | District | Preparation & Review of Transcript | 8/27/09 |
| 9/1/09 | Parents | IHO Technology issues; computer network malfunction; data loss due to computer rootkit virus[2] | 9/26/09 |
| 9/2/09 | Parents | IHO Technology issues; computer network malfunction; data loss due to computer rootkit virus | 10/26/09 |
| 11/17/09 | Parents | IHO needed additional time to review and consider Extensive Record/Testimony/Issues after resolving technology issues | 11/27/09 |

---

[2] As set forth in an email communications to both parties, the preparation of the decision in this case was delayed by a series of malfunctions on the Hearing Officer's computer, office network, and internet connection. These technical issues, which adversely impacted the processing of all pending decisions, resulted in data loss and required replacement of the modem and router, reconfiguration of the network, and reinstallation of the operating system and applications software. Upon receiving notice of these problems, the Parents requested extensions of the compliance date in order to allow time for the Hearing Officer to address the problems. The DOE did not object to the extensions of the compliance date.