UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------- x

T.L. and D.L. on behalf of their child B.L.,

                                        Plaintiffs,

                    -against-

THE DEPARTMENT OF EDUCATION OF
THE CITY OF NEW YORK a/k/a THE BOARD
OF EDUCATION OF THE CITY SCHOOL
DISTRICT OF THE CITY OF NEW YORK,

                                        Defendant.

-------------------------------------------------------------- x

**DEFENDANT'S LOCAL
RULE 56.1 STATEMENT OF
UNDISPUTED FACTS**

10 CV 3125 (SLT) (LB)

        Pursuant to Rule 56.1 of the Local Rules of this Court, and in support of its motion for

summary judgment, defendant New York City Department of Education ("DOE") submits that

the following material facts are undisputed:

        1.      Plaintiffs T.L. and D.L. are the parents of B.L. ("the Student").  See, e.g., Def.'s

Ex. 3 at 1.[1]

        2.      Plaintiffs presently appeal from the decision of the State Review Officer ("SRO")

of the New York State Education Department dated March 12, 2010, finding that defendant DOE

offered the Student a free appropriate public education ("FAPE") as set forth in the Individuals

with Disabilities Education Act ("IDEA"), 20 U.S.C. §§ 1400-1482, for the 2008-2009 school

year and denying plaintiffs' request for reimbursement for tuition stemming from plaintiffs'

unilateral placement of the Student at the Winston Preparatory School ("Winston Prep").  See

Compl. Ex. A.

---

[1] Unless otherwise indicated, citations to "Def.'s" and "Pls.'" exhibits refer to the exhibits
submitted by the parties in the state administrative proceedings and made part of the hearing
record provided to this Court.

3.      The Student was born on May 8, 1993. <u>See, e.g.</u>, Def.'s Ex. 3 at 1. As of the 2008-2009 school year at issue, he was fifteen years old and attending tenth grade at Winston Prep. <u>See, e.g.</u>, Pls.' Ex. A at 1-2. He had been classified as a student with Other Health Impairment. <u>See</u> Def.'s Ex. 3 at 1.

4.      During the two school years prior to the 2008-2009 school year (eighth grade and ninth grade), the Student had been attending Winston Prep. <u>See, e.g.</u>, Tr. of Impartial Hrg. before Mindy Wolman, Impartial Hearing Officer, in Case No. 120133 at 244, May 18-July 23, 2009 [hereinafter "Tr."].[2]

5.      In 2006, a school psychologist and a developmental pediatrician at the McCarton Center conducted a private neurodevelopmental evaluation of the Student. <u>See</u> Def.'s Ex. 7 at 1, 10. In describing the Student's medical and developmental history, the evaluators reported that he had been diagnosed with Attention Deficit Disorder/Hyperactivity (ADHD) and was taking medication for it. <u>See id.</u> at 1. At the time, the Student was in a general education class, with a special education consultant teacher "available." <u>Id.</u> One of the McCarton evaluators opined that the Student's school at that time was "a poor fit" and "lacks appropriate resources," because "[f]or example, there is no school psychologist." <u>Id.</u>

6.      Based on a series of tests, observations, and information from the Student's mother (plaintiff T.L.) and teachers, the evaluators concluded that the Student's "intellectual ability is average to high average, with the exception of processing speed, where he exhibits significant difficulty." <u>Id.</u> at 7. Specifically, the Student's verbal comprehension skills were average to high average, his perceptual reasoning skills were high average to superior, his working memory skills were average to high average, and his processing speed was very low.

_____

[2] The impartial hearing was conducted over four dates: May 18, 2009, May 21, 2009, June 24,

<u>See</u> <u>id.</u> at 4. Test findings also revealed that the Student had average visual-motor ability, that his verbal memory skills were significantly stronger than his visual memory skills but that his ability to learn visual information was within average limits, and that his receptive and expressive vocabulary skills were average. <u>See</u> <u>id.</u> at 5-7. The evaluators further stated that the Student's "academic skills in the areas of reading, writing, mathematics, spelling, understanding directions and memory, are all within age appropriate limits" and that the Student "faces the most challenge when required to complete a task within a time limit." <u>Id.</u> at 7. The evaluators also noted that the Student had "some attentional weaknesses," stating that his teachers and mother had reported attentional weaknesses, but that the Student's performance on the assessment of attentional skills was good. <u>See</u> <u>id.</u> at 6, 7.

7. The evaluators further observed that the Student "had improved academically across the board" since a prior McCarton evaluation in 2002. <u>Id.</u> at 8. They concluded that the Student was "generally functioning well, although he requires some additional intervention to help him achieve his full potential," and made several recommendations for the Student, including classroom modifications, continuation of his medication, extended time limits on standardized tests and testing in a separate location, and placement in a school with "small classes and specialized resources" to meet his needs. <u>Id.</u> at 8-9. The evaluators also suggested a few schools, including Winston Prep. <u>See</u> <u>id.</u> at 9.

8. A DOE Social Worker/Educational Evaluator completed a Social History Update for the Student on September 18, 2007. <u>See</u> Def.'s Ex. 6. The Social History Update primarily consisted of information reported by plaintiff T.L. <u>See</u> <u>id.</u> Among the information that plaintiff T.L. reported was that the Student was attending Winston Prep and making progress there, but

2009, and July 23, 2009.

that he had some difficulties with reading, writing, and organization, and was taking medication to help him focus.  See id. at 1.  The report also noted that while socializing was not always easy for the Student, he "is able to get along well with others" and that there "are no behavior problems . . . it is more that [the Student] tends to be socially immature."  Id.  The report also stated that plaintiff wanted the Student to remain at Winston Prep.  See id. at 2.

9.      On April 15, 2008, plaintiff T.L. signed an Enrollment Agreement for the Student's enrollment at Winston Prep for the 2008-2009 school year.  See Pls.' Ex. N; Tr. 245. By signing the Agreement, plaintiff T.L. "accept[ed] the place offered in Winston Preparatory School for 2008-2009 academic year and agree[d] to be bound by the terms and conditions set forth above."  Pls.' Ex. N.  The terms of the Agreement include an absolute prohibition on "absence or early withdrawal," and the Agreement further states:  "Should it become necessary to withdraw a student any time after this Agreement is signed, the parent or guardian will continue to be responsible for the balance of the entire tuition and fees; all advance payments will be retained."  Id.; see Tr. 245-46.

10.     Under the Agreement, a reservation deposit of $4,350.00 was due upon return of the Agreement to Winston Prep, and the tuition fees for the 2008-2009 school year were $43,500.00, which could be paid in two payments of $19,575.00, due on June 1, 2008 and October 1, 2008, respectively.  See id.

11.     By check dated April 11, 2008, plaintiffs paid the reservation deposit of $4,350.00 to Winston Prep.  See Def.'s Ex. 8; Pls.' Ex. P at 3.

12.     By check dated May 26, 2008, plaintiffs made a payment to Winston Prep of $19,575.00, the first half of the tuition fees for the 2008-2009 school year.  See Def.'s Ex. 8; Pls.' Ex. P at 1.

13.     Two weeks later, on June 10, 2008, the Committee on Special Education ("CSE") held a review to develop an Individualized Education Program ("IEP") for the Student.  <u>See</u> Def.'s. Ex. 3.

14.     The participants at the review included plaintiffs T.L. and D.L., a special education teacher who also acted as the district representative, a general education teacher, a school psychologist, one of the Student's teachers at Winston Prep, and plaintiffs' educational advocate.  <u>See</u> Def.'s Ex. 3 at 2; <u>see also</u> Pls.' Ex. I at 4.

15.     The data about the Student that was reviewed and discussed at the CSE review and that informed his Individualized Education Program ("IEP") included the McCarton neurodevelopmental evaluation, teacher reports from Winston Prep, the Student's educational file, the Student's IEP from the previous school year, a classroom observation, medical information about the Student, and teacher estimates of the Student's then-present academic performance.  <u>See</u> Tr. 178; Def.'s Ex. 3 at 3, 5.

16.      The recommendations made at the end of the June 10, 2008 CSE conference and reflected in the Student's IEP were, *inter alia*, to change the Student's program to a collaborative team teaching ("CTT") program with a 14:1 ratio,[3] with the related services of one forty-minute three-to-one counseling session per week, and two forty-minute one-to-one speech and language therapy sessions per week.  <u>See</u> Def.'s Ex. 3 at 1-2, 12.

17.     The recommendation of the CTT program was based on the CSE team's observation that the Student had average to high intelligence, and that his higher potential would allow him to benefit from exposure to a general education curriculum with students who have the

---

[3] "Collaborative team teaching" refers to classes in which both students with disabilities and nondisabled students are taught together.  Each class includes at least one special education

same interests and abilities.  See Tr. 183-85.  The CSE team also believed that access to general education students would benefit the Student's social/emotional development because the Student would be able to interact with and socially learn from such peers.  See Tr. 185.

18.     The IEP reflected the CSE participants' consideration of alternative programs, stating that a general education class with SETSS[4] and related services would not be adequate because it "would not provide sufficient support" to the Student, and that a special class in a community school with related services would be "too restrictive" and would not permit the Student to achieve his academic potential.  Def.'s Ex. 3 at 11; see Tr. 199-200.

19.     The IEP also indicated the Student's reading, writing, and math levels and academic management needs; indicated his levels of social/emotional performance and health and physical development; contained annual goals and short-term objectives; described accommodations that would be used when the Student participated in assessments; and included a transition plan that stated long-term adult outcomes and transition services.  See Def.'s Ex. 3 passim.

20.     In the section describing the Student's academic performance and learning characteristics, the IEP reflected that the Student was "functioning in the average range of intelligence, with variability among his skill areas.  Perceptual reasoning is in the above average range.  Verbal comprehension and working memory are also good, in the average range. Processing speed is by comparison extremely weak (impaired range).  Visuomotor integration is intact.  Memory skills in the verbal and visual domain are intact.  Receptive and expressive

_____

teacher and one general education teacher, with a maximum number of fourteen students-with-IEPs per special education teacher.  See Tr. 30, 182; see also Compl. Ex. A at 5 n.8.

[4] SETTS stands for "Special Education Teacher Support Service."  See New York City Department of Education Professional Roles, http://schools.nyc.gov/Offices/District75/ Departments/InclusiveEducation/ProfessionalRoles/default.htm (last visited Jan. 3, 2011).

language are likewise intact. . . . Organization and time management remain problematic." Def.'s Ex. 3 at 3.

21.     The same section of the IEP further indicated that as of June 2008 (the end of the Student's ninth grade year), the Student was generally at or above grade level in his math skills and at or below grade level in his reading and writing skills (specifically, the Student's decoding skills were at grade level, his comprehension skills were at an eighth grade level, and his writing skills were at an eighth-to-ninth grade level). See id. These instructional levels were based on information provided by the Student's Winston Prep teacher. See id.; Tr. 187, 189-90.

22.     In the section describing the Student's social/emotional performance, the IEP stated that the Student "reportedly struggles with reading social cues" and that he "tends to be reserved and is inattentive and distractible," but that his behavior did not seriously interfere with instruction and could be addressed by his general education teacher and/or his special education teacher. Def.'s Ex. 3 at 4.

23.     The IEP delineated academic goals related to the Student's reading and writing needs. See id. at 7-8. These goals included short-term objectives, such as the Student "will describe two main characters in each of two texts including character traits and motives, with 80% accuracy"; "will correctly state the moral of four fables, and justify this with evidence from each fable, with 75% accuracy"; "will take notes on a given topic from an informational source, jotting down pertinent words, short phrases and quotes relevant to topic, with 80% accuracy"; and "will take 10 sentences chosen by the teacher from a rough draft of a narrative being written, and rewrite for greater clarity and elaboration, with 80% accuracy." Id.

24.     The IEP also included goals addressing the Student's social/emotional and speech and language needs, such as goals related to improving the Student's ability to develop

appropriate peer interactions and recognize social cues, to improve task attention, and to improve pragmatic language skills. <u>See</u> <u>id.</u> at 6; <u>see also</u> Tr. 90, 99-100. These goals also included short-term objectives, such as the Student "will initiate a positive interaction with another, using appropriate body language and facial expressions 80% of the time"; will "complet[e] class assignments and homework with 95% regularity"; and "will summarize necessary information in the context of structured conversational speech, keeping the needs of the listener in mind and reducing redundant information with 70% accuracy given moderate clinician prompting." <u>Id.</u>

25. Plaintiffs did not agree with the recommendation of a CTT class; plaintiff T.L. explained that this was because she "believe[d] [the Student] needs more attention," so she "believe[d] he might not be able to do his work in a CTT class." Tr. 223. Plaintiff T.L. later stated that the reason she did not think that the CTT class was appropriate for the Student was that plaintiffs' educational advocate (who also represented plaintiffs in the administrative proceedings) told her it was not appropriate for the Student. <u>See</u> Tr. 249; <u>see also, e.g.</u>, Tr. 1. Plaintiffs did not object to or disagree with the other recommendations contained in the IEP, such as the goals and objectives and the related services recommendations. Tr. 242-43.

26. By letter dated July 23, 2008, DOE informed plaintiffs of its Final Notice of Recommendation, which identified Cobble Hill School of American Studies ("Cobble Hill") as the specific school placement recommended to implement the Student's IEP. <u>See</u> Def.'s Ex. 4. The letter also stated that should plaintiffs wish to discuss the final recommendation, they should call "Nancy Funke," and provided a phone number for doing so. <u>See</u> <u>id.</u>

27. A form letter dated August 15, 2008 to the "CSE Chairperson" from plaintiffs' educational advocate, and also signed by plaintiff T.L., advised DOE that "the students' parent could not observe the recommended placement because the school was not in session, and/or the

Committee did not offer their child a placement; and/or the Committee failed to conduct a timely annual review and draft an IEP, and/or visited the program and did not find it appropriate." Pls.' Ex. E. The letter also stated:

> This will serve as a 10-day notice letter as mandated by Federal law. The parent will enroll their child for the 2008-2009 school year in the Winston Prep School.
>
> If the parent has already received or does receive a letter recommending that their child attend a specific public school they will make every effort to observe the offered program in September of 2008. They will notify the Committee if the program placement is appropriate and if they expect to enroll the child in the recommended placement.

Id. The letter further stated that it was not an impartial hearing request. See id.

28. Plaintiffs never visited the recommended school over the summer, visiting for the first time on October 6, 2008, more than a month after the school year had begun. See Tr. 230-32. Plaintiff T.L. contacted Cobble Hill and made that visit per the educational advocate's request. See Tr. 250-51. Plaintiff T.L. returned to the school for another visit on October 8, 2008. See Tr. 231.

29. By check dated October 6, 2008, plaintiffs made a payment to Winston Prep of $19,575.00, the second half of the tuition fees for the 2008-2009 school year. See Def.'s Ex. 8; Pls.' Ex. P at 2.

30. By letter dated October 10, 2008, plaintiffs' educational advocate wrote to Gerry Donegan at DOE, informing him that plaintiffs had observed Cobble Hill and that plaintiff T.L. "did not find the program appropriate for [the Student]" because there "were much too many children in the class to enable [the Student] to gain any educational benefit. In addition [T.L.] observed several instances of problem behaviors—without the adults in the class able to control outbursts and such." Pls.' Ex. G. The letter stated plaintiffs' intention to enroll the Student in Winston Prep and request "an impartial hearing for tuition in the near future." Id.

31.     During the 2008-2009 school year at Winston Prep, the Student was in a 12:1 class with other students with disabilities, and received instruction from teachers who did not have special education degrees.  <u>See</u> Tr. 94:15, 111-12, 114, 117, 123.

32.     Robert Bodall, one of the Student's teachers at Winston Prep and the Dean of the school, acknowledged that although the Student would benefit from mainstreaming with typically developing peers, the Student had no opportunities to mainstream with non-disabled children during the course of the day at Winston Prep.  <u>See</u> Tr. 87-88, 123.

33.     Although the Student had social/emotional and pragmatic language deficits that needed to be addressed, as his teachers at Winston Prep also acknowledged, the Student did not receive any counseling or speech and language therapy at Winston Prep and received counseling from an outside (non-Winston Prep) provider instead.  <u>See</u> Tr. 104, 125-28, 136, 140:17-21, 148-49, 156-57.

34.     The Student began receiving counseling because plaintiffs also believed that he would benefit from it, and according to plaintiff T.L., the counseling in fact benefited the Student.  <u>See</u> Tr. 252-53.

35.     While at Winston Prep, the Student had difficulty regulating and sustaining attention, and could also exhibit impulsivity or a lack of impulse control.  <u>See</u> Tr. 117-18.  The students in his class had similar issues.  <u>See id.</u>  As an example of the Student's challenges with impulsivity and lack of impulse control, Dean Bodall testified regarding two occasions on which the Student overturned a table in the classroom.  <u>See</u> Tr. 118-19.

36.     In writing and reading comprehension, which were two of the Student's "greatest areas of deficit," the Student remained at an eighth grade level towards the end of the 2008-2009 school year at Winston Prep (as of February 26, 2009).  <u>See</u> Tr. 159:16-19, 162:5-11, 164:1-8.

Writing independently without support, he was working at only a sixth to seventh grade level. See Tr. 164:5-8. The Student had also been estimated to be at an eighth grade level in reading comprehension and writing at the end of the previous school year (2007-2008). See Def.'s Ex. 3 at 3.

37.     Plaintiffs requested an impartial hearing by letter dated January 15, 2009, contending that DOE "failed to offer their son a Free Appropriate Public Education ('FAPE')." Def.'s Ex. 1 at 1.

38.     An impartial hearing was held before Impartial Hearing Officer ("IHO") Mindy G. Wolman, Esq. See Pls.' Compl. Ex. B. It consisted of four days of testimony, beginning on May 18, 2009 and concluding on July 23, 2009. See id.; Tr. 1, 44, 82, 216.

39.     At the impartial hearing, plaintiffs presented three witnesses and submitted sixteen exhibits. DOE presented three witnesses and submitted eight exhibits. See Tr. 1-3, 44-45, 82-83, 216-17; Pls.' Exs. A-P; Def.'s Exs. 1-8.

40.     Among DOE's witnesses at the hearing was Gail Trimmer, the Compliance Coordinator for Special Education at Cobble Hill. Tr. 48-49. Ms. Trimmer has been employed by DOE for twenty-eight years. Tr. 48. She has a master's degree in special education and a license in special education, emotionally handicapped, and has received training in CTT classes. See Tr. 51-52. Prior to her position as Compliance Coordinator for Special Education, she was in charge of mainstreaming special education students into the general education population. See Tr. 50-51. She was also a special education teacher for eleven years, teaching emotionally disturbed students for seven years and learning disabled students for four years. See Tr. 51.

41.     Having reviewed the Student's IEP, and being familiar with the CTT class proposed for the Student, Ms. Trimmer testified that the Student would have been appropriately

placed in that program, that the Student's deficits and needs would have been able to be addressed by the Cobble Hill staff, and that the Student would have received a meaningful educational benefit at Cobble Hill. See Tr. 58-68.

42.     At the time of the impartial hearing, the Student's proposed CTT class at Cobble Hill consisted of 25 students, seven of whom had IEPs. See Tr. 71-72. The ratio of students-with-IEPs to the special education teacher in the proposed class was thus 7:1, and the overall ratio of students to teachers in the class was thus approximately 12:1. See generally Tr. 30, 182. Because there were fewer than fourteen students with IEPs in the proposed class, there was even more opportunity for individualized instruction for those students. See Tr. 182-83.

43.     In the proposed CTT class, the Student would have been grouped with students with similar reading and math levels. See Tr. 53, 59, 67-68. He would have received individualized instruction through lessons that were differentiated according to his abilities and interests, using a curriculum that could be modified or adapted to address his needs. See Tr. 55.

44.     Cobble Hill also has speech and language therapists and counselors within the school, and speech and language therapy and counseling would have been available to the Student had he attended during the 2008-2009 school year. Tr. 28-29. The related service providers work with students both inside and outside of the classroom, and communicate with the classroom teachers "almost every day" to further assist teachers in creating lessons that "are specifically geared towards helping [a] student" with his or her specific needs. Tr. 29-30.

45.     All of the teachers at Cobble Hill are trained in reading IEPs, in differentiating instruction, and in various methods of classroom management, instruction, and helping students. See Tr. 27.

46.     The Student would have received CTT instruction in the core subjects of math, science, English, and social studies.  See Tr. 31, 58.  In other subjects, such as Spanish, physical education, music, or art, the Student would have been in a general education class with support: in such classes, the general education teacher has a copy of every student's IEP; meets regularly with special education teachers in order to structure lessons and discuss strategies, accommodations, or other management needs to assist students in meeting their IEP goals; and communicates regularly with the special education teachers about the students with IEPs in their class.  See Tr. 33-34, 76-77.

47.     The IHO issued her Findings of Fact and Decision on December 4, 2009.  See Compl. Ex. B.

48.     The IHO found that DOE failed to offer the Student a FAPE for the 2008-2009 school year on the grounds that "[t]he CSE's recommendation to place him in a CTT program was not reasonably calculated to allow him to make meaningful educational progress.  Even if the full-time CTT program could have met [the Student's] special education needs during the 2008-2009 school year, the Cobble Hill CTT program would not have provided him with the full-time CTT program mandated by his IEP."  Compl. Ex. B at 6.  The IHO further found that the Winston Prep program "met [the Student's] special education needs for the 2008-2009 school year," and that there was "nothing in the record that would preclude [tuition] reimbursement on equitable grounds."  Id. at 7.  The IHO thus awarded plaintiffs tuition reimbursement in the amount of $43,500.00.  Id. at 8.

49.     DOE appealed the IHO's decision to the New York State Education Department's Office of State Review, and the SRO issued a twenty-one-page single-spaced decision on March 12, 2010.  See Compl. Ex. A.

50.     The SRO found that "the hearing record supports a finding that the June 2008 CSE's recommendation was reasonably calculated to confer educational benefits on the student," Compl. Ex. A at 14, and that the IHO thus "erred in determining that the district failed to offer the student a FAPE," id. at 21.

51.     Among the SRO's specific findings were that the IEP "accurately depicted the student's needs at the time that the IEP was developed," id. at 14, that the annual goals and short-term objectives were appropriate to the Student's needs, see id. at 15-16, that the Student's "special education needs would have been addressed in his CTT core academic classes and in his general education elective classes, and that the lack of a special education teacher in the student's elective classes did not rise to a denial of FAPE," id. at 18.

52.     Plaintiffs appealed the SRO's decision to this Court by complaint dated July 8, 2010.

Dated:          January 7, 2011
                New York, New York

                                    MICHAEL A. CARDOZO
                                    Corporation Counsel of the City of New York
                                    Attorney for Defendant
                                    100 Church Street, Room 2-185
                                    New York, N.Y. 10007
                                    (212) 788-0908
                                    Fax: (212) 788-0940
                                    tgantz@law.nyc.gov

                                    By:_____s/_____
                                        Toni Gantz
                                        Assistant Corporation Counsel