10 CV 3125 (SLT) (LB)

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

T.L. and D.L. on behalf of their child B.L.,

Plaintiffs,

-against-

THE DEPARTMENT OF EDUCATION OF THE CITY
OF NEW YORK a/k/a THE BOARD OF EDUCATION
OF THE CITY SCHOOL DISTRICT OF THE CITY OF
NEW YORK,

Defendant.

## DEFENDANT'S MEMORANDUM OF LAW
## IN SUPPORT OF ITS MOTION FOR SUMMARY
## JUDGMENT

**MICHAEL A. CARDOZO**
*Corporation Counsel of the City of New York*
Attorney for Defendant
100 Church Street
New York, NY  10007

Of Counsel:  Toni Gantz
Tel:  (212) 788-0908

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ....................................................................................................... 1

STATEMENT OF FACTS .............................................................................................................. 2

ARGUMENT ................................................................................................................................... 3

Statutory Scheme and Legal Standards ......................................................................................... 3

POINT I

DEFENDANT OFFERED THE STUDENT A FREE
APPROPRIATE PUBLIC EDUCATION FOR THE 2008-2009
SCHOOL YEAR ............................................................................................................... 6

    A. Defendant Complied with the Procedural Requirements
       Set Forth in the IDEA ............................................................................................. 7

        1. The Student's IEP meets federal and State
           requirements ....................................................................................... 7

        2. The CSE used sufficient and appropriate data in
           developing the Student's IEP ....................................................... 10

        3. The composition of the CSE did not deprive the
           Student of a FAPE ......................................................................... 11

        4. The IEP describes the Student's then-present levels of
           performance ................................................................................... 12

        5. The IEP states appropriate annual goals and short-
           term objectives .............................................................................. 13

        6. Plaintiffs had appropriate notice of the change in
           recommended services.................................................................... 14

    B. The Student's IEP Was Reasonably Calculated to Confer
       Educational Benefit and Would Have Been Appropriately
       Implemented in DOE's Recommended Placement .............................................. 15

POINT II

PLAINTIFFS' UNILATERAL PRIVATE PLACEMENT WAS
INAPPROPRIATE.............................................................................................................. 19

POINT III

    THE EQUITIES FAVOR DEFENDANT ......................................................................... 21

CONCLUSION ................................................................................................................................. 25

## TABLE OF AUTHORITIES

**Cases**

A.C. v. Bd. of Educ.,
    553 F.3d 165 (2d Cir. 2009) ................................................................................................6

A.H. ex rel. J.H. v. N.Y. City Dep't of Educ.,
    652 F. Supp. 2d 297 (E.D.N.Y. 2009) ...............................................................................24

Bd. of Educ. v. Rowley,
    458 U.S. 176 (1982).................................................................................3, 5, 6, 15, 18

Bettinger v. N.Y. City Bd. of Educ.,
    2007 U.S. Dist. LEXIS 86116 (S.D.N.Y. Nov. 20, 2007)..............................................25

Carmel Cent. Sch. Dist. v. V.P.,
    373 F. Supp. 2d 402 (S.D.N.Y. 2005) ........................................................................22, 25

Cerra v. Pawling Cent. Sch. Dist.,
    427 F.3d 186 (2d Cir. 2005) .............................................................3, 6, 15, 18, 19

D.F. v. Ramapo Cent. Sch. Dist.,
    430 F.3d 595 (2d Cir. 2005) ...............................................................................................5

Forest Grove Sch. Dist. v. T.A.,
    129 S. Ct. 2484 (2009).........................................................................................................5

Florence County Sch. Dist. Four v. Carter,
    510 U.S. 7 (1993).................................................................................................................4

Frank G. v. Bd. of Educ.,
    459 F.3d 356 (2d Cir. 2006) ......................................................................................5, 19

Gagliardo v. Arlington Cent. Sch. Dist.,
    489 F.3d 105 (2d Cir. 2007) ...........................................................................5, 6, 20, 21

J.R. v. Bd. of Educ.,
    345 F. Supp. 2d 386 (S.D.N.Y. 2004). ........................................................................5, 18

M.C. v. Voluntown Bd. of Educ.,
    226 F.3d 60 (2d Cir. 2000) .....................................................................4, 6, 19, 22, 23

M.M. v. N.Y. City Dep't of Educ.,
    583 F. Supp. 2d 498 (S.D.N.Y. 2008) ...............................................................................11

M.S. v. Yonkers Bd. of Educ.,
  231 F. 3d 96 (2d Cir. 2000) .................................................................................................. 19, 21

Perricelli v. Carmel Cent. Sch. Dist.,
  2007 U.S. Dist. LEXIS 9873 (S.D.N.Y. Feb. 9, 2007) .................................................... 10

Pinn v. Harrison Cent. Sch. Dist.,
  473 F. Supp. 2d 477 (S.D.N.Y. 2007) .............................................................................. 20

R.R. v. Scarsdale Union Free Sch. Dist.,
  615 F. Supp. 2d 283 (S.D.N.Y. 2009) .............................................................................. 14

S.W. v. N.Y. City Dep't of Educ.,
  646 F. Supp. 2d 346 (S.D.N.Y. 2009) ........................................................................ 23, 25

San Antonio Indep. Sch. Dist. v. Rodriguez,
  411 U.S. 1 (1973).................................................................................................................. 6

Sch. Comm. of Burlington v. Dep't of Educ.,
  471 U.S. 359 (1985).............................................................................................................. 4

Schreiber v. E. Ramapo Cent. Sch. Dist.,
  700 F. Supp. 2d 529 (S.D.N.Y. 2010) .............................................................................. 20

Thies v. N.Y. City Bd. of Educ.,
  2008 U.S. Dist. LEXIS 11354 (S.D.N.Y. Feb. 4, 2008).................................................. 20

Tucker v. Bay Shore Union Free Sch. Dist.,
  873 F.2d 563 (2d Cir. 1989) .............................................................................................. 25

Viola v. Arlington Cent. Sch. Dist.,
  414 F. Supp. 2d 366 (S.D.N.Y. 2006) ................................................................................ 5

W.S. v. Rye City Sch. Dist.,
  454 F. Supp. 2d 134 (S.D.N.Y. 2006) ....................................................................7, 14, 15, 18

Walczak v. Fla. Union Free Sch. Dist.,
  142 F.3d 119 (2d Cir. 1998) ................................................... 3, 4, 6, 8, 15, 16, 18, 19, 20

Werner v. Clarkstown Cent. Sch. Dist.,
  363 F. Supp. 2d 656 (S.D.N.Y. 2005) ......................................................................... 21, 24

**Statutes**

20 U.S.C. § 1400.........................................................................................1, 3

20 U.S.C. § 1401.............................................................................................3

20 U.S.C. § 1412.......................................................3, 4, 5, 15, 16, 19, 22, 23

20 U.S.C. § 1414..................................................................3, 7, 10, 11, 12, 13

20 U.S.C. § 1415.........................................................................3, 4, 5, 7, 15

N.Y. Educ. Law § 4404...................................................................................3, 4

8 N.Y. Comp. Codes R. & Regs. § 200.1...........................................................20

8 N.Y. Comp. Codes R. & Regs. § 200.3...........................................................11

8 N.Y. Comp. Codes R. & Regs. § 200.4........................................................7, 10

## PRELIMINARY STATEMENT

Plaintiffs, the parents of a student with a disability, appeal the administrative decision by the New York State Department of Education Office of State Review finding that defendant New York City Department of Education ("DOE") offered plaintiffs' child ("the Student") a free appropriate public education for the 2008-2009 school year, and denying plaintiffs reimbursement for tuition costs related to the Student's attendance at the Winston Preparatory School ("Winston Prep"), a private school at which plaintiffs unilaterally placed the Student. Defendant submits this memorandum of law in support of its motion for summary judgment.

The Court should dismiss the instant Complaint and grant summary judgment to defendant because, as found by the State Review Officer, defendant offered the Student a free appropriate public education under the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400 et seq., for the 2008-2009 school year. Specifically, and as discussed more fully below, the record amply demonstrates that defendant formulated an Individualized Education Program for the Student that conformed to the procedural requirements of the IDEA and that was reasonably calculated to enable the Student to receive educational benefits.

Because defendant offered the Student a free appropriate public education, the Court need not reach the questions of whether plaintiffs' unilaterally chosen placement is appropriate to the Student's needs or whether the equities favor plaintiffs. However, should the Court consider those questions, plaintiffs cannot prevail on either ground. First, plaintiffs failed to enroll the Student in a private placement specifically designed to meet his unique needs because Winston Prep was not the least restrictive environment for the Student and did not offer the Student necessary related services, and because the record reflects that the Student made no progress in reading and writing, his areas of weakness, during the 2008-2009 school year at Winston Prep. Second, the equities favor defendant because plaintiffs did not provide proper notice to defendant of their rejection of defendant's recommended program and placement and their intent to seek tuition reimbursement from defendant,

and the record strongly suggests that plaintiffs intended only to place the Student in Winston Prep and retroactively seek tuition reimbursement.

Accordingly, defendant is entitled to judgment as a matter of law, and its motion should be granted.

## **STATEMENT OF FACTS**

Defendant respectfully refers the Court to Defendant's Local Civil Rule 56.1 Statement of Undisputed Facts dated January 7, 2010 ("Def.'s 56.1 Statement") for a statement of the relevant undisputed facts on which this motion is based.

In brief summary, plaintiffs allege that the Individualized Education Program ("IEP") that was created for the 2008-2009 school year for the Student, who is classified as a student with "Other Health Impairment," was procedurally and substantively invalid and thus that defendant did not offer the Student a free appropriate public education ("FAPE").  (See Def.'s 56.1 Statement ¶ 3; Compl. ¶¶ 32-42.)  Plaintiffs unilaterally enrolled the Student in a private school prior to even the formulation of the Student's IEP and before knowing what program and school placement defendant would recommend for the Student.  (See Def.'s 56.1 Statement ¶¶ 9, 13, 26.)  The private school in which plaintiffs enrolled the Student did not provide counseling or speech and language therapy services, notwithstanding the Student's need for such services, and offered the Student no opportunities for mainstreaming with typically developing peers, although the Student would benefit from such.  (See id. at ¶¶ 32, 33.)  Moreover, during the 2008-2009 school year at Winston Prep, the Student's instructional levels in reading and writing—the academic areas in which the Student struggled most—did not change from the prior year, placing the Student even further below grade level in those subjects.  (See id. at ¶ 36.)  Plaintiffs then retroactively sought tuition reimbursement in State administrative proceedings, as they seek here.  (See Compl. Ex. B.)  Plaintiffs' request for reimbursement was ultimately denied on the ground that defendant had offered the Student a FAPE for the 2008-2009 school year.  (See Compl. Ex. A.)

## ARGUMENT

### Statutory Scheme and Legal Standards

The purpose of the IDEA is to ensure that "all children with disabilities have available to them a free appropriate public education that emphasizes special education and related services designed to meet their unique needs and prepare them for further education, employment, and independent living." 20 U.S.C. § 1400(d)(1)(A). The FAPE must be "reasonably calculated to enable the child to receive educational benefits." Bd. of Educ. v. Rowley, 458 U.S. 176, 207 (1982). Under this mandate, school districts are not required to maximize the potential of the disabled child, but rather must provide a "basic floor of opportunity" to allow the child meaningful access to a free public education. Id. at 192, 200; see also, e.g., Cerra v. Pawling Cent. Sch. Dist., 427 F.3d 186, 195 (2d Cir. 2005); Walczak v. Fla. Union Free Sch. Dist., 142 F.3d 119, 130 (2d Cir. 1998).

The special education and related services provided must meet the standards of the State educational agency and conform with an IEP designed for the child. 20 U.S.C. § 1401(9). Broadly speaking, the IEP must delineate the child's present levels of academic achievement and functional performance, measurable annual goals for the child, and the special educational program and related services that will be provided to help the child advance towards those goals. See 20 U.S.C. § 1414(d)(1)(A). A child with a disability is to be educated in the least restrictive environment to the "maximum extent appropriate." 20 U.S.C. § 1412(a)(5)(A). This means that a child with a disability should be educated whenever possible "with children who are not disabled," and should only be removed "from the regular educational environment . . . when the nature or severity of the [child's disability] is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily." Id.

If parents are dissatisfied with an IEP, they may request an impartial due process hearing before an Impartial Hearing Officer ("IHO"). See 20 U.S.C. § 1415(f)(1)(A); N.Y. Educ. Law § 4404(1)(a). The IHO's decision may be appealed to the State Review Officer ("SRO"), who

independently reviews the IHO's findings and decision. 20 U.S.C. § 1415(g); N.Y. Educ. Law § 4404(2). Although the SRO's decision is considered final, a party aggrieved by that decision may bring an action for relief in state or federal district court. 20 U.S.C. § 1415(i)(1)(B), (2)(A).

Parents challenging an IEP may also unilaterally enroll their child in a private school of their choice, without the consent of state or local officials, and request retroactive reimbursement. However, they do so "at their own financial risk." Florence County Sch. Dist. Four v. Carter, 510 U.S. 7, 15 (1993) (quoting Sch. Comm. of Burlington v. Dep't of Educ., 471 U.S. 359, 373-74 (1985)). This is because parents are entitled to reimbursement "only if a federal court concludes both that the public placement violated IDEA and that the private school placement was proper under the Act." Carter, 510 U.S. at 15; see generally 20 U.S.C. § 1412(a)(10)(C)(i) (providing that a local educational agency is not required to pay for the cost of a private school in which parents have unilaterally enrolled their child if the agency made a FAPE available to the child). Moreover, the Supreme Court has explained that tuition reimbursement for a parent's unilateral placement is not the normal means of obtaining a FAPE. See Carter, 510 U.S. at 12 ("Congress intended that IDEA's promise of a 'free appropriate public education' for disabled children would normally be met by an IEP's provision for education in the regular public schools or in private schools chosen jointly by school officials and parents.").

Thus, to award parents tuition reimbursement for private school in an action challenging an educational program offered by a school district, courts must find that (1) the proposed program prepared by the school district was inadequate to provide the student with a FAPE, and (2) the private educational services obtained by the parents were appropriate to the student's needs. See, e.g., M.C. v. Voluntown Bd. of Educ., 226 F.3d 60, 66 (2d Cir. 2000); Walczak, 142 F.3d at 129; see generally Burlington, 471 U.S. at 370. If the challenged IEP was adequate, "the necessary inquiry is at an end," and the court does not examine the appropriateness of the parents' private placement. M.C., 226 F.3d at 66. Where courts reach both prongs of the analysis, they often

also examine whether equitable considerations support the parents' claim. See, e.g., Frank G. v. Bd. of Educ., 459 F.3d 356, 363-64 (2d Cir. 2006); M.C., 226 F.3d at 65, 68-69; see generally 20 U.S.C. § 1412(a)(10)(C)(iii)(III). One such equitable consideration is whether the parents properly notified the school district that they were rejecting the district's IEP and proposed placement and would be enrolling their child in a private school at public expense. See 20 U.S.C. § 1412(a)(10)(C)(iii)(I); Forest Grove Sch. Dist. v. T.A., 129 S. Ct. 2484, 2496 (2009) (reiterating that courts can reduce reimbursement on equitable grounds "if the parents failed to give the school district adequate notice of their intent to enroll the child in private school"); M.C., 226 F.3d at 68-69.

A proposed IEP is considered adequate when (1) the educational agency complied with the procedural requirements of the IDEA, and (2) the IEP was "reasonably calculated" to confer "educational benefit" on the student. Rowley, 458 U.S. at 206-07. In determining the appropriateness of the parents' placement, generally "the same considerations and criteria that apply in determining whether the School District's placement is appropriate should be considered," but there are certain requirements that do not apply (for example, a unilaterally chosen private placement need not furnish an IEP). Frank G., 459 F.3d at 364.

Federal courts normally resolve IDEA actions by examination of the administrative record via the parties' summary judgment motions. Viola v. Arlington Cent. Sch. Dist., 414 F. Supp. 2d 366, 377 (S.D.N.Y. 2006). In an IDEA action, however, the existence of a disputed issue of material fact will not defeat the motion. Id.; see also, e.g., J.R. v. Bd. of Educ., 345 F. Supp. 2d 386, 394 (S.D.N.Y. 2004). Rather, federal courts reviewing administrative determinations under the IDEA must base their decisions on the preponderance of the evidence. 20 U.S.C. § 1415(i)(2)(C).

Furthermore, the United States Supreme Court and the Second Circuit "have interpreted the IDEA as strictly limiting judicial review of state administrative proceedings." D.F. v. Ramapo Cent. Sch. Dist., 430 F.3d 595, 598 (2d Cir. 2005); see, e.g., Gagliardo v. Arlington Cent. Sch. Dist., 489 F.3d 105, 112 (2d Cir. 2007) (noting that "the role of the federal courts in reviewing

state educational decisions under the IDEA is 'circumscribed'") (citation omitted).  Thus, district courts "may not 'substitute their own notions of sound educational policy for those of the school authorities which they review.'"  <u>A.C. v. Bd. of Educ.</u>, 553 F.3d 165, 171 (2d Cir. 2009) (<u>quoting</u> <u>Rowley</u>, 458 U.S. at 206); <u>see</u> <u>Cerra</u>, 427 F.3d at 191 ("In reviewing the administrative proceedings, it is critical to recall that IDEA's statutory scheme requires substantial deference to state administrative bodies on matters of educational policy."); <u>Walczak</u>, 142 F.3d at 129 ("While federal courts do not simply rubber stamp administrative decisions, they are expected to give 'due weight' to these proceedings, mindful that the judiciary generally 'lacks the "specialized knowledge and experience" necessary to resolve "persistent and difficult questions of educational policy."'" (quoting <u>San Antonio Indep. Sch. Dist. v. Rodriguez</u>, 411 U.S. 1, 42 (1973))).  Judicial deference is particularly warranted when the district court's decision is based solely on the administrative record, as well as when the SRO's review has been thorough and careful.  <u>A.C.</u>, 553 F.3d at 171; <u>Walczak</u>, 142 F.3d at 129; <u>see also, e.g.</u>, <u>M.C.</u>, 226 F.3d at 66.  In addition, where the SRO's decision conflicts with the IHO's decision, as in the present case, the IHO's decision "may be afforded diminished weight."  <u>A.C.</u>, 553 F.3d at 171 (quoting <u>Gagliardo</u>, 489 F.3d at 113 n.2).

## <u>POINT I</u>

### DEFENDANT OFFERED THE STUDENT A FREE APPROPRIATE PUBLIC EDUCATION FOR THE 2008-2009 SCHOOL YEAR

Plaintiffs should not be awarded any relief related to their unilateral placement of the Student in Winston Prep because defendant offered the Student a FAPE for the 2008-2009 school year.  This determination was also made by the SRO, whose twenty-one-page, single-spaced decision demonstrated a careful and thorough review of the administrative record.  (<u>See</u> Decision No. 10-001 of the State Review Officer, Mar. 12, 2010 [hereinafter "SRO Decision"].)  This Court should uphold the SRO's decision, because, as the record makes clear and as is discussed in detail below, the

Student's IEP was both procedurally and substantively proper under the IDEA, and would have been appropriately implemented in the public school placement offered to the Student by DOE.

**A.      Defendant Complied with the Procedural Requirements Set Forth in the IDEA**

While the IDEA delineates certain procedural requirements, the Act also provides that denial of a FAPE cannot be found on procedural grounds alone unless the alleged procedural inadequacies "(I) impeded the child's right to a free appropriate public education; (II) significantly impeded the parents' opportunity to participate in the decisionmaking process regarding the provision of a free appropriate public education to the parents' child; or (III) caused a deprivation of educational benefits."   20 U.S.C. § 1415(f)(3)(E)(ii).   Thus, for procedural flaws to amount to a denial of FAPE, they must either "result in the loss of educational opportunity or *seriously infringe* on a parent's participation in the creation or formulation of the IEP."   W.S. v. Rye City Sch. Dist., 454 F. Supp. 2d 134, 138 (S.D.N.Y. 2006) (emphasis added).

Here, a review of the record demonstrates that the Student's IEP comported with the procedural provisions of the Act and afforded the Student a FAPE.

**1.   The Student's IEP meets federal and State requirements**

Under the IDEA and New York regulations, an IEP must delineate, in pertinent part, the student's present levels of academic achievement and functional performance, measurable annual goals for the child, the special education program and related services that will be provided to help the child advance towards those goals, and the reasons for and extent to which the child will not be educated with nondisabled peers in a regular education environment.   20 U.S.C. § 1414(d)(1)(A); 8 N.Y. Comp. Codes R. & Regs. ("N.Y.C.R.R.") § 200.4(d)(2).   In addition, New York regulations require that the IEP for a student who takes an alternative assessment include "short-term instructional objectives and/or benchmarks that are the measurable intermediate steps between the student's present level of performance and the measurable annual goal."   8 N.Y.C.R.R. § 200.4(d)(2)(iv).

The Student's IEP meets all of these requirements. The IEP that was finalized at the June 10, 2008 Committee on Special Education ("CSE")[1] review was developed using data and reports about the Student from a variety of sources, and was based on and reflected this information as well as the input of the CSE meeting participants, who included plaintiffs T.L. and D.L., a special education teacher who also acted as the district representative, a general education teacher, a school psychologist, one of the Student's teachers at Winston Prep,[2] and plaintiffs' educational advocate. (See Def.'s 56.1 Statement ¶¶ 14, 15.) The IEP indicated the Student's reading, writing, and math levels and his levels of social/emotional performance and health and physical development. (Id. at ¶¶ 19-22; see also Def.'s Ex. 3 at 3-5.) It contained annual goals and short-term objectives related to the Student's academic and behavioral and speech and language needs. (Def.'s 56.1 Statement ¶¶ 23, 24; see also Def.'s Ex. 3 at 6-8.) It recommended placement in a collaborative team teaching ("CTT") program with a 14:1 ratio,[3] with the related services of one forty-minute three-to-one counseling session per week, and two forty-minute one-to-one speech and language therapy sessions per week. (Def.'s 56.1 Statement ¶ 16; see also Def.'s Ex. 3 at 1-2, 12.) It also discussed alternative programs that the CSE participants considered and ultimately rejected. (Def.'s 56.1 Statement ¶ 18; see also Def.'s Ex. 3 at 11.)

The Student's levels, goals, and recommended program within the IEP were consistent with and reflected pertinent information provided about the Student, including the assessments and recommendations of Student's teachers at Winston Prep and the

---

[1] In New York, IEPs are developed by local Committees on Special Education. See N.Y. Educ. Law § 4402(1); Walczak, 142 F.3d at 123.

[2] The Student also attended Winston Prep during the 2007-2008 school year that preceded the June 2008 IEP meeting. (See Def.'s 56.1 Statement ¶¶ 4, 13.)

[3] "Collaborative team teaching" refers to classes in which both students with disabilities and nondisabled students are taught together. Each class includes at least one special education teacher and one general education teacher, with a maximum number of fourteen students-with-IEPs per special education teacher. (See Def.'s 56.1 Statement ¶ 16 n.3.)

neurodevelopmental evaluation of the Student that had been privately conducted by a school psychologist and developmental pediatrician at the McCarton Center. (See Def.'s 56.1 Statement ¶¶ 5, 15.) For example, the discussion of the Student's "Academic Performance and Learning Characteristics" in the IEP comports with the findings of the private evaluators and contains the Student's instructional levels as provided by Winston Prep. (See Def.'s 56.1 Statement ¶¶ 6, 20; Exs. 3 at 3, 7 at 4-7; Tr. 187, 189-90 (discussing the Student's academic skill levels, perceptual reasoning, verbal comprehension, working memory, processing speed, visual-motor ability, memory skills, receptive and expressive language, and time management skills).) Task attention, organization, and time management were also weaknesses noted by the Student's teachers and private evaluators as well as within the Student's IEP, and addressed within the IEP through recommendations of supports and teaching strategies such as graphic organizers and prompts and reminders, testing modifications such as testing in a separate location and having "double time" for testing, and through the annual goals and short-term objectives. (See Def.'s Ex. 3 at 3, 4, 6, 8, 12; Def.'s Ex. 7 at 7-9; Tr. 62-63, 90, 99-100, 136, 150-52, 190-91.) In addition, information from plaintiffs, the private evaluators, and the Student's teachers at Winston Prep indicated that the Student had speech and language and social/emotional deficits that needed to be addressed, which the IEP did through the provision of speech and language therapy and counseling. (See, e.g., Tr. 126, 136, 156-57, 252-53; Def.'s Ex. 7 at 1 (noting the need for a school psychologist); Def.'s Ex. 3 at 12.) Although plaintiffs did not agree with the recommendation of the CTT program, neither they nor their educational advocate objected to or disagreed with the other recommendations and provisions in the IEP, such as the indications of the Student's levels, the goals and objectives, and the related services recommendations. (See Def.'s 56.1 Statement ¶ 25.)

In sum, the Student's IEP accurately reflected the Student's needs and goals and recommended appropriate educational services to assist the Student to advance towards those goals.

### 2. The CSE used sufficient and appropriate data in developing the Student's IEP

Plaintiffs' contention that defendant failed to comply with the procedural and substantive requirements of the IDEA and New York State Law because the IEP "did not include standardized testing regarding the student's instructional levels in the core subjects of reading, writing and math" is both factually and legally baseless. (Compl. ¶ 35.)

As a threshold matter, there is no requirement in federal or state law for an IEP to include data from standardized testing. Rather, an IEP team is to review evaluation data on a student, including "(i) evaluations and information provided by the parents of the child; (ii) current classroom-based, local, *or* State assessments, and classroom-based observations; and (iii) observations by teachers and related services providers." 20 U.S.C. § 1414(c)(1)(A) (emphasis added); see 8 N.Y.C.R.R. § 200.4(b)(5)(i) (similarly providing that the CSE must review "evaluation data on the student, including evaluations and information provided by the parents of the student, current classroom-based assessments, local or State assessments, classroom-based observations, and observations by teachers and related services providers"); see also Perricelli v. Carmel Cent. Sch. Dist., 2007 U.S. Dist. LEXIS 9873, at *21, 34-36 (S.D.N.Y. Feb. 9, 2007) (finding that the data that formed the basis of the IEP at issue—which did not include standardized test results—was sufficient and complied with the procedural requirements of the IDEA).

Here, the team reviewed exactly such evaluation data, namely, the McCarton neurodevelopmental evaluation report, teacher reports from Winston Prep, the Student's educational file, the Student's IEP from the previous school year, a classroom observation, and teacher estimates of the Student's then-present academic performance. (See Def.'s 56.1 Statement ¶ 15.) The IEP incorporated this data, as discussed above and as reflected in the statements of the Student's "Academic Performance and Learning Characteristics" and the annual goals and short-term objectives. (See Def.'s Ex. 3 at 3, 7-8.) Moreover, the neurodevelopmental evaluation report contained the results of a standardized test assessing the Student's academic skills in reading,

writing, spelling, mathematics, and memory, the results of which were summarized in the Student's IEP. (See Def.'s Ex. 7 at 1-2, 5, 7; Def.'s Ex. 3 at 3.)

In short, there is simply no basis for plaintiffs' contention that the IEP did not include or the CSE did not consider appropriate data.

### 3. The composition of the CSE did not deprive the Student of a FAPE

Plaintiffs allege that a procedural violation occurred because the "CSE failed to include the participation of a related service provider who provided the student with speech/language therapy." (Compl. ¶ 33.) This contention also lacks legal and factual support.

First, the IDEA does not mandate that related service providers participate in the development of a student's IEP; instead, such individuals may attend IEP meetings "at the discretion of the parent or the agency." 20 U.S.C. § 1414(d)(1)(B)(vi). The relevant New York State regulation similarly provides that a CSE is to include "related services personnel as appropriate, as the school district or the parent(s) shall designate." 8 N.Y.C.R.R. § 200.3(a)(1)(ix). Second, and perhaps more significantly, a service provider "who provided the student with speech/language therapy" could not have attended the IEP meeting because the Student did not have such a provider at Winston Prep or otherwise receive speech and language services (as discussed further below, this is one of the reasons Winston Prep was not an appropriate placement for the Student). (See, e.g., Tr. 104, 126, 252-53.) Accordingly, plaintiffs' claim that the absence of a "related service provider who provided the student with speech/language therapy" at the IEP meeting violated the IDEA is both false and disingenuous, and would not constitute a procedural violation in any event. See generally M.M. v. N.Y. City Dep't of Educ., 583 F. Supp. 2d 498, 505-06 (S.D.N.Y. 2008) (finding no procedural violation in the composition of a CSE meeting despite the alleged absence of various individuals, including a related services provider).

### 4. The IEP describes the Student's then-present levels of performance

Plaintiffs allege that the IEP did not appropriately state or describe the Student's present levels of academic achievement and functional performance. (Compl. ¶¶ 34, 38.) These claims similarly lack merit.

Under the IDEA, an IEP must include a "statement of the child's present levels of academic achievement and functional performance, including . . . how the child's disability affects the child's involvement and progress in the general education curriculum" and "a description of benchmarks or short-term objectives." 20 U.S.C. § 1414(d)(1)(A)(i)(I)(aa),(cc). As the SRO also found, the Student's IEP complies with this requirement, explicitly stating the Student's then-present levels of academic and social/emotional performance, and including appropriate benchmarks. (See Def.'s Ex. 3 at 3, 4, 6-8; Def.'s 56.1 Statement ¶¶ 20-24; SRO Decision 14-16.) Specifically, the IEP provides a detailed description of the Student's functional performance; reports the Student's instructional grade levels for math, reading, and writing; describes the Student's social/emotional performance; and indicates that his behavior did not seriously interfere with instruction and could be addressed by his general education teacher and/or his special education teacher. (See Def.'s Ex. 3 at 3, 4; Def.'s 56.1 Statement ¶¶ 20-22.) In addition, the IEP includes annual goals and short-tem objectives related to the Student's academic and behavioral needs. (See Def.'s Ex. 3 at 6-8; Def.'s 56.1 Statement ¶¶ 23-24.)

Plaintiffs contend that "[t]eachers' estimates alone are not sufficient to provide baseline data on the student's present level of academic performance." (Compl. ¶ 38.) As previously noted, classroom-based assessments, classroom-based observations, and teacher observations are explicitly recognized as the types of data that IEP teams should review and use in developing an IEP. See 20 U.S.C. § 1414(c)(1)(A). Moreover, in determining the Student's then-present levels and needs, the CSE relied upon not only teacher estimates, but a variety of additional data about the Student, including teacher reports from Winston Prep, the Student's educational file, the McCarton

neurodevelopmental evaluation, and a classroom observation. (See Def.'s 56.1 Statement ¶ 15.) Accordingly, the IEP appropriately describes the Student's levels of achievement and performance.

### 5. The IEP states appropriate annual goals and short-term objectives

Plaintiffs erroneously allege that the annual goals and objectives on the Student's IEP were not appropriate, were not sufficiently specific or measurable, and did not include goals related to the Student's speech and language needs. (Compl. ¶¶ 36-38, 40.) The record does not support their contentions.

Under the IDEA, an IEP must include "a statement of measurable annual goals, including academic and functional goals" designed to meet the child's needs. 20 U.S.C. § 1414(d)(1)(A)(i)(II). The Student's June 2008 IEP included annual goals related to reading and writing, which were the Student's weaker academic areas, as well as goals to address his social/emotional and speech and language needs, additional recognized deficits. (See Def.'s Ex. 3 at 6-8; Def.'s 56.1 Statement ¶ 36; Tr. 125-26, 136, 148-49, 156-57.) As the SRO found, these goals were appropriate for the Student and designed to meet his needs. (See, e.g., Tr. 193-99; SRO Decision 15-16.) Notably, plaintiffs also did not state any disagreement with these goals at the IEP meeting. (See Tr. 242.)

In addition, the goals and their corresponding short-term objectives are specific and measurable. For example, under the annual goal, "[The Student] will read texts written on instructional reading level, and comprehend on a critical and inferential reasoning level," short-term objectives include: "[The Student] will describe two main characters in each of two texts including character traits and motives, with 80% accuracy" and "[The Student] will correctly state the moral of four fables, and justify this with evidence from each fable, with 75% accuracy." (Defs.' Ex. 3 at 7.) Under the goal pertaining to writing, short-term objectives include that the Student "will take notes on a given topic from an informational source, jotting down pertinent words, short phrases and quotes relevant to topic, with 80% accuracy" and "will take 10 sentences chosen by the teacher from

a rough draft of a narrative being written, and rewrite for greater clarity and elaboration, with 80% accuracy." (Def.'s Ex. 3 at 6.) Under the goal pertaining to the Student's pragmatic language skills, short-term objectives include that the Student "will increase turn taking skills during discourse of up to 3 to 4 turns at least 85% of the time" and "will summarize necessary information in the context of structured conversational speech, keeping the needs of the listener in mind and reducing redundant information with 70% accuracy given moderate clinician prompting." (Id.) As one court reviewing similar goals and objectives observed, it is "difficult . . . to imagine how much more specific the District could be concerning its goals and objectives for the student's continued educational progress." W.S., 454 F. Supp. 2d at 147; see also R.R. v. Scarsdale Union Free Sch. Dist., 615 F. Supp. 2d 283, 295 (S.D.N.Y. 2009) (finding that the alleged inadequacy in the annual goals on a student's IEP did not rise to the level of a denial of a FAPE). In addition, the record reflects that the goal related to improving the Student's pragmatic language skills was a speech and language goal, refuting plaintiffs' claim that the IEP lacked such goals. (See Tr. 198-99.)

In short, the goals and objectives as stated on the IEP were appropriate and did not result in any procedural violation of the IDEA.

### 6. Plaintiffs had appropriate notice of the change in recommended services

Plaintiffs claim that DOE did not provide reasons for the change in the Student's program to a CTT class with related services, and that this constituted a procedural violation. (See Compl. ¶ 39.) The record, however, reflects that the recommendation of the CTT program was based on the CSE team's observation that the Student had average to high intelligence and high potential, and that exposure to a general education curriculum and general education students would be beneficial academically and otherwise. (See Def.'s 56.1 Statement ¶ 17.) As discussed further below, and as found by the SRO, the record also reflects that the CTT program was appropriate for the Student. (See SRO Decision 18-19.) Moreover, alternative programs that the CSE considered and ultimately rejected, and the reasons they did so, are reflected in the IEP. (See id. at ¶ 18.)

In addition, the record establishes that the CSE team discussed this change with plaintiffs, as the other members of the team were aware that plaintiffs did not agree with the recommendation of the CTT class. (See, e.g., Tr. 203.) Thus, insofar as plaintiffs allege a procedural violation of the IDEA related to the change in the Student's program, they cannot establish that they were significantly impeded from participating in the CSE review process or that any alleged procedural inadequacies resulted in the loss of educational opportunity, and they thus cannot establish a denial of FAPE on such grounds. See 20 U.S.C. § 1415(f)(3)(E)(ii); see W.S., 454 F. Supp. 2d at 138.

In sum, plaintiffs have not demonstrated that defendant did not comply with the IDEA's procedural requirements, and plaintiffs accordingly cannot prevail on this ground.

**B.  The Student's IEP Was Reasonably Calculated to Confer Educational Benefit and Would Have Been Appropriately Implemented in DOE's Recommended Placement**

A State or local educational agency has complied with the substantive provisions of the IDEA if it provides the disabled child with an IEP that is "reasonably calculated to enable the child to receive educational benefits." Rowley, 458 U.S. at 206-07. More specifically, "a school district fulfills its substantive obligations under the IDEA if it provides an IEP that is 'likely to produce progress, not regression,' and if the IEP affords the student with an opportunity greater than mere 'trivial advancement.'" Cerra, 427 F.3d at 195 (quoting Walczak, 142 F.3d at 130). In addition, "the law expresses a strong preference for children with disabilities to be educated, 'to the maximum extent appropriate,' together with their non-disabled peers." Walczak, 142 F.3d at 122 (citing 20 U.S.C. § 1412(5)). Finally, "[b]ecause administrative agencies have special expertise in making judgments concerning student progress, deference is particularly important when assessing an IEP's substantive adequacy." Cerra, 427 F.3d at 195. As set forth below, the Student's IEP comports with these standards and the substantive requirements of the IDEA.

The IEP developed for the Student recommended, *inter alia*, a CTT program with a 14:1 ratio, with the related services of one forty-minute three-to-one counseling session per week,

and two forty-minute one-to-one speech and language therapy sessions per week. (Def.'s 56.1 Statement ¶ 16.) In the CTT class in which the Student would have been placed at the recommended placement, Cobble Hill School of American Studies, the Student would have received instruction from a teacher certified in special education while being exposed to a general education curriculum and general education students. (See id. at ¶ 16 n.3.) He would have been grouped with students with similar academic levels, while receiving individualized instruction that was modified to meet his needs and abilities. (See id. at ¶ 43.) He would have been in a class having an overall student-to-teacher ratio of approximately 12:1, and a 7:1 ratio of students-with-IEPs to the special education teacher. (See id. at ¶ 42.) The 7:1 ratio would have allowed the Student to receive even more individualized instruction from the special education teacher. (See id.)

In the proposed placement, the Student would have worked on improving his academic skills (such as reading and writing) in addition to working on behavior skills, such as task attention and appropriate peer interaction, all of which were recognized difficulties for the Student. (See Def.'s 56.1 Statement ¶¶ 23-24, 36.) He also would have received counseling and speech and language therapy, services that the record established were necessary for addressing his educational and social/emotional needs. (See, e.g., Tr. 126, 136, 156-57, 252-53; Def.'s Ex. 7 at 1.) Cobble Hill's Compliance Coordinator for Special Education, who was familiar with the recommended program and placement and the Student's needs, and who has extensive special education experience, including experience mainstreaming special education students into the general education population, testified that the Student would have been appropriately placed in the CTT program, that the Student's deficits and needs would have been able to be addressed by the Cobble Hill staff, and that the Student would have received a meaningful educational benefit at Cobble Hill. (See Def.'s 56.1 Statement ¶ 41.) Moreover, the recommended program would have provided educational benefits to the Student in the least restrictive environment—as the IDEA requires—since it allowed for the Student to interact with non-disabled peers. See 20 U.S.C. § 1412(5); Walczak, 142 F.3d at 122.

16

Plaintiffs allege that the CTT program and recommended placement were not appropriate for the Student because plaintiff T.L. found the class "too large and disruptive" and because the Student's elective classes (such as Spanish, art, and physical education) would not be co-taught by a special education teacher.[4] (See Compl. ¶¶ 23, 26.) The record, however, belies plaintiffs' contentions.

First, plaintiff T.L. testified that the proposed class was too "disruptive" based on her observation of a group of four students talking loudly during the course of a class. (See Tr. 228.) But on this basis the Student's own class at Winston Prep would likely also be described as disruptive: the record reflects that the Student's fellow classmates at Winston Prep could have difficulty with impulsivity and lack of impulse control, which could manifest in the class becoming "very vocal" with "lots of strong personalities, lively discussions," and the Student himself had on two separate occasions overturned a table in the classroom. (Tr. 118-19.)

Second, the student-teacher ratio in the proposed CTT class was roughly 12:1, the same student-teacher ratio at Winston Prep, and the ratio of students-with-IEPs to the special education teacher in the proposed CTT class was even smaller (7:1), undermining plaintiffs' claim that the recommended class was too large. (See Def.'s 56.1 Statement ¶¶ 31, 42.)

Third, the general education teachers at Cobble Hill who would have taught the Student's elective classes were trained in reading IEPs, in differentiating instruction, and in various methods of classroom management, instruction, and helping students. (See id. at ¶¶ 45-46.) The general education teachers also would have had a copy of the Student's IEP, and would have communicated and met regularly with his special education teacher in order to structure lessons and discuss strategies, accommodations, or other management needs to assist him in meeting his IEP

_____

[4] Whether these were actually plaintiffs' concerns is unclear from the record, as plaintiff T.L. also testified that the reason she did not think the CTT class was appropriate for the Student was that plaintiffs' educational advocate (who also represented plaintiffs in the administrative proceedings) told her it was not appropriate for the Student. (See Def.'s 56.1 Statement ¶ 25.)

goals.  (See id. at ¶ 46.)  Thus, and as the SRO also found, the record does not provide evidence that the Student would not have received appropriate instruction and educational benefit at Cobble Hill, notwithstanding the fact that some of his courses would not have been taught by special education teachers.[5]  (See SRO Decision 17-18.)

Based on all of the evidence, the SRO concluded—after setting forth a decision that reviewed the record in detail and made frequent citation to it—that the CTT program and Cobble Hill placement offered by defendant were appropriate and that the IEP was reasonably calculated to enable the Student to receive educational benefits.  (See SRO Decision 18-21.)  His decision is consistent with the record and comports with the IDEA and the case law interpreting its substantive requirements, see, e.g., Rowley, 458 U.S. at 198-99, and should be given the "due weight" to which it is entitled under the IDEA.  See Cerra, 427 F.3d at 195; J.R., 345 F. Supp. 2d at 398 (giving "the requisite weight to the decisions of impartial state education officers who are far better versed in educational policy and practice than this Court" in holding that an IEP was reasonably calculated to confer educational benefit).  Plaintiffs thus ask this Court to engage in exactly the type of substitution of judgment that is barred by Rowley and its progeny.  See, e.g., Cerra, 427 F.3d at 195; W.S., 454 F. Supp. 2d at 145 ("The problem with plaintiffs' argument is that this sort of weighing of conflicting evidence is exactly the sort of area in which I am required to defer to the SRO—the education professional—rather than pretend to transform myself into some sort of educational specialist.").

While plaintiffs may desire the private school education that they unilaterally chose for the Student, the record makes clear that this is not required in order for him to receive a FAPE. See, e.g., Walczak, 142 F.3d at 129 ("What the statute guarantees is an 'appropriate' education, 'not one that provides everything that might be thought desirable by loving parents.'"); J.R., 345 F. Supp.

---

[5] Plaintiff T.L. also testified that "the only time [the Student] was kind of in [a] general ed setting" was when he went to Hebrew school every Sunday from 9:30 to 1:00 during eighth and ninth grade, and that he "didn't do anything for it." (Tr. 226-27.)  This experience hardly provides a useful comparison or prediction of how the Student would perform in the CTT class at Cobble Hill.

2d at 399 ("[N]either our sympathy, nor more importantly the IDEA, entitles S.R. to the 'best education that money can buy' at the expenditure of the District's finite financial resources."). In short, and as the SRO found, the evidence does not reflect that the Student could not make progress in the CTT program with related services at Cobble Hill. Accordingly, DOE complied with the IDEA's substantive requirements and plaintiffs are therefore not entitled to tuition reimbursement. 20 U.S.C. § 1412(a)(10)(C)(i); see, e.g., Cerra, 427 F.3d at 195.

As set forth above, defendant offered the Student a FAPE for the 2008-2009 school year. Defendant is thus entitled to judgment as a matter of law and its motion should be granted.

## POINT II

### PLAINTIFFS' UNILATERAL PRIVATE PLACEMENT WAS INAPPROPRIATE

Because the IEP was adequate and defendant offered the Student a FAPE for the 2008-2009 school year, defendant "has satisfied its obligations under the IDEA and the necessary inquiry is at an end." M.C., 226 F.3d at 66. Nonetheless, even assuming *arguendo* that the IEP was not adequate to afford the Student with an appropriate education, tuition reimbursement is still not warranted because plaintiffs cannot demonstrate that their unilateral placement is appropriate to the Student's needs. See, e.g., Walczak, 142 F.3d at 129.

As previously stated, in determining the appropriateness of plaintiffs' unilateral placement, most of "the same considerations and criteria that apply in determining whether the School District's placement is appropriate should be considered." Frank G., 459 F.3d at 364. While the "test for the parents' private placement is that it is appropriate, and not that it is perfect," M.S. v. Yonkers Bd. of Educ., 231 F. 3d 96, 105 (2d Cir. 2000) (citation omitted), the IDEA's preference for educating disabled students in the least restrictive environment to the maximum extent appropriate "remains a consideration that bears upon a parent's choice of an alternative placement," id.; see generally 20 U.S.C. § 1412(a)(5)(A).

In New York, educating students in the "least restrictive environment" requires that "placement of students with disabilities in special classes, separate schools or other removal from the regular educational environment occurs only when the nature or severity of the disability is such that even with the use of supplementary aids and services, education cannot be satisfactorily achieved." 8 N.Y.C.R.R. § 200.1(cc). The regulation further provides that placement in the least restrictive environment means educating "the student to the maximum extent appropriate to the needs of the student with other students who do not have disabilities." Id.

It is undisputed that in plaintiffs' unilaterally chosen private placement, Winston Prep, the Student had *no* exposure to non-disabled peers. (See Def.'s 56.1 Statement ¶ 32.) Given this evidence, Winston Prep did not allow the Student to be educated in the least restrictive environment. In view of the IDEA's "strong preference" for educating students as much as possible in such an environment, plaintiffs' placement is inappropriate under the IDEA. Gagliardo, 489 F.3d at 108; see Walczak, 142 F.3d at 132; Pinn v. Harrison Cent. Sch. Dist., 473 F. Supp. 2d 477, 482 (S.D.N.Y. 2007) (denying plaintiffs' request for tuition reimbursement because, among other things, the unilaterally chosen placement was not the least restrictive placement for the student).

In addition, Winston Prep was not an appropriate placement because it did not provide the special education services the Student needed during the 2008-2009 school year. Specifically, it did not and could not provide either speech and language therapy or counseling, services that even plaintiff T.L. and the Student's teachers at Winston Prep acknowledged would be beneficial for the Student. (See Def.'s 56.1 Statement ¶ 33; Tr. 243-44.) Because Winston Prep failed to offer these services, plaintiffs cannot sustain their burden of demonstrating that Winston Prep was an appropriate private placement. See, e.g., Schreiber v. E. Ramapo Cent. Sch. Dist., 700 F. Supp. 2d 529, 554 (S.D.N.Y. 2010) (holding that the failure of the parents' unilaterally chosen private placement to offer necessary counseling was one of the factors precluding tuition reimbursement, and denying the parents' motion for summary judgment on that issue); Thies v. N.Y.

20

City Bd. of Educ., 2008 U.S. Dist. LEXIS 11354, at *8-9 (S.D.N.Y. Feb. 4, 2008) (holding that plaintiffs had not met their burden of demonstrating that their private placement was appropriate where the student only received private counseling and therapeutic services outside of the placement); Werner v. Clarkstown Cent. Sch. Dist., 363 F. Supp. 2d 656, 660 (S.D.N.Y. 2005) (holding that the parents failed to sustain their burden of showing that their placement offered their child necessary special education services where counseling was not part of the normal program of the school and had to be paid for separately).[6]

Finally, the record shows that the Student made no progress in reading and writing, his two greatest areas of academic need, during his 2008-2009 school year at Winston Prep. (See Def.'s 56.1 Statement ¶ 36.) A student's progress (or lack thereof) at a unilateral placement, while not dispositive, is relevant to a court's review of the appropriateness of a placement, Gagliardo, 489 F.3d at 115, and the Student's lack of progress in these subject areas also supports the conclusion that Winston Prep was not an appropriate placement.

In sum, because plaintiffs cannot show that their unilaterally chosen placement was appropriate for the Student, plaintiffs' claim for reimbursement for the costs incurred at Winston Prep must be denied. See, e.g., M.S., 231 F. 3d at 105.

## POINT III

### THE EQUITIES FAVOR DEFENDANT

While the Court need not consider the equities in this case because defendant offered the Student a FAPE, and because plaintiffs' unilateral placement was inappropriate, a consideration of the equitable factors also requires a finding in favor of defendant.

---

[6] Although the SRO was not required to review the appropriateness of plaintiffs' private placement (because the SRO found that DOE had offered the Student a FAPE), he also strongly suggested that Winston Prep was not an appropriate placement because it did not provide necessary related services to the Student. (See SRO Decision 17.)

Under the IDEA, a request for tuition reimbursement for a unilaterally chosen private school may be reduced or denied if:

> (aa) at the most recent IEP meeting that the parents attended prior to removal of the child from the public school, the parents did not inform the IEP Team that they were rejecting the placement proposed by the public agency to provide a free appropriate public education to their child, including stating their concerns and their intent to enroll their child in a private school at public expense; or
>
> (bb) 10 business days (including any holidays that occur on a business day) prior to the removal of the child from the public school, the parents did not give written notice to the public agency of the information described in item (aa).

20 U.S.C. § 1412(a)(10)(C)(iii)(I). In short, parents "cannot, in fairness, expect to recover for expenses [they] incurred prior to contacting the school board about [their] dissatisfaction with [their child's] IEP." M.C., 226 F.3d at 69 (citation omitted).

Here, the evidence plainly indicates that plaintiffs committed the Student to Winston Prep for the 2008-2009 school year prior even to the CSE review regarding the Student and before defendant recommended any specific placement for the Student. On April 15, 2008, plaintiffs signed an Enrollment Agreement for the Student's attendance at Winston Prep for the 2008-2009 school year, which committed them for payment of the entire year's tuition of $43,500.00 and which made no allowance for withdrawal. (See Def.'s 56.1 Statement ¶¶ 9, 10.) Plaintiffs also paid Winston Prep a reservation deposit of $4,350.00 by check dated April 11, 2008, and later made a payment of $19,575.00, the first half of the tuition fees for the 2008-2009 school year, by check dated May 26, 2008. (See id. at ¶¶ 11, 12.) Plaintiffs took all of these steps prior to the CSE review on June 10, 2008, and well in advance of receiving defendant's Final Notice of Recommendation, dated July 23, 2008, identifying Cobble Hill as the specific recommended school placement. (See id. at ¶¶ 10-13, 26.) This evidence strongly suggests that plaintiffs intended only to unilaterally place the Student in the private school of their choosing and retroactively seek tuition reimbursement. See, e.g., Carmel Cent. Sch. Dist. v. V.P., 373 F. Supp. 2d 402, 414-15 (S.D.N.Y. 2005). This action is not what the

IDEA contemplates, and should preclude any grant of relief.  See, e.g., Tucker v. Bay Shore Union Free Sch. Dist., 873 F.2d 563, 567 (2d Cir. 1989) (recognizing the "danger" that plaintiffs "might have sought to exploit the [Act] by selecting Eagle Hill without first fulfilling their obligation to work together with school officials to find a placement that was 'appropriate' within the meaning of the [Act]").

          In addition, there is no evidence that plaintiffs ever informed the CSE team during the June 10 CSE review that they had already enrolled the Student in Winston Prep and that they intended to seek reimbursement.  It was not until mid-August that plaintiffs informed defendant that the Student would be attending Winston Prep, and even then plaintiffs did not state that they were rejecting defendant's proposed placement or intending to seek reimbursement.  (See Pls.' Ex. E.)[7]  In fact, plaintiffs did not indicate that they were rejecting the proposed placement until October 10, 2008—over a month after the beginning of the school year.  (See Pls.' Ex. G; Tr. 232.)  Moreover, plaintiffs did not even visit the recommended placement until October 6, 2008—the same date on which plaintiffs made the second and final tuition payment to Winston Prep—and according to plaintiff T.L., she only made that visit at the request of her educational advocate.  (See Def.'s 56.1 Statement ¶¶ 28-29.)  Because plaintiffs did not give proper notice of their rejection of the recommended program and placement and their intent to seek reimbursement—particularly in light of the fact that they had enrolled the Student in Winston Prep prior to the CSE review and prior to visiting the recommended placement—tuition reimbursement should be denied.  See 20 U.S.C. § 1412(a)(10)(C)(iii)(I); M.C., 226 F.3d at 68-69; S.W. v. N.Y. City Dep't of Educ., 646 F. Supp. 2d

_____

[7] Although plaintiffs' August 2008 letter purported to be a "10-day notice letter as mandated by Federal law" (Pls.' Ex. E), the letter did not fulfill the notice requirements delineated under the IDEA.  See 20 U.S.C. § 1412(a)(10)(C)(iii)(I).  Specifically, the letter did not state that plaintiffs were rejecting the proposed placement, stating instead that plaintiffs "will notify the Committee if the program placement is appropriate and if they expect to enroll the child in the recommended placement"; did not state any definitive or specific concerns, including instead a boilerplate list of "and/or" possible complaints; and did not inform the CSE team of plaintiffs' intent to seek tuition reimbursement.  (Pls.' Ex. E.)

346, 364 (S.D.N.Y. 2009) (denying tuition reimbursement where plaintiff did not provide timely notice that she was rejecting defendant's placement and would be seeking tuition reimbursement for her unilateral enrollment of her child in a private placement, and where plaintiff enrolled her child in the unilateral placement prior to even visiting the recommended placement).

In a case recently decided by the Court in which the facts related to equitable considerations are virtually indistinguishable from the facts here, the Court denied tuition reimbursement solely on equitable grounds. See A.H. ex rel. J.H. v. N.Y. City Dep't of Educ., 652 F. Supp. 2d 297, 312 (E.D.N.Y. 2009), aff'd in part, rev'd in part on another ground, 2010 U.S. App. LEXIS 17173 (2d Cir. Aug. 16, 2010).[8]  Like plaintiffs here, plaintiff A.H. had not informed DOE that she had committed to paying a full year of tuition at the private school she had unilaterally selected for her child even prior to receiving DOE's Final Notice of Recommendation.  See id. at 312-13.  In unilaterally choosing to place her child in a private school "before DOE's process was complete," the Court found that "plaintiff demonstrated that she did not seriously intend to enroll J.H. in public school." Id. at 313.  The Court further found that "[t]o permit reimbursement in such a circumstance would encourage parents to sidestep the process established by Congress and New York law to ensure that disabled children receive a free appropriate public education." Id.  In a similar case, a court denied tuition reimbursement where the parents had not "reveal[ed] that they had already applied to, and been accepted at, a private school" until just before the school year at issue was to begin.  See Werner, 363 F. Supp. at 661.  As that court noted:

> Obviously, what went on here was that the parents decided to send a troubled son to private school in September 2002, found a school they liked (with no regard whatever for what his special education needs might be, because there had as yet been no

---

[8] The A.H. district court had granted in part and denied in part each party's respective motion for summary judgment.  See 652 F. Supp. 2d at 300.  On appeal, the Second Circuit reversed to the extent that summary judgment had been granted to plaintiff A.H. and denied to defendant DOE, remanding with instructions to enter judgment in favor of defendant.  See 2010 U.S. App. LEXIS 17173, at *11.

assessment and no determination about his needs), got their son accepted at the school, and then took steps to try to get the District to pay for the boy's private school education. The equities are clearly not on their side.

Id.

In sum, the evidence as a whole shows that plaintiffs committed the Student to Winston Prep well before the start of the 2008-2009 school year and before defendant had even the opportunity to conduct a CSE review or recommend a placement for the Student.  Because plaintiffs never intended to place the Student in or even seriously consider the public school program offered by DOE, and did not cooperate with DOE in its efforts to provide a FAPE, the equities weigh heavily against awarding plaintiffs tuition costs for the 2008-2009 school year.  See, e.g., S.W., 646 F. Supp. 2d at 364; Bettinger v. N.Y. City Bd. of Educ., 2007 U.S. Dist. LEXIS 86116, at *23-24, *35 (S.D.N.Y. Nov. 20, 2007) (noting that "a major consideration" in assessing equitable factors "is whether the parents have cooperated with the City throughout the process to ensure their child receive a FAPE" and denying tuition reimbursement on equitable grounds); Carmel, 373 F. Supp. 2d at 414-15.

## **CONCLUSION**

Based on the foregoing, defendant respectfully requests that plaintiffs' Complaint be dismissed in its entirety, that defendant's motion for summary judgment be granted, and that the Court grant defendant such other and further relief as the Court deems just and proper.

Dated:          January 7, 2011
                New York, New York

MICHAEL A. CARDOZO
Corporation Counsel of the City of New York
Attorney for Defendant
100 Church Street, Room 2-185
New York, NY 10007
(212) 788-0908
Fax: (212) 788-0940
tgantz@law.nyc.gov

By:_____s/_____
    Toni Gantz
    Assistant Corporation Counsel

25