UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------------X

T.L.. and D.L., on behalf of their child, B.L.,

                           Plaintiffs,

                                                                **10 CIV. 3125 (SLT) (LB)**

    -against-

DEPARTMENT OF EDUCATION OF THE
CITY OF NEW YORK,
                         Defendant.
---------------------------------------------------------------X

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION
TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

**1.    Preliminary Statement**

Plaintiff submits this memorandum of law in opposition to Defendant's motion for summary judgment.

**ARGUMENT**

**2.    DOE did not utilize sufficient evaluative data in the core subjects**

In order to make an appropriate recommendation, it is necessary to have adequate, sufficient, and relevant evaluative information. (8 NYCRR §200.4(d)(2)(i) ["The IEP shall report *present* levels of academic achievement and functional performance] [emphasis added]; Application of a Child with a Disability, Appeal No. 02-114; Application of a Child with a Disability, Appeal No 02-100; Application of the Bd. Of Educ., Appeal No. 02-008) In this case, the record does not adequately demonstrate that the CSE, as a team, considered or reviewed a sufficient amount of evaluative data so that they could have an appropriate understanding of B.L.'s needs. The June 10, 2008 IEP does not adequately describe the student's present level of cognitive, social/emotional and

1

academic functioning needs. Global and vague statements do not provide a meaningful description of the student's abilities or needs, nor provide sufficient specificity regarding the deficits that need to be addressed (See Exhibit C at p. 3-4). The IEP did not include data from standardized testing regarding the student's instructional levels in the core subjects of reading, writing and math. (Exhibit C) The June 10, 2008 IEP does not describe the student's present levels of academic performance. Teachers' estimates alone are not sufficient to provide baseline data on the student's present level of academic performance. (Exhibit C) The IEP did not even include a statement of the student's present level of academic achievement and functional performance with respect to his speech and language needs. (Exhibit C) Obviously, in order to generate an IEP that meets the needs of the student, one must have an accurate assessment of the student's present levels and a meaningful description of the student's critical areas of need. Here, the DOE failed to utilize critical data and thus failed to capture the necessity of small classroom environment for B.L.

**3.  The IEP failed to include speech and language goals**

An IEP is substantively invalid if it fails to include appropriate goals. (34 C.F.R. § 300.347[a][2]; 8 NYCRR 200.4[d][2][iii]; <u>Application of the Bd. Of Educ.</u>, Appeal No. 03-100; <u>Application of a Child with a Disability</u>, Appeal No. 99-97) Appropriate goals must accurately reflect the results of a child's evaluations to identify the child's needs, provide for the use of appropriate special education services to address the child's special educational needs, and establish annual goals and short-term instructional objectives which are related to the child's educational deficits. (<u>Application of a Child with a Disability</u>, Appeal No. 93-12; <u>Application of a Child with a Disability</u>, Appeal No. 93-9) Here, the record shows that the IEP did not include academic and functional goals relating to the student's speech and language needs. (Exhibit C) even though the

2

CSE's evaluations showed critical deficits. Without these goals, the IEP is fundamentally flawed.[1]

### 4. The DOE changed the placement without a written evaluation

The CSE made a program recommendation of a collaborative team teaching class. This program recommendation was a change from the previous year's recommendation of a special class with a 12:1:1 staffing ratio in a community school.(Ex. C-1, C-12). (Tr. 222) Under New York law, if the CSE recommends a modification of a child's current placement it must do so pursuant to a written evaluation, furnished to the parent, setting forth the reasons for such modifications. NY Education Law §4402 (b)(3)(b)(i); 8 NYCRR §200.4(b)(6)(vii); see also 20 USC 1415 (c) requiring a school district seeking to initiate a change in placement to provide: (1) a description of each evaluation procedure, assessment or report the agency used as a basis, and (2) description of other options considered by the CSE team, and a reasons those options were rejected. The June 10, 2008 IEP failed comply with these requirements.

### 5. DOE Could Not Implement the IEP

The Impartial Hearing Officer properly determined that the lack of specialized instruction by a special education teacher in the elective classes required for graduation from high school is not a de minimis violation; it is a material failure rendering the placement inappropriate as a matter of law. The CTT class would not apply to required electives such as Spanish, art, music, technology and law. Rather, these classes would be taught in general education classes with no special education teacher. Art and music were required for graduation as were a total of seven electives.(Tr. 33-34,

---

[1] Defendant has argued that pragmatic goals are a substitute for speech and language goals. Pragmatic skills relate to socialization with peers and reacting appropriately in a social situations and is not speech and language. In fact, a student may have no deficits in speech and language but still have pragmatic language deficits.

3

68-69). For the 2008-2009 school year, Spanish classes at the recommended placement contained between 25 and 30 students (Tr. 35). It is clear that B.L. required a much smaller classroom environment with individual special education instruction.

### 6. The large class size is inappropriate to meet BL.'s needs

The CSE made a program recommendation of a collaborative team teaching ("CH") class with a 14:1 staffing ratio in a general education classroom and the related services of counseling and speech/language therapy. This program recommendation was a change from the previous year's recommendation of a special class with a 12:1:1 staffing ratio in a community school. (Ex. C-1, C-12). (Tr. 222) The parent visited the recommended placement in October 2008.(Tr. 224, 254). At the recommended placement, the parent observed a History class. (Tr. 224). There were approximately 15-20 students in the CTT class, and a general education teacher and a special education teacher. (Tr. 224). The special education teacher only remained in the class for approximately 20 minutes; he spoke to a group of 4 students and then left.(Tr. 224-225). The parent did not find the recommended placement to be appropriate for her son. The class was too large and disruptive for her son to learn.(Tr. 227-228). The CTT class at the recommended placement would only be held in the subjects of math, science, English and social studies.(Tr. 31, 68-69). The CTT class would not apply to required electives such as Spanish, art, music, technology and law. Rather, these classes would be taught in general education classes with no special education teacher. For the 2008-2009 school year, Spanish classes at the recommended placement contained between 25 and 30 students (Tr. 35). Within a CTT class, 14 students is the cap for the special education students, not for the class as a whole but typically those classes would have approximately twenty students. At the beginning of the 2008-2009 school year, the CTT class at the recommended placement

4

contained 20-25 students. At the time of the hearing in this matter, the class contained 25 students.(Tr. 52, 71, 182). Bodall (Dean and Teacher) testified that it would be very difficult for B.L. to succeed in a class with twenty students, even if there were two teachers in the class: one general education and one special education (Tr. 102-103)Weiner testified that B.L. was often distractible even in their one to one sessions (Tr. 138). Here, the evidence is overwhelming that B.L. needed to continue his placement in a 12:1:1 self contained classroom.

### 7. Winston Prep was an appropriate placement

Winston Prep, a private school for children with learning and speech disabilities, is an appropriate placement for B.L. as it provides the small class and small school environment that he required. Significantly, as a small school, recognizing B.L's strong need for individual attention, and small class size meets B.L.'s needs as a highly distractible student. Furthermore, at Winston Prep, B.L.'s academic programs are broken down into smaller groups so that his distractability is minimized and he can receive more one-on-one instruction, teacher modeling, and preferential seating. Speech and language was incorporated throughout the day as well as pragmatic skills. Winston Prep had a 12:1 staffing ratio.(Tr. 100) The students in a Winston Prep class tended to have largely homogeneous issues, which allowed the teacher to work both individually with students and with the group as a whole Similar to B.L., the students in his class had deficits in the areas of expressive language and attention/focusing.(Tr. 100, 1 15, Ex. K). Bodall noted that in addition to the individualized attention that the student received in class, Bodall often spent extra individualized time with the student during lunch periods or after school to further address the student's weaknesses (Tr. 95)

Mayer Weiner, the student's Focus teacher for the 2008-2009 school year, saw the student

5

every day, five days a week for 45 minutes a day (Tr. 135). improving reading comprehension, completing an essay properly and advocating for himself in the classroom (Tr. 138). This goal was something that the student and Weiner continued to work toward throughout the year (Tr. 138-139). Progress reports written by Winston Prep teachers presented specific goals and methodologies to address B.L.'s key deficit areas, including: reading (e.g. inferential skills), written expression, organizational skills, study and homework skills and social functioning.(Exs. I, J). B.L. completed at-home reading assignments and answered comprehension in a journal. B.L. learned to strengthen organization, time management and study skills through a weekly and monthly syllabus and graphic organizers.(Ex. 1-3-4). B.L. also learned to facilitate the writing process and organization through note taking, brainstorming, outlining, rough drafts and editing. He reinforced study and homework skills through the use of time management, binder organization and homework completion.(Ex. I-5). B.L.'s deficits in pragmatic language were addressed in and out of the classroom . B.L. improved his expressive language through participating in structured class discussions in his Literature course. B.L. further improved his expressive language through methodologies utilized in his Writing and Language Skills classes, including: focusing on receptive and expressive language. The student's deficits in this area were addressed in and out of the classroom (Tr. 99, 124-126). The student improved his expressive language through participating in structured class discussions in his Literature course (Ex. I-3). The one to one attention B.L. received in his classes at Winston Prep helped him to succeed academically and socially. B.L.'s daily one to one time with his Focus Teacher helped the student to succeed. (Tr. 92, 100, 104, 147, 153, 229). His speech and language were directly addressed and significantly improved. His ability to get along with other students also improved.

Progress reports comment from the student's teachers included the following: B.L. is able to give interesting and informative presentations that show his research and knowledge. has taken a positive turn and has since been producing quality work and has maintained consistency with all assignments. B.L. is increasingly confident as a student.(Ex. J). For the 2008-2009 school year, the student's grades were in the B range; he did not fail any classes. At Winston Prep, the student is earning credits toward a high school diploma and is on track to graduate.(Tr. 97, 107-108, 130, 167). Therefore, Winston Prep provided B.L. with an appropriate education.

### 8. The equities support a claim for tuition reimbursement

The DOE has argued that an award of tuition reimbursement would be improper because the parent had placed a deposit at Winston Prep. The equities do not prohibit a parent from entering into a contract with a private school prior to the start of the school year. The case law is well settled that a parent's preference for a private school placement is not dispositive of a claim for tuition reimbursement. (Application of a Child with a Disability, Appeal No. 05-070; Application of a Child with a Disability, Appeal No. 03-003) Moreover, the equities do not prohibit a parent from entering into a contract with a preferred private school prior to the start of the school year. See, Application of a Child with a Disability, Appeal No. 03-091; Application of a Child with a Disability, Appeal No. 02-059. The DOE still did not recommend a placement until after school had closed. This deprived the parent of an opportunity to visit the program. As a result, the parent, did what any parent would do under these extraordinary circumstances, the parent as a safeguard secured a seat. What would the DOE have parent do. Wait until the placement recommendation in the middle of the summer and then visit the program in the fall and then scramble to hope to be able to find a seat in a special education school in the event the program as in this case did not meet the student's needs.

It is ironic that due to the DOE's own delay in recommending an inappropriate program, the DOE stands to benefit from its own delay in recommending a placement.

In other words, DOE did not recommend a placement until the summer, after school was no longer in session. . Thus, DOE deprived the parent of a disabled child an opportunity to actually view the program and decide its appropriateness for BL. until the start of the new school year. The evidence demonstrates that the parent has been cooperative with the CSE. The parent always provided the CSE with any requested information and attended CSE meetings.

What should have the parent done under these circumstances? Should the parent have patiently waited until the start of the school year to first observe the program and then if it was not appropriate to then begin searching for an appropriate program. Thus, BL would have been placed in a inappropriate program while the parent would then desperately look for an available seat in a special education school that could meet BL's education needs. In short, the parent had no choice but to secure a seat at a private special school and could not wait until September to begin the search. Finally, clearly by August 15, 2008 the DOE was placed on notice of the inadequacy of its program and that BL would be attending Winston Prep. Certainly by at the latest the time of the hearing request on January 15, 2009, the DOE was on notice that the parent was seeking tuition reimbursement. However, the DOE did not change its program. Under these circumstances, the tuition reimbursement should be allowed or only slightly reduced.

## **CONCLUSION**

For the foregoing reasons, Plaintiff respectfully requests that this Court grant his summary judgment in all respects, that the determination of the SRO be vacated, and that the Court find that the DOE had failed to offer a free and appropriate education to B.L.. Plaintiff also respectfully

requests that the Court find that Winston Prep was an appropriate placement, that equitable factors support an award of tuition reimbursement and that tuition be awarded for the 2008-2009 school year together with costs, a reasonable attorney fee, and disbursements and for such other relief as the Court deems just and appropriate.

Dated: New York, New York
March 3, 2011

Respectfully submitted,

s/Stewart Lee Karlin, Esq.
NEAL H. ROSENBERG (NHR 7827)
STEWART LEE KARLIN (SLK3720)
Attorneys for Plaintiff
9 Murray Street, Suite 4W
New York, NY 10007
(212) 732-9450

TO: Toni Gantz, Ass't Corp Counsel
via ECF