UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
**10 CIV. 3125 (SLT) (LB)**
X------------------------------------------------------------X

T.L.. and D.L., on behalf of their child, B.L.,

Plaintiffs,

-against-

DEPARTMENT OF EDUCATION OF THE
CITY OF NEW YORK,

Defendant.

X------------------------------------------------------------X

**PLAINTIFF'S MEMORANDUM OF LAW IN
<u>SUPPORT OF HIS MOTION FOR SUMMARY JUDGMENT</u>**

Respectfully submitted,


s/Stewart Lee Karlin, Esq.
NEAL H. ROSENBERG (NHR 7827)
STEWART LEE KARLIN (SLK3720)
Attorneys for Plaintiff
9 Murray Street, Suite 4W
New York, N.Y. 10007
(212) 732-9450

TO:  Toni Gantz, Esq.
     Ass't Corp Counsel
     via ECF

# TABLE OF CONTENTS

**Item**                                                                                      **Page**

TABLE OF CONTENTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . i-ii

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii-iv

PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT
OF HIS MOTION FOR SUMMARY JUDGMENT . . . . . . . . . . . . . . . . . . . . . . . . . 1-8

1.  Preliminary Statement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

2.  Procedural History . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1-2

3.  Factual Statement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2-8

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8-19

1.  A De Novo Review is Required and little weight should be given to the SRO Decision

since there were numerous errors as set forth below . . . . . . . . . . . . . . . . . . . . . . 8-9

2.  The DOE Failed to Comply with the Procedural Requirements of the IDEA

and New York State Law . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9-13

1.  *The DOE denied J.H. FAPE because B.L.'s related services provider did not*

    *participate in the development of the IEP* . . . . . . . . . . . . . . . . . . . . . 10-11

2.  *The DOE denied FAPE because the CSE did not utilize sufficient evaluative data*

    *at the CSE review* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11-12

3.  *The DOE Improperly Changed the Placement* . . . . . . . . . . . . . . . . . . . . . 12

4.  *DOE failed to Implement the IEP* . . . . . . . . . . . . . . . . . . . . . . . . . 12-13

3.  The DOE failed to comply with the substantive requirements of the IDEA . . . . . . 13

1.  *The goals, and objectives of the IEP fail to appropriately address J.H.'s*

i

  *special education needs* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13-14

   2. *The large size setting of PS 32 is inappropriate to meet J.H.'s needs* . . . . . . 14-15

**4.** **The parents' placement appropriately meets B.L.'s needs** . . . . . . . . . . . . . . . 15-19

**5.** **The equities support a claim for tuition reimbursement** . . . . . . . . . . . . . . . . . . . 19

**CONCLUSION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19-20

# TABLE OF AUTHORITIES

**Statute**                                                                    **Page**

8 NYCRR §200.3(a)(1)(iii) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

8 NYCRR §200.4(d)(2)(i) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

8 NYCCR §200.4(d)(2)(iii)(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

34 C.F.R. § 300.347[a][2]; 8 NYCRR 200.4[d][2][iii] . . . . . . . . . . . . . . . . . . . . . . . 12

20 U.S.C. §1412 [a][10][C][iii][I] . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

IDEA 20 U.S.C. 1400 et. seq. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Arlington Cent. Sch. Dist. v. D.K.*
2002 WL 31521158 [S.D.N.Y. 2002]) (34 C.F.R. § 300.344[a][3] . . . . . . . . . . . . . . . . 9,10

*Board of Education v. Rowley*
457 U.S. 176, 206-207 (1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Burlington,* 471 U.S. at 370 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Carter,* 510 U.S. at 12, 15 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Frank G. v. Bd. of Educ.*
459 F.3d 356, 364 (2d Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Grim v. Rhinebeck Cent. Sch. Dist.,*
346 F.3d 377, 381 (2d Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*J.D. v. Pawlet Sch. Dist.,*
224 F.3d 60, 69 (2d Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*M.S. v. Bd. of Educ.,*
231 F.3d 96, 104 [2d Cir. 20000] . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Walczak v. Florida Union Free Sch. District,*
142 F.3d 119, 129 (2nd Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8,9

*Walker County School District v. Bennett 203 F.3d 1293 (11th Cir. 2000) cert. denied,*
531 U.S. 1059 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Werner v. Clarkstown Cent. Sch. Dist.,*
363 F. Supp. 2d 656, 659 [S.D.N.Y. 2005] . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

**Applications of a Child with a Disability**

<u>Application of a Child with a Disability</u>; Appeal No. 05-087 . . . . . . . . . . . . . . . . . . . . . . . 10

<u>Application of a Child with a Disability</u>; Appeal No. 07-105) 35 . . . . . . . . . . . . . . . . . . . . . . 11

<u>Application of a Child with a Disability</u>, Appeal No. 02-114 . . . . . . . . . . . . . . . . . . . . . . . 11

<u>Application of a Child with a Disability</u>, Appeal No 02-100 . . . . . . . . . . . . . . . . . . . . . . . 11

<u>Application of the Bd. Of Educ.</u>, Appeal No. 02-008 . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

<u>Application of a Child with a Disability</u>; Appeal No. 95-57 . . . . . . . . . . . . . . . . . . . . . . . 15

<u>Application of a Child with a Disability</u>; Appeal No. 94-34 . . . . . . . . . . . . . . . . . . . . . . . 15

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------X

T.L.. and D.L., on behalf of their child, B.L.,

                                 Plaintiffs,

                                                                    **10 CIV. 3125 (SLT) (LB)**

        -against-

DEPARTMENT OF EDUCATION OF THE
CITY OF NEW YORK,
                                 Defendant.
-------------------------------------------------------------X

## PLAINTIFF'S MEMORANDUM OF LAW IN
## SUPPORT OF HIS MOTION FOR SUMMARY JUDGMENT

**1.**     **Preliminary Statement**

Plaintiff submits this memorandum of law in support of his motion for summary judgment.

**2.**     **Procedural History**

This matter arises pursuant to the Individual with Disabilities Education Act (hereinafter

IDEA 20 U.S.C. 1400 et. seq. The Impartial Hearing Officer found that the DOE did not establish

that it offered the student an appropriate program and placement for the 2008 2009 school year. The

IHO further found that the Winston Prep program was appropriate for the student and met his special

education needs for the 2008-2009 school year. Finally, the IHO found that there was nothing in

the record to preclude tuition reimbursement on equitable grounds. The IHO directed the DOE to

reimburse the parent for the cost of the student's placement at Winston Prep for the 2008-2009

school year in the amount of $43,500.00. (Exhibit "B"). Thereafter, the DOE timely filed a petition

for review at the New York State Office of State Review. On March 12, 2010 , the New York State

Review Officer ("SRO") improperly and erroneously held that the District had offered a FAPE for

1

the 2008-2009 school year despite the fact that the Plaintiffs had demonstrated that the Individualized Education Program (IEP) placement of a collaborative team teaching ("CH") class with a 14:1 staffing ratio and the related services of counseling and speech/language therapy was not sufficient to meet B.L.'s needs and that DOE's program recommendation was a significant change from the previous year's recommendation of a special class with a 12:1:1 staffing ratio in a community school. As a result of the adverse SRO decision dated March 12, 2010, a *de novo* appeal is herein being filed. (Exhibit "A") On or about July 6, 2010 plaintiff filed the instant case seeking to annul the decision of the S.R.O. and reinstate the decision of the Impartial Hearing Officer.

### 3.  Factual Statement

The Court is respectfully referred to Plaintiff's 56.1 statement for the factual background. However, in sum, the following is summary of the pertinent background. B.L. was born on May 8, 1993 and lives in Brooklyn, New York (Ex. C 1). The student functions in the average range of intellectual ability (Ex. 7-7). Socializing is very difficult for the student; he has difficulty making friends (Tr. 70). He has difficulty reading social cues (Tr. 136). The student's processing speed is significantly delayed (Ex. 7-4). He has difficulties in terms of writing and analytical work (Tr. 70). The student has been diagnosed with attention deficit hyperactivity disorder ("ADHD") and needs frequent assistance with maintaining focus; he can be impulsive and distractible (Tr. 100, 135-136). As a result, he often struggles to participate effectively in a classroom environment and to demonstrate his strengths (Id.). In April of 2006, the student underwent a neuro developmental evaluation at The McCarton Center in New York, New York (Ex. 7). Based on the evaluation, various recommendations were made in order to assist the student in achieving his full potential (Ex. 7-8). These recommendations included placement in a school with small classes, specialized

resources for meeting the student's needs and a positive environment in which to learn (Ex. 7-9).On June 10, 2008, the CSE scheduled an annual review meeting to develop an IEP for the student for the 2008-2009 school year (the "IEP") (Ex. C). The parent and her advocate participated via telephone (Tr. 222, 235). The CSE classified the student with a disability under the "other health impairment" disability category which is not in dispute (Tr. 181; Ex. C-1).

The CSE made a program recommendation of a collaborative team teaching ("CH") class with a 14:1 staffing ratio and the related services of counseling and speech/language therapy (Ex. C-1, C-12). This program recommendation was a significant change from the previous year's recommendation of a special class with a 12:1:1 staffing ratio in a community school (Tr. 222). At the time of the IEP meeting, the parent did not agree with the team's recommendation of a CH class due to the student's need for individualized attention in the small classroom and re-focusing (Tr. 203, 223). During the IEP meeting, the parent's advocate also noted that a CTT class would be inappropriate for the student (Tr. 241-242). At the end of the IEP meeting, the CSE team was aware that the parent was not in agreement with the program recommendation (Tr. 212). In a letter dated July 23, 2008, the DOE provided final recommendations for the student, including a placement in a CTT class in Cobble Hill School of American Studies (the "recommended placement") (Ex. D). In a letter dated August 15, 2008, the parent informed the DOE that she would enroll the student in Winston Prep for the 2008-2009 school year (Ex. E-1).     The parent visited the recommended placement in October 2008 (Tr. 224, 254). Any delay in the visiting the school was due to the fact that the parent was recovering from surgery in September (Tr. 233, 255). At the recommended placement, the parent observed a History class (Tr. 224). There were approximately 15-20 students in the CTT class, and a general education teacher and a special education teacher (Tr. 224). The

3

special education teacher only remained in the class for approximately 20 minutes; he spoke to a group of 4 students and then left (Tr. 224-225).

The parent did not find the recommended placement to be appropriate for the student (Tr. 227-228). The class was too large and disruptive for her son to learn there (Id.). The parent spoke with Gail Trimmer, the compliance coordinator of special education at the recommended placement (Tr. 225). The parent described the student to Trimmer (Tr. 225-227). Trimmer said that a CH class would not be appropriate for the student (Tr. 227). The CTT class at the recommended placement would only be held in the subjects of math, science, English and social studies (Tr. 31, 68-69).The CTT class would not apply to required electives such as Spanish, art, music,technology and law (Tr. 33). Rather, these classes would be taught in general education classes with no special education teacher (Tr. 34, 68-69). Art and music were required for graduation as were a total of seven electives (Id.). For the 2008-2009 school year, Spanish classes at the recommended placement contained between 25 and 30 students (Tr. 35).

Within a CTT class, 14 students is the cap for the special education students, not for the class as a whole (Tr. 182). At the beginning of the 2008-2009 school year, the CTT class at the recommended placement contained 22 students (Tr. 52). At the time of the hearing in this matter, the class contained 25 students (Tr. 71). In a letter dated October 10, 2008, the parent submitted an additional notice to the DOE that she had visited the recommended placement and did not find it to be appropriate for the student for the reasons stated above (Ex. G-I). In the same letter, further written notice was provided to the DOE that the student would attend Winston Prep for the 2008-2009 school year and that the parent would request an impartial hearing (Id.).

For the 2008-2009 school year at Winston Prep, the student took the following classes: Math,

Science, History, Literature, Writing, Language Skills, Focus, Physical Education and Art (Ex. L). Classes at Winston Prep had a 12:1 staffing ratio; only physical education classes might be slightly larger (Tr. 100). The students in a Winston Prep class tended to have largely homogeneous issues, which allowed the teacher to work both individually with students and with the group as a whole (Tr.94). Similar to the student, the students in his class had deficits in the areas of expressive language and attention/focusing (Tr. 1 15; Ex. K).

Progress reports written by Winston Prep teachers presented specific goals and methodologies to address the student's key deficit areas, including: reading (e.g. inferential skills), written expression, organizational skills, study and homework skills and social functioning (Exs. I, J). B.L.'s Literature course featured developing independent reading and critical thinking skills through studying such classics as Shakespeare's Macbeth and Hamlet (Tr. 91-92; Ex. 1-2). Reading comprehension was a relative strength for B.L.; his Literature teacher estimated his reading level to be at about the twelfth grade level (Tr. 92, 93, 121; Ex. I-1). B.L. completed at-home reading assignments and answered comprehension in a journal (Ex. I-1). B.L. developed analytical reading skills and practiced essay writing through the use of cognitive mapping and linear outlining (Ex. I-3). B.L. learned to strengthen organization, time management and study skills though a weekly and monthly syllabus and graphic organizers (Ex. 1-3-4). B.L. also learned to facilitate the writing process and organization through note taking, brainstorming, outlining, rough drafts and editing (Ex. I-5). He reinforced study and homework skills through the use of time management, binder organization and homework completion (Id.). B.L.'s deficits in pragmatic language were exhibited in B.L. speaking in an inappropriate way in social settings (Tr. 124-126). B.L.'s deficits in this area were addressed in and out of the classroom (Tr. 99). B.L. improved his expressive language through

participating in structured class discussions in his Literature course (Ex. I-3). B.L. further improved his expressive language through methodologies utilized in his Writing and Language Skills classes, including: focusing on receptive and expressive language.

Bodall noted that in reading, B.L. needed guidance in recognizing and interpreting literary devices, such as metaphor (Tr. 92-93, 96). B.L. needed assistance in analysis in his written expression (Tr. 92-94). Bodall noted that in addition to the individualized attention that B.L. received in class, Bodall often had to spend extra individualized time with B.L. during lunch periods or after school to further address B.L.'s weaknesses (Tr. 95). Bodall testified that it would be very difficult for B.L. to succeed in a class with twenty students, even if there were two teachers in the class: one general education and one special education (Tr. 102-103). Bodall concluded that Winston Prep was an appropriate special education placement for B.L. for the 2008-2009 school year (Tr. 103-104). Bodall testified that the one to one attention B.L. received in his classes at Winston Prep helped him to succeed academically and socially (Tr. 105). Bodall noted that B.L.'s daily one to one time with his Focus Teacher helped B.L. to succeed ("Fr. 105-106).

Mayer Weiner, B.L.'s Focus teacher for the 2008-2009 school year, testified about B.L. and his work with him (Tr. 133-173). Weiner has a master's degree in learning disabilities (Tr. 133). The job of a Focus Teacher at Winston Prep is to develop an understanding of B.L. and then share that understanding with B.L.'s team: all the teachers and others involved in maximizing B.L.'s education (Tr. 134). Weiner has been a Focus Teacher for the past eight years that he has spent at Winston Prep (Tr. 133-134). During the 2008-2009 school year, Weiner saw B.L. every day, five days a week for 45 minutes a day (Tr. 135). On a short school day, Weiner would see B.L. for 30 to 35 minutes (Tr. 135).Weiner testified that B.L. was often distractible even in their one to one sessions (Tr. 138).

Weiner testified about the goals he set for B.L. for the 2008-2009 school year and how they worked toward them (Tr. 138-144). Weiner wanted B.L. to reach the goals of improving reading comprehension, completing an essay properly and advocating for himself in the classroom (Tr. 138).Weiner took the goal of self-advocacy in the classroom and broke it down into smaller pieces (Tr. 139). For example, Weiner, B.L. and B.L.'s teachers met together in order to have a positive discussion (Tr. 139-140). Then, as situations arose, Weiner and B.L. would role-play as if B.L. were asking the teacher questions (Tr. 140). This goal was something that B.L. and Weiner continued to work toward throughout the year (Tr. 138-139). B.L. appeared to have a fear of confrontation, which Weiner discussed with Bodall, the dean, and the staff social worker (Tr. 139-140). Weiner also worked with B.L. in learning to follow the topic of discussion in a class and to avoid saying unrelated things (Tr. 142).

For the 2008-2009 school year, B.L. received a grade of B- in Focus (Tr. 170). He showed progress in reaching his Focus goals throughout the year (Tr. 147). Weiner testified that in order to succeed, B.L. needed to be in a small class where the teacher could keep him focused and on track and provide consistent one to one assistance (Tr. 143-144). Weiner further testified that in terms of class size, the "smaller the better" would be appropriate for B.L. (Tr. 144-145). B.L. showed progress during the 2008-2009 school year at Winston Prep (Tr. 92, 100, 147, 153, 229). As the school year progressed, B.L. improved in submitting assignments and in answering questions in class (Tr. 92, 104). His attention and focus in class improved (Tr. 100, 104, 153). Progress report comments from B.L.'s teachers included the following: "[B.L.] is able to give interesting and informative presentations that show his research and knowledge." (Ex. J-3); "[B.L.] has taken a positive turn and has since been producing quality work and has maintained consistency with all assignments." (Ex.

J-3); ".... For the 2008-2009 school year, B.L.'s grades were in the B range; he did not fail any classes (Tr. 97, 130, 167). At Winston Prep, B.L. is earning credits toward a high school diploma and is on track to graduate (Tr. 107-108).

## ARGUMENT

1. **A De Novo Review is Required and little weight should be given to the SRO Decision since there were numerous errors as set forth below**

Under IDEA, the role of the Court is not an appellate role. In fact, the Court must conduct a *de novo* review of IDEA administrative decision. *See Walker County School District v. Bennett 203 F.3d 1293 (11th Cir. 2000) cert. denied 531 U.S. 1059 (2000);* In fact, Section 1415 (i) (2) (B) states that in any action brought under this paragraph, the court (i) shall receive the records of the administrative proceedings; (ii) shall hear additional evidence at the request of a party; and (iii) basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate Thus, the Court should receive the entire record of the proceeding in order to be able to conduct a *de novo review*. IDEA requires the Court to review the findings of the administrative proceeding and base its decision on the preponderance of the evidence. *Board of Education v. Rowley,* 457 U.S. 176, 206 (1982). However, the provision that a reviewing court bases its decision on the preponderance of the evidence is by no means an invitation to the courts to substitute their own notions of sound educational policy for those of the school authorities which they review. The Second Circuit echoed the Rowley holding to wit: two issues are relevant to a federal court's review of a challenged IEP: (1) whether the state complied with the procedural requirements of IDEA and (2) whether the challenged IEP was reasonably calculated to enable the child to receive educational benefits.see *Rowley supra* at 206-207 and *Walczak v. Florida Union*

*Free Sch. District,* 142 F.3d 119, 129 (2nd Cir. 1998)   While federal courts do not simply rubberstamp administrative decisions, they are expected to give due weight to these proceedings, mindful that the judiciary generally lacks the specialized knowledge and experience necessary to resolve persistent and difficult questions of educational policy. *Walczak supra* at 129.   However, little weight should be given to the SRO Decision since there were numerous errors as set forth below. After full review of the evidence, and based upon credibility of the witnesses testimony, the IHO correctly found that the DOE failed to offer an appropriate placement; that respondent's placement was appropriate to meet the child's needs, and that equitable considerations did not preclude reimbursement award.   The IHO's decision was made after careful evaluation of both the transcripts and documents submitted, and should be upheld because it was supported by all of the testimony and substantial evidence submitted at the bearing.

## 2.     The DOE Failed to Comply with the Procedural Requirements of the IDEA and New York State Law

While school districts are required to comply with all IDEA procedures, not all procedural errors render an IEP legally inadequate under the IDEA. Grim v. Rhinebeck Cent. Sch. Dist., 346 F.3d 377, 381 (2d Cir. 2003) If a procedural violation has occurred, relief is warranted only if the violation affects the student's right to a FAPE. (J.D. v. Pawlet Sch. Dist., 224 F.3d 60, 69 (2d Cir. 2000) A denial of FAPE occurs when procedural inadequacies either result in a loss of educational opportunity for the student or seriously infringe on the parents' opportunity to participate in the IEP formulation process (see, Werner v. Clarkstown Cent. Sch. Dist., 363 F. Supp. 2d 656, 659 [S.D.N.Y. 2005]); or compromise the development of an appropriate IEP in a way that deprives the student of educational benefits under that IEP. (see Arlington Cent. Sch. Dist. v. D.K., 2002 WL

31521158 [S.D.N.Y. 2002]) In this case, the CSE's procedural violations created a loss of educational opportunity ., thereby denying B.L. FAPE.

1. *The DOE denied J.H. FAPE because B.L.'s related services provider did not participate in the development of the IEP*

The record establishes that At the IEP meeting, the CSE failed to include the participation of a related service provider who provided the student with speech/language therapy. (Exhibit C)

Federal and state regulations require that the membership of each CSE include at least one special education teacher of the child. (34 C.F.R. § 300.344[a][3]; 8 NYCRR §200.3(a)(1)(iii)) The special education teacher who is a member of the CSE team should be the person who is or will be responsible for implementing the IEP. The record clearly demonstrates that one of the critical deficits is speech and language and that the service provider did not participate at all in the development of the IEP. The State Review Officer (SRO) has found that the absence of an appropriate special education teacher at a CSE meeting impedes the development of an appropriate IEP for a student because it "deprives the student and her parent of the perspective and input of a special education teacher familiar with the self-contained special education class and program recommended as appropriate for the student's needs." Application of a Child with a Disability; Appeal No. 05-087[1]; *see also* Application of a Child with a Disability; Appeal No. 07-105) 35. The IEP did not even include a statement of the student's present level of academic achievement and functional performance with respect to his speech and language needs. (Exhibit C) The IEP did not include academic and functional goals relating to the student's speech and language needs. (Exhibit C) Here,

---

[1]This refers to a New York State Review Office Decision. The decision are on their website.

without the special education provider participating in the IEP, the resulting IEP could not have fully captured the special education needs of B.L., thereby denying him a FAPE.

2. *The DOE denied FAPE because the CSE did not utilize sufficient evaluative data at the CSE review*

In order to make an appropriate recommendation, it is necessary to have adequate, sufficient, and relevant evaluative information. (8 NYCRR §200.4(d)(2)(i) ["The IEP shall report *present* levels of academic achievement and functional performance] [emphasis added]; Application of a Child with a Disability, Appeal No. 02-114; Application of a Child with a Disability, Appeal No 02-100; Application of the Bd. Of Educ., Appeal No. 02-008) In this case, the record does not adequately demonstrate that the CSE, as a team, considered or reviewed a sufficient amount of evaluative data so that they could have an appropriate understanding of B.L.'s needs.

The June 10, 2008 IEP does not adequately describe the student's present level of cognitive, social/emotional and academic functioning needs. Global and vague statements do not provide a meaningful description of the student's abilities or needs, nor provide sufficient specificity regarding the deficits that need to be addressed (See Exhibit C at p. 3-4). B.L. needed to be in a smaller classroom and he would not have succeeded in a class with twenty students, even if there were two teachers in the class: one general education and one special education. B.L. needed to be in a small class where the teacher could keep him focused and on track and provide consistent one to one assistance. (Exhibit C (Tr. 102-105, 143-145). The IEP did not include data from standardized testing regarding the student's instructional levels in the core subjects of reading, writing and math. (Exhibit C) The June 10, 2008 IEP does not describe the student's present levels of academic performance. Teachers' estimates alone are not sufficient to provide baseline data on the student's

present level of academic performance. (Exhibit C) The IEP did not include academic and functional goals that were specific and measurable. (Exhibit C) New York law requires that "the IEP shall list measurable annual goals, including academic and functional goals, consistent with the student's needs and abilities." (8 NYCCR §200.4(d)(2)(iii)(a)

Here, the DOE failed to utilize current data and thus failed to capture the necessity of small classroom environment for B.L.

3.   *The DOE Improperly Changed the Placement*

The CSE made a program recommendation of a collaborative team teaching ("CH") class with a 14:1 staffing ratio and the related services of counseling and speech/language therapy. This program recommendation was a change from the previous year's recommendation of a special class with a 12:1:1 staffing ratio in a community school.(Ex. C-1, C-12). (Tr. 222)   Under New York law, if the CSE recommends a modification of a child's current placement it must do so pursuant to a written evaluation, furnished to the parent, setting forth the reasons for such modifications. NY Education Law §4402 (b)(3)(b)(i); 8 NYCRR §200.4(b)(6)(vii); see also 20 USC 1415 (c) requiring a school district seeking to initiate a change in placement to provide: (1) a description of each evaluation procedure, assessment or report the agency used as a basis, and (2) description of other options considered by the CSE team, and a reasons those options were rejected. The June 10, 2008 IEP failed comply with these requirements.

4.   *DOE failed to Implement the IEP*

Lastly, the Impartial Hearing Officer properly determined that DOE failed to implement the IEP. Contrary to the Petitioner's assertions, lack of specialized instructions by a special education teacher in the elective classes required for graduation from high school is not a de minimis violation;

it is a material failure rendering the placement inappropriate as a matter of law. The CTT class would not apply to required electives such as Spanish, art, music, technology and law. Rather, these classes would be taught in general education classes with no special education teacher. Art and music were required for graduation as were a total of seven electives.(Tr. 33-34, 68-69). For the 2008-2009 school year, Spanish classes at the recommended placement contained between 25 and 30 students (Tr. 35). It is clear that B.L. required a much smaller classroom environment with individual instruction.

### 3. The DOE failed to comply with the substantive requirements of the IDEA.

#### *1. The goals, and objectives of the IEP fail to appropriately address J.H.'s special education needs*

An IEP is substantively invalid if it fails to include appropriate goals. (34 C.F.R. § 300.347[a][2]; 8 NYCRR 200.4[d][2][iii]; Application of the Bd. Of Educ., Appeal No. 03-100; Application of a Child with a Disability, Appeal No. 99-97) Appropriate goals must accurately reflect the results of a child's evaluations to identify the child's needs, provide for the use of appropriate special education services to address the child's special educational needs, and establish annual goals and short-term instructional objectives which are related to the child's educational deficits. (Application of a Child with a Disability, Appeal No. 93-12; Application of a Child with a Disability, Appeal No. 93-9) In this case, not only have we already established that the IEP failed to include sufficient evaluative information, that its goals were created without the input of a critical service provider, and that the goals were not calibrated to match B.L.'s special education needs, but the record also demonstrates that the goals in this IEP fail to address B.L.'s areas of deficit and his individualized needs. Most significantly, the record shows that the IEP did not include academic and

functional goals that were specific and measurable. (Exhibit C) The IEP did not include academic and functional goals relating to the student's speech and language needs. (Exhibit C) even though the CSE's evaluations showed critical deficits.

## 2. *The large size setting of PS 32 is inappropriate to meet J.H.'s needs*

The CSE made a program recommendation of a collaborative team teaching ("CH") class with a 14:1 staffing ratio and the related services of counseling and speech/language therapy. This program recommendation was a change from the previous year's recommendation of a special class with a 12:1:1 staffing ratio in a community school.(Ex. C-1, C-12). (Tr. 222) At the time of the IEP meeting, the parent did not agree with the team's recommendation of a CH class due to the student's need for individualized attention in the small classroom and re-focusing.(Tr. 203, 223). During the IEP meeting, the parent's advocate also noted that a CTT class would be inappropriate for the student.(Tr. 241-242). At the end of the IEP meeting, the CSE team was aware that the parent was not in agreement with the program recommendation.(Tr. 212). In a letter dated July 23, 2008, the DOE provided the final recommendations for the student, including a placement in a CTT class in Cobble Hill School of American Studies (the "recommended placement") (Exhibit "D") In a letter dated August 15, 2008, the parent informed the DOE that she would enroll the student in Winston Prep for the 2008-2009 school year.(Ex. E-1).

The parent visited the recommended placement in October 2008.(Tr. 224, 254). At the recommended placement, the parent observed a History class.(Tr. 224). There were approximately 15-20 students in the CTT class, and a general education teacher and a special education teacher.(Tr. 224). The special education teacher only remained in the class for approximately 20 minutes; he spoke to a group of 4 students and then left.(Tr. 224-225). The parent did not find the recommended

placement to be appropriate for her son. The class was too large and disruptive for her son to learn.(Tr. 227-228).

The CTT class at the recommended placement would only be held in the subjectsof math, science, English and social studies.(Tr. 31, 68-69). The CTT class would not apply to required electives such as Spanish, art, music, technology and law. Rather, these classes would be taught in general education classes with no special education teacher. Art and music were required for graduation as were a total of seven electives.(Tr. 33-34, 68-69). For the 2008-2009 school year, Spanish classes at the recommended placement contained between 25 and 30 students (Tr. 35). Within a CTT class, 14 students is the cap for the special education students, not for the class as a whole. At the beginning of the 2008-2009 school year, the CTT class at the recommended placement contained 22 students. At the time of the hearing in this matter, the class contained 25 students.(Tr. 52, 71, 182). Bodall (Dean and Teacher) testified that it would be very difficult for B.L. to succeed in a class with twenty students, even if there were two teachers in the class: one general education and one special education (Tr. 102-103)Weiner testified that B.L. was often distractible even in their one to one sessions (Tr. 138). Here, the evidence is overwhelming that B.L. needed to continue his placement in a 12:1:1 self contained classroom.

### 4. The parents' placement appropriately meets B.L.'s needs

Under the second prong of the Burlington test, the parents bear the burden of proof with regard to the appropriateness of Winston Prep for which they seek reimbursement during the 2008-2009 school year. (M.S. v. Bd. of Educ. 231 F.3d 96, 104 [2d Cir. 20000]; Application of a Child with a Disability; Appeal No. 95-57; Application of a Child with a Disability; Appeal No. 94-34) The private school placement must be "proper under the Act" (Carter, 510 U.S. at 12, 15; Burlington,

471 U.S. at 370). The private school need not meet the IDEA definition of a FAPE, formulate an IEP for the student, or provide the student with teachers certified in special education. *Frank G. v. Bd. of Educ.*, 459 F.3d 356, 364 (2d Cir. 2006). The private school does not need to provide all of the services mandated by the student's IEP Id. The record clearly establishes that Winston Prep, a private school for children with learning and speech disabilities, is an appropriate placement for B.L. as it provides the small class and small school environment that he requires. Significantly, as a small school, recognizing B.L's strong need for individual attention, and small class size meets B.L.'s needs as a highly distractible student.

Furthermore, at Winston Prep, B.L.'s academic programs are broken down into smaller groups so that his distractability is minimized and he can receive more one-on-one instruction, teacher modeling, and preferential seating. Winston Prep is a small private school for students with learning difficulties.(Tr. 100). Winston Prep determines how each student learns best and develops individually tailored curricula to achieve success. Winston Prep faculty develops personal academic programs and teaches in small groups.(Tr. 100, 1 15, Ex. K).

For the 2008-2009 school year at Winston Prep, B.L. took the following classes: Math, Science, History, Literature, Writing, Language Skills, Focus, Physical Education and Art classes. Winston Prep had a 12:1 staffing ratio.(Tr. 100) The students in a Winston Prep class tended to have largely homogeneous issues, which allowed the teacher to work both individually with students and with the group as a whole Similar to B.L., the students in his class had deficits in the areas of expressive language and attention/focusing.(Tr. 100, 1 15, Ex. K). Bodall noted that in reading, the student needed guidance in recognizing and interpreting literary devices, such as metaphor (Tr. 92-93, 96). The student needed assistance in analysis in his written expression (Tr. 92-94). Bodall

noted that in addition to the individualized attention that the student received in class, Bodall often had to spend extra individualized time with the student during lunch periods or after school to further address the student's weaknesses (Tr. 95). Bodall testified that it would be very difficult for the student to succeed in a class with twenty students, even if there were two teachers in the class: one general education and one special education (Tr. 102-103). Bodall further testified that Winston Prep was an appropriate special education placement for the student for the 2008-2009 school year (Tr. 103-104).

Mayer Weiner, the student's Focus teacher for the 2008-2009 school year, testified about the student and his work with him (Tr. 133-173). During the 2008-2009 school year, Weiner saw the student every day, five days a week for 45 minutes a day (Tr. 135). On a short school day, Weiner would see the student for 30 to 35 minutes (Tr. 135). Weiner testified that the student was often distractible even in their one to one sessions (Tr. 138). Weiner testified about the goals he set for the student for the 2008-2009 school year and how they worked toward them (Tr. 138-144). Weiner wanted the student to reach the goals of improving reading comprehension, completing an essay properly and advocating for himself in the classroom (Tr. 138). This goal was something that the student and Weiner continued to work toward throughout the year (Tr. 138-139). Progress reports written by Winston Prep teachers presented specific goals and methodologies to address B.L.'s key deficit areas, including: reading (e.g. inferential skills), written expression, organizational skills, study and homework skills and social functioning.(Exs. I, J). B.L. completed at-home reading assignments and answered comprehension in a journal.

B.L. learned to strengthen organization, time management and study skills through a weekly and monthly syllabus and graphic organizers.(Ex. 1-3-4). B.L. also learned to facilitate the writing

process and organization through note taking, brainstorming, outlining, rough drafts and editing. He reinforced study and homework skills through the use of time management, binder organization and homework completion.(Ex. I-5). B.L.'s deficits in pragmatic language were addressed in and out of the classroom . B.L. improved his expressive language through participating in structured class discussions in his Literature course. B.L. further improved his expressive language through methodologies utilized in his Writing and Language Skills classes, including: focusing on receptive and expressive language. The student's deficits in this area were addressed in and out of the classroom (Tr. 99, 124-126). The student improved his expressive language through participating in structured class discussions in his Literature course (Ex. I-3). The one to one attention B.L. received in his classes at Winston Prep helped him to succeed academically and socially. B.L.'s daily one to one time with his Focus Teacher helped the student to succeed. (Tr. 92, 100, 104, 147, 153, 229).

As the school year progressed, the student improved in submitting assignments and in answering questions in class. His attention and focus in class improved. Progress report comments from the student's teachers included the following: B.L. is able to give interesting and informative presentations that show his research and knowledge. has taken a positive turn and has since been producing quality work and has maintained consistency with all assignments. B.L. is increasingly confident as a student.(Ex. J). For the 2008-2009 school year, the student's grades were in the B range; he did not fail any classes. At Winston Prep, the student is earning credits toward a high school diploma and is on track to graduate.(Tr. 97, 107-108, 130, 167). Therefore, Winston Prep provided B.L. with an appropriate education.

### 5. The equities support a claim for tuition reimbursement

The parents worked in good faith with the CSE and did nothing to impede the CSE process. The parent attended the CSE meeting and arranged to visit the DOE proposed placement as she was able.

Contrary to the DOE's assertions, equities support the parents' demand for tuition reimbursement. The parent met the ten days notice requirement under 20 U.S.C. §1412 [a][10][C][iii][I] by expressing her concerns regarding the recommended placement at the June 10, 2008 CSE review and submitting the August 15, 2008 letter, through advocate (Ex. E). The parent disagreed with the program recommendation at the CSE review meeting and provided sufficient notice of her intent to enroll the student at Winston Prep for the 2008-2009 school year at the Department's expense (See Ex. E).

The parent's failure to state her concerns in the August 15, 2008 letter did not cause Petitioner any prejudice as it took no steps to revisit the appropriateness of the recommended program. Further, the concerns had been stated clearly at the CSE meeting. The parent spoke with Gail Trimmer, the compliance coordinator of special education at the recommended placement. The parent described the student to Trimmer. Trimmer conceded that a CH class would not be appropriate for the student.(Tr. 225-227).

## CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that this Court grant her summary judgment in all respects, that the determination of the SRO be vacated, and that the Court find that the DOE had failed to offer a free and appropriate education to B.L.. Plaintiff also respectfully requests that the Court find that Winston Prep was an appropriate placement, that equitable factors

support an award of tuition reimbursement and that tuition be awarded for the 2008-2009 school year together with costs, a reasonable attorney fee, and disbursements and for such other relief as the Court deems just and appropriate.

Dated: New York, New York
      January 6, 2010

                              Respectfully submitted,

                              s/Stewart Lee Karlin, Esq.
                              NEAL H. ROSENBERG (NHR 7827)
                              STEWART LEE KARLIN (SLK3720)
                              Attorneys for Plaintiff
                              9 Murray Street, Suite 4W
                              New York, N.Y. 10007
                              (212) 732-9450

TO:    Toni Gantz, Ass't Corp Counsel
        via ECF