UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

T.L. and D.L. on behalf of their child B.L.,

Plaintiffs,

-against-

THE DEPARTMENT OF EDUCATION OF THE CITY
OF NEW YORK a/k/a THE BOARD OF EDUCATION
OF THE CITY SCHOOL DISTRICT OF THE CITY OF
NEW YORK,

Defendant.

## DEFENDANT'S MEMORANDUM OF LAW
## IN OPPOSITION TO PLAINTIFFS' MOTION FOR
## SUMMARY JUDGMENT

### MICHAEL A. CARDOZO
*Corporation Counsel of the City of New York*
Attorney for Defendant
100 Church Street
New York, NY 10007

Of Counsel: Toni Gantz
Tel: (212) 788-0908

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT...................................................................................................1

STATEMENT OF FACTS......................................................................................................2

ARGUMENT ........................................................................................................................3

Statutory Scheme and Legal Standards ................................................................................3

POINT I

DEFENDANT OFFERED THE STUDENT A FREE APPROPRIATE PUBLIC EDUCATION FOR THE 2008-2009 SCHOOL YEAR ...........................................................................................4

    A. Defendant Complied with the Procedural Requirements Set Forth in the IDEA ...................................................................4

        1. The composition of the CSE did not deprive the Student of a FAPE ...................................................................5

        2. The CSE used sufficient and appropriate data in developing the Student's IEP.............................................6

        3. Plaintiffs had appropriate notice of the change in recommended services.........................................................8

        4. The IEP would have been appropriately implemented at the recommended placement ...................................10

    B. The Student's IEP Was Reasonably Calculated to Confer Educational Benefit and Would Have Been Appropriately Implemented in DOE's Recommended Placement...............................................11

        1. The IEP contained appropriate goals and objectives.....................................12

        2. The Student did not require a smaller class size to receive a FAPE ...................................................14

POINT II

PLAINTIFFS' UNILATERAL PRIVATE PLACEMENT WAS INAPPROPRIATE...........................................................18

POINT III
    THE EQUITIES FAVOR DEFENDANT ........................................................................20

CONCLUSION .............................................................................................................25

# TABLE OF AUTHORITIES

**Cases**

A.C. v. Bd. of Educ.,
    553 F.3d 165 (2d Cir. 2009)......................................................................................3, 4

A.H. ex rel. J.H. v. N.Y. City Dep't of Educ.,
    652 F. Supp. 2d 297 (E.D.N.Y. 2009) ...................................................................23, 24

Bd. of Educ. v. Rowley,
    458 U.S. 176 (1982).................................................................................................12, 17

Bettinger v. N.Y. City Bd. of Educ.,
    2007 U.S. Dist. LEXIS 86116 (S.D.N.Y. Nov. 20, 2007) ............................................24

Carmel Cent. Sch. Dist. v. V.P.,
    373 F. Supp. 2d 402 (S.D.N.Y. 2005) ...................................................................21, 24

Cerra v. Pawling Cent. Sch. Dist.,
    427 F.3d 186 (2d Cir. 2005).....................................................................................12, 17

D.F. v. Ramapo Cent. Sch. Dist.,
    430 F.3d 595 (2d Cir. 2005)...........................................................................................3

Frank G. v. Bd. of Educ.,
    459 F.3d 356 (2d Cir. 2006)..........................................................................................18

Gagliardo v. Arlington Cent. Sch. Dist.,
    489 F.3d 105 (2d Cir. 2007)........................................................................3, 4, 19, 20

Grim v. Rhinebeck Cent. Sch. Dist.,
    2003 U.S. App. LEXIS 27934 (2d Cir. Oct. 8, 2003).....................................................14

J.R. v. Bd. of Educ.,
    345 F. Supp. 2d 386 (S.D.N.Y. 2004)............................................................................17

M.C. v. Voluntown Bd. of Educ.,
    226 F.3d 60 (2d Cir. 2000)...........................................................................4, 18, 21, 23

M.M. v. N.Y. City Dep't of Educ.,
    583 F. Supp. 2d 498 (S.D.N.Y. 2008)..............................................................................6

M.S. v. Yonkers Bd. of Educ.,
    231 F. 3d 96 (2d Cir. 2000)....................................................................................18, 20

Perricelli v. Carmel Cent. Sch. Dist.,
    2007 U.S. Dist. LEXIS 9873 (S.D.N.Y. Feb. 9, 2007) ....................................................7

Pinn v. Harrison Cent. Sch. Dist.,
    473 F. Supp. 2d 477 (S.D.N.Y. 2007).........................................................................19

R.R. v. Scarsdale Union Free Sch. Dist.,
    615 F. Supp. 2d 283 (S.D.N.Y. 2009)................................................................... 13-14

S.W. v. N.Y. City Dep't of Educ.,
    646 F. Supp. 2d 346 (S.D.N.Y. 2009)...................................................................23, 24

San Antonio Indep. Sch. Dist. v. Rodriguez,
    411 U.S. 1 (1973).........................................................................................................3

Schreiber v. E. Ramapo Cent. Sch. Dist.,
    700 F. Supp. 2d 529 (S.D.N.Y. 2010).........................................................................19

Thies v. N.Y. City Bd. of Educ.,
    2008 U.S. Dist. LEXIS 11354 (S.D.N.Y. Feb. 4, 2008) .............................................19

Tucker v. Bay Shore Union Free Sch. Dist.,
    873 F.2d 563 (2d Cir. 1989).........................................................................................21

Wasser v. N.Y. State Office of Vocational & Educ. Servs.,
    602 F.3d 476 (2d Cir. 2010)...........................................................................................3

W.S. v. Rye City Sch. Dist.,
    454 F. Supp. 2d 134 (S.D.N.Y. 2006)....................................................4, 10, 13, 17

Walczak v. Fla. Union Free Sch. Dist.,
    142 F.3d 119 (2d Cir. 1998)..........................................3, 4, 5, 12, 16, 17, 18, 19

Werner v. Clarkstown Cent. Sch. Dist.,
    363 F. Supp. 2d 656 (S.D.N.Y. 2005)..................................................................19, 24

**Statutes**

20 U.S.C. § 1400 ...............................................................................................1

20 U.S.C. § 1412 ........................................... 12, 16, 17, 18, 20-21, 22, 23

20 U.S.C. § 1414 ........................................................... 5, 6, 7, 12-13

20 U.S.C. § 1415 ...............................................................................4, 10

N.Y. Educ. Law § 4402 ...................................................................5

8 N.Y. Comp. Codes R. & Regs. § 200.1 .......................................16, 18

8 N.Y. Comp. Codes R. & Regs. § 200.3 ...........................................5

8 N.Y. Comp. Codes R. & Regs. § 200.4 ...........................................6

## PRELIMINARY STATEMENT

Plaintiffs, the parents of a student with a disability, appeal the administrative decision by the New York State Education Department's Office of State Review finding that defendant New York City Department of Education ("DOE") offered plaintiffs' child ("the Student") a free appropriate public education for the 2008-2009 school year, and denying plaintiffs reimbursement for tuition costs related to the Student's attendance at the Winston Preparatory School ("Winston Prep"), a private school at which plaintiffs unilaterally placed the Student.

On January 7, 2011, plaintiffs served a motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. Defendant submits this memorandum of law in opposition to plaintiffs' motion on the ground that defendant offered the Student a free appropriate public education ("FAPE") under the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400 *et seq.*, for the 2008-2009 school year. Because defendant offered the Student a FAPE, the Court need not reach the questions of whether plaintiffs' unilaterally chosen placement is appropriate to the Student's needs or whether the equities favor plaintiffs. However, should the Court consider those questions, plaintiffs cannot prevail on either ground. As explained in defendant's motion for summary judgment[1] and below, plaintiffs failed to enroll the Student in a private placement specifically designed to meet his unique needs because (a) Winston Prep was not the least restrictive environment for the Student and did not offer the Student necessary related services, and (b) the record reflects that the Student made no progress in reading and writing, his areas of weakness, during the 2008-2009 school year at Winston Prep. Second, the equities favor defendant because plaintiffs did not provide proper notice to defendant of their rejection of defendant's recommended program and placement and their intent to seek tuition reimbursement from defendant, and the record demonstrates that plaintiffs never intended to accept defendant's

---

[1] Pursuant to the Court's Order dated December 17, 2010, the parties served cross-motions for summary judgment on January 7, 2011.

recommended placement, and intended only to place the Student in Winston Prep and retroactively seek tuition reimbursement.

## STATEMENT OF FACTS

Defendant respectfully refers the Court to Defendant's Local Civil Rule 56.1 Statement of Undisputed Facts dated January 7, 2011 ("Def.'s 56.1 Statement") for a fuller statement of the factual background of this case, as well as to Defendant's Response to Plaintiffs' Rule 56.1 Statement dated March 3, 2011 ("Def.'s 56.1 Resp."). Defendant also summarizes the facts below.

In brief summary, plaintiffs argue that the Individualized Education Program ("IEP") that was created for the 2008-2009 school year for the Student, who is classified as a student with "Other Health Impairment," was procedurally and substantively invalid and thus that defendant did not offer the Student a FAPE. (See Def.'s 56.1 Statement ¶ 3; Pl.'s Mem. of Law in Supp. of His Mot. for Summ. J. 9-15, Jan. 6, 2011 [hereinafter "Pls.' Mem."].) Plaintiffs unilaterally enrolled the Student in a private school prior to even the formulation of the Student's IEP and before knowing what program and school placement defendant would recommend for the Student. (See Def.'s 56.1 Statement ¶¶ 9, 13, 26.) The private school in which plaintiffs enrolled the Student did not provide counseling or speech and language therapy services, notwithstanding the Student's need for such services, and offered the Student no opportunities for mainstreaming with typically developing peers, although the Student would benefit from such. (See id. at ¶¶ 32, 33.) Moreover, during the 2008-2009 school year at Winston Prep, the Student's instructional levels in reading and writing—the academic areas in which the Student struggled most—did not change from the prior year, placing the Student even further below grade level in those subjects. (See id. at ¶ 36.) Plaintiffs then retroactively sought tuition reimbursement in State administrative proceedings, as they seek here. (See Compl. Ex. B.) Plaintiffs' request for reimbursement was ultimately denied on the ground that defendant had offered the Student a FAPE for the 2008-2009 school year. (See Compl. Ex. A.)

## ARGUMENT

### Statutory Scheme and Legal Standards

Defendant respectfully refers the Court to pages 3-6 of defendant's moving memorandum of law dated January 7, 2011 for a more complete description of the IDEA's statutory scheme, the standards for assessing a parent's challenge to the adequacy of a child's IEP, and federal court review of state administrative proceedings.

Plaintiffs contend that this Court should conduct a "de novo review" of the state educational decisions below, and should give little weight to the decision of the State Review Officer ("SRO"). (See Pls.' Mem. 8-9.) This is not, however, the applicable standard of review. Rather, the Second Circuit has described the standard of review that district courts should apply as a "modified de novo standard of review," whereby courts "engag[e] in an independent review of the administrative record while according *substantial deference* to the . . . findings of state administrative proceedings." Wasser v. N.Y. State Office of Vocational & Educ. Servs., 602 F.3d 476, 477 (2d Cir. 2010) (emphasis added). Thus, "[w]hile federal courts do not simply rubber stamp administrative decisions, they are expected to give 'due weight' to these proceedings, mindful that the judiciary generally 'lacks the "specialized knowledge and experience" necessary to resolve "persistent and difficult questions of educational policy."'" Walczak v. Fla. Union Free Sch. Dist., 142 F.3d 119, 129 (2d Cir. 1998) (quoting San Antonio Indep. Sch. Dist. v. Rodriguez, 411 U.S. 1, 42 (1973)); see also Gagliardo v. Arlington Cent. Sch. Dist., 489 F.3d 105, 112 (2d Cir. 2007) (noting that "the role of the federal courts in reviewing state educational decisions under the IDEA is 'circumscribed'") (citation omitted); D.F. v. Ramapo Cent. Sch. Dist., 430 F.3d 595, 598 (2d Cir. 2005) (noting that the Supreme Court and the Second Circuit have both "interpreted the IDEA as strictly limiting judicial review of state administrative proceedings"). Judicial deference to administrative proceedings is particularly warranted when the district court is relying only on the administrative record, as in the present case, as well as when the SRO's review has been thorough and careful. A.C. v. Bd. of Educ.,

553 F.3d 165, 171 (2d Cir. 2009); Walczak, 142 F.3d at 129; see also, e.g., M.C. v. Voluntown Bd. of Educ., 226 F.3d 60, 66 (2d Cir. 2000). In addition, where the SRO's decision conflicts with the IHO's decision, as in the present case, the IHO's decision "may be afforded diminished weight." A.C., 553 F.3d at 171 (quoting Gagliardo, 489 F.3d at 113 n.2). Accordingly, plaintiffs' contention that this Court should give little weight to the SRO's decision is meritless.

## POINT I

### DEFENDANT OFFERED THE STUDENT A FREE APPROPRIATE PUBLIC EDUCATION FOR THE 2008-2009 SCHOOL YEAR

Plaintiffs claim that DOE failed to offer the Student a FAPE for the 2008-2009 school year. This claim is not supported by the record evidence, however, as was also determined by the SRO, whose twenty-one-page, single-spaced decision demonstrated a careful and thorough review of the administrative record. (See Decision No. 10-001 of the State Review Officer, Mar. 12, 2010 [hereinafter "SRO Decision"].) This Court should uphold the SRO's decision because, as the record makes clear and as discussed in detail below, the Student's IEP was both procedurally and substantively proper under the IDEA, and would have been appropriately implemented in the public school placement offered to the Student by DOE.

**A.    Defendant Complied with the Procedural Requirements Set Forth in the IDEA**

Under the IDEA, denial of a FAPE cannot be found on procedural grounds alone unless the alleged procedural inadequacies "result in the loss of educational opportunity or *seriously infringe* on a parent's participation in the creation or formulation of the IEP." W.S. v. Rye City Sch. Dist., 454 F. Supp. 2d 134, 138 (S.D.N.Y. 2006) (emphasis added); see generally 20 U.S.C. § 1415(f)(3)(E)(ii).

Here, plaintiffs allege a host of procedural violations, which were properly deemed insignificant by the SRO. Moreover, a review of the evidence demonstrates that the Student's IEP comported with the procedural provisions of the Act and afforded the Student a FAPE.

4

1. **The composition of the IEP team did not deprive the Student of a FAPE**

Plaintiffs claim that DOE "denied [the Student] FAPE because B.L.'s related services provider did not participate in the development of the IEP." (Pls.' Mem. 10.) As discussed in Point I(A)(3) of defendant's moving memorandum of law, this contention is completely baseless, and plaintiffs offer no legal or factual support for their claim in their motion.

The IDEA does not mandate that related service providers participate in the development of a student's IEP; instead, such individuals may attend IEP meetings "at the discretion of the parent or the agency." 20 U.S.C. § 1414(d)(1)(B)(vi). The relevant New York State regulation similarly provides that a Committee on Special Education ("CSE")[2] is to include "related services personnel as appropriate, as the school district or the parent(s) shall designate." 8 N.Y.C.R.R. § 200.3(a)(1)(ix). Thus, there is no mandatory State or federal requirement that related service providers participate in the development of a student's IEP.[3]

More significantly, a "related service provider who provided the student with speech/language therapy" (Pl.'s Mem. 10) could not have attended the IEP meeting because the Student did not have such a provider at Winston Prep[4] or otherwise receive speech and language services. (See, e.g., Tr. 104, 126, 252-53.) Accordingly, plaintiffs' claim is both false and

---

[2] In New York, IEPs are developed by local Committees on Special Education. See N.Y. Educ. Law § 4402(1); Walczak, 142 F.3d at 123.

[3] In their memorandum of law, plaintiffs cite inapposite regulations and administrative decisions concerning a different issue, namely, the absence of a special education teacher at a CSE meeting. (See Pls.' Mem. 10.) Plaintiffs do not discuss why the absence of a special education teacher, whose participation at an IEP meeting is mandatory, see 20 U.S.C. § 1414(d)(1)(B)(iii); 8 N.Y.C.R.R. § 200.3(a)(1)(iii), would be comparable to the absence of a related services provider, whose participation is not mandatory, as discussed above. In any event, there is no dispute that a special education teacher, Carol Schachter, participated in the Student's IEP meeting, as did the Student's "Focus" teacher from Winston Prep. (See, e.g., Def.'s Ex. 3 at 2.)

[4] The Student also attended Winston Prep during the 2007-2008 school year that preceded the June 2008 IEP meeting. (See Def.'s 56.1 Statement ¶¶ 4, 13.)

disingenuous, and would not constitute a procedural violation in any event. <u>See generally</u> <u>M.M. v. N.Y. City Dep't of Educ.</u>, 583 F. Supp. 2d 498, 505-06 (S.D.N.Y. 2008) (finding no procedural violation in the composition of a CSE meeting despite the alleged absence of various individuals, including a related services provider).

### 2. The CSE used sufficient and appropriate data in developing the Student's IEP

Plaintiffs claim that the CSE did not have "a sufficient amount of evaluative data" and that the IEP did not appropriately describe the Student's then-present levels of academic achievement and functional performance. (Pls.' Mem. 11.) As addressed in Point I(A)(2) of defendant's moving memorandum of law and below, these claims lack merit.

The type of evaluation data that an IEP team is to review includes "(i) evaluations and information provided by the parents of the child; (ii) current classroom-based, local, or State assessments, and classroom-based observations; and (iii) observations by teachers and related services providers." 20 U.S.C. § 1414(c)(1)(A); <u>see</u> 8 N.Y.C.R.R. § 200.4(b)(5)(i) (similarly providing that the CSE must review "evaluation data on the student, including evaluations and information provided by the parents of the student, current classroom-based assessments, local or State assessments, classroom-based observations, and observations by teachers and related services providers"). Here, the team reviewed exactly such evaluation data, namely, the McCarton neurodevelopmental evaluation report, teacher reports from Winston Prep, the Student's educational file, the Student's IEP from the previous school year, a classroom observation, and teacher estimates of the Student's then-present academic performance. (<u>See</u> Def.'s 56.1 Statement ¶ 15.) And contrary to plaintiffs' assertion that the IEP did not include data from standardized testing reflecting the Student's reading, writing, and math levels, the IEP in fact summarized the results of a standardized

test assessing the Student's academic skills in reading, writing, spelling, mathematics, and memory. (See Def.'s Ex. 7 at 1-2, 5, 7; Def.'s Ex. 3 at 3.)[5]

Plaintiffs contend that "[t]eachers' estimates alone are not sufficient to provide baseline data on the student's present level of academic performance." (Pls.' Mem. 11-12.) As previously noted, classroom-based assessments, classroom-based observations, and teacher observations are explicitly recognized as the types of data that IEP teams should review and use in developing an IEP. See 20 U.S.C. § 1414(c)(1)(A). Moreover, in determining the Student's then-present levels and needs, the CSE relied upon not only teacher estimates, but a variety of additional data about the Student, including teacher reports from Winston Prep, the Student's educational file, the McCarton neurodevelopmental evaluation, and a classroom observation. (See Def.'s 56.1 Statement ¶ 15.)

Under the IDEA, an IEP must also include a "statement of the child's present levels of academic achievement and functional performance, including . . . how the child's disability affects the child's involvement and progress in the general education curriculum" and "a description of benchmarks or short-term objectives." 20 U.S.C. § 1414(d)(1)(A)(i)(I)(aa),(cc). As the SRO also found, the Student's IEP complies with this requirement, explicitly stating the Student's then-present levels of academic and social/emotional performance based on the data the CSE team reviewed, and including appropriate benchmarks. (See Def.'s Ex. 3 at 3, 4, 6-8; Def.'s 56.1 Statement ¶¶ 20-24; SRO Decision 14-16.) Specifically, the IEP provides a detailed description of the Student's functional performance; reports the Student's instructional grade levels for math, reading, and writing; describes the Student's social/emotional performance; and indicates that his behavior did not

_____

[5] Even if, *arguendo*, the IEP did not include data from standardized testing, this would not constitute a procedural violation. See, e.g., Perricelli v. Carmel Cent. Sch. Dist., 2007 U.S. Dist. LEXIS 9873, at *21, 34-36 (S.D.N.Y. Feb. 9, 2007) (finding that the data that formed the basis of the IEP at issue—which did not include standardized test results—was sufficient and complied with the procedural requirements of the IDEA).

seriously interfere with instruction and could be addressed by his general education teacher and/or his special education teacher. (See Def.'s Ex. 3 at 3, 4; Def.'s 56.1 Statement ¶¶ 20-22.)

Although plaintiffs appear to suggest that the descriptions of the Student's performance levels are "[g]lobal and vague" (Pls.' Mem. 11), the IEP flatly contradicts their assertion, containing concrete and specific descriptions such as "Comprehension is approximately at the 8th grade level; he has difficulty with inferential thinking" and "Written language skills are at the 9th grade level; fact-based writing is easier for [the Student], he needs support to structure and organize his writing." (Def.'s Ex. 3 at 3.) In addition, and as discussed further below, the IEP also includes specific and measurable goals and objectives related to the Student's academic and behavioral needs. (See Def.'s Ex. 3 at 6-8; Def.'s 56.1 Statement ¶¶ 23-24.)

In short, there is simply no basis for plaintiffs' contention that the IEP did not include or the CSE did not consider appropriate data, or that the IEP does not appropriately state the Student's then-present levels of performance.

### 3. Plaintiffs had appropriate notice of the change in recommended services

Plaintiffs claim that DOE did not comply with procedural requirements related to modifications of placements, and thereby "[i]mproperly [c]hanged" the Student's placement. (Pls.' Mem. 12.) Specifically, plaintiffs state that the CSE team failed to recommend a modification "pursuant to a written evaluation, furnished to the parent, setting forth the reasons for such modifications" and containing "a description of each evaluation procedure, assessment or report" used and a "description of other options considered by the CSE team, and a reason[] those options were rejected." (Pls.' Mem. 12.) The record, however, reflects that DOE provided written notice of any proposed changes and the basis of the proposed recommendations, including a summary of assessments and evaluations of the Student's progress and abilities, a description of other options considered by the CSE team, and the reasons those options were rejected, via the provision of the IEP and Final Notice of Recommendation to plaintiffs. (See Def.'s Ex. 4 at 1 (noting two attachments to

8

the Final Notice of Recommendation: the Notice of Parental Rights and the IEP); Def.'s Ex. 3 at 2 (indicating that the IEP and Notice of Recommendation had been "Sent to Parent").)

In addition, it is undisputed that plaintiffs were on notice of and participated in developing the recommendations that were ultimately reflected in the Student's IEP and Final Notice of Recommendation. In particular, the record establishes that the CSE team discussed the recommendation of the collaborative team teaching ("CTT")[6] class with plaintiffs, as the other members of the team were aware that plaintiffs did not agree with that specific recommendation. (See, e.g., Tr. 203.)[7] Finally, although the IEP does not explicitly describe each evaluation procedure, assessment, or report used by the CSE team, the Student's levels, goals, and recommended program within the IEP were consistent with and reflected such data about the Student, including the assessments and recommendations of Student's teachers at Winston Prep and the neurodevelopmental evaluation of the Student that had been privately conducted by a school psychologist and developmental pediatrician at the McCarton Center. (See Def.'s 56.1 Statement ¶¶ 5, 15.) For example, the discussion of the Student's "Academic Performance and Learning Characteristics" in the IEP comports with the findings of the private evaluators and contains the Student's instructional levels as provided by Winston Prep. (See Def.'s 56.1 Statement ¶¶ 6, 20; Exs. 3 at 3, 7 at 4-7; Tr. 187, 189-90 (discussing the Student's academic skill levels, perceptual reasoning, verbal comprehension, working memory, processing speed, visual-motor ability, memory skills, receptive and expressive language, and time management skills).) Task attention, organization, and

---

[6] "Collaborative team teaching" refers to classes in which both students with disabilities and nondisabled students are taught together. Each class includes at least one special education teacher and one general education teacher, and the 14:1 ratio stated on the IEP refers to a maximum number of fourteen students-with-IEPs per special education teacher. (See Def.'s Ex. 3 at 1; Tr. 30, 182; see also Compl. Ex. A at 5 n.8.)

[7] Although plaintiffs did not agree with the recommendation of the CTT program, neither they nor their educational advocate objected to or disagreed with the other recommendations and provisions in the IEP, such as the indications of the Student's levels, the goals and objectives, and the related services recommendations. (See Def.'s 56.1 Statement ¶ 25.)

time management were also weaknesses noted by the Student's teachers and private evaluators as well as within the Student's IEP, and addressed within the IEP through recommendations of supports and teaching strategies such as graphic organizers and prompts and reminders, testing modifications such as testing in a separate location and having "double time" for testing, and through the annual goals and short-term objectives. (See Def.'s Ex. 3 at 3, 4, 6, 8, 12; Def.'s Ex. 7 at 7-9; Tr. 62-63, 90, 99-100, 136, 150-52, 190-91.) In addition, information from plaintiffs, the private evaluators, and the Student's teachers at Winston Prep indicated that the Student had speech and language and social/emotional deficits that needed to be addressed, which the IEP did through the provision of speech and language therapy and counseling. (See, e.g., Tr. 126, 136, 156-57, 252-53; Def.'s Ex. 7 at 1 (noting the need for a school psychologist); Def.'s Ex. 3 at 12.)

Thus, insofar as plaintiffs allege a procedural violation of the IDEA related to the change in the Student's program, they cannot establish that they were impeded—let alone significantly impeded—from participating in the CSE review process or that any alleged procedural inadequacies resulted in the loss of educational opportunity, and they thus cannot establish a denial of FAPE on such grounds. See 20 U.S.C. § 1415(f)(3)(E)(ii); see W.S., 454 F. Supp. 2d at 138.

## 4. The IEP would have been appropriately implemented at the recommended placement

Plaintiffs assert that the Student's receipt of instruction by general education teachers in elective classes at the proposed placement "render[ed] the placement inappropriate as a matter of law." (Pls.' Mem. 13.)[8] Plaintiffs cite absolutely no legal authority to support their claim, and defendant is unaware of any.

Contrary to plaintiffs' assertion, the record reflects that the Student would have received appropriate instruction and educational benefit at the recommended placement, Cobble Hill

---

[8] To the extent that plaintiffs otherwise argue that defendant "failed to implement the IEP," it is plaintiffs' unilateral placement of the Student in Winston Prep that prevented any such implementation.

School of American Studies ("Cobble Hill"), notwithstanding the fact that his elective classes would have been taught by general education teachers. The general education teachers who would have taught those courses were trained in reading IEPs, in differentiating instruction, and in various methods of classroom management, instruction, and helping students. (See Def.'s 56.1 Statement ¶¶ 45-46.) The general education teachers also would have had a copy of the Student's IEP, and would have communicated and met regularly with his special education teacher in order to structure lessons and discuss strategies, accommodations, or other management needs to assist him in meeting his IEP goals. (See id. at ¶ 46.) Thus, and as the SRO also correctly found, the record indicates that the Student's IEP would have been appropriately implemented and "the student would have been provided with personalized instruction with sufficient support to permit him to benefit educationally from instruction" at Cobble Hill. (SRO Decision 18.)

Although plaintiffs also claim that "Spanish classes at the recommended placement contained between 25 and 30 students" (Pls.' Mem. 13), the record does not contain definitive evidence regarding Spanish class size, because the witness who provided that estimate also testified that some Spanish classes had fewer than 25 students. (See Tr. 35.) In addition, the record does not suggest that the Student would even have taken Spanish, which was not required and which the Student did not elect to take at Winston Prep during the 2008-2009 school year. (See Pls.' Exs. I, J.) Thus, there is no evidence that the Student would have been in such a class, and plaintiffs' focus on it is misplaced.

In sum, the record establishes that defendant complied with the IDEA's procedural requirements, and plaintiffs accordingly cannot prevail on this ground.

## B. The Student's IEP Was Reasonably Calculated to Confer Educational Benefit and Would Have Been Appropriately Implemented in DOE's Recommended Placement

A State or local educational agency has complied with the substantive provisions of the IDEA if it provides the disabled child with an IEP that is "reasonably calculated to enable the

child to receive educational benefits." Bd. of Educ. v. Rowley, 458 U.S. 176, 206-07 (1982). It is worth emphasizing that under the IDEA, school districts are not required to maximize the potential of a disabled child, but rather must provide a "basic floor of opportunity" to allow the child meaningful access to a free public education. Id. at 192, 200. More specifically, "a school district fulfills its substantive obligations under the IDEA if it provides an IEP that is 'likely to produce progress, not regression,' and if the IEP affords the student with an opportunity greater than mere 'trivial advancement.'" Cerra v. Pawling Cent. Sch. Dist., 427 F.3d 186, 195 (2d Cir. 2005) (quoting Walczak, 142 F.3d at 130). In addition, "the law expresses a strong preference for children with disabilities to be educated, 'to the maximum extent appropriate,' together with their non-disabled peers." Walczak, 142 F.3d at 122 (citing 20 U.S.C. § 1412(5)). Finally, "[b]ecause administrative agencies have special expertise in making judgments concerning student progress, deference is particularly important when assessing an IEP's substantive adequacy." Cerra, 427 F.3d at 195.

Plaintiffs argue that defendant "failed to comply with the substantive requirements of the IDEA." (Pls.' Mem. 13.) Defendant respectfully refers the Court to pages 15-16 of its moving memorandum of law for a discussion of why the Student's IEP is "likely to produce progress, not regression," and is reasonably calculated to allow the Student to receive educational benefits. Cerra, 427 F.3d at 195; see Rowley, 458 U.S. at 206-07. As set forth below, plaintiffs' specific claims that the IEP was substantively inappropriate are unsupported by the record and cannot be sustained.

## 1. The IEP contained appropriate goals and objectives

Plaintiffs claim that the annual goals and objectives on the Student's IEP were not calibrated to the Student's special education needs, were not sufficiently specific or measurable, and did not include goals related to the Student's speech and language needs. (See Pls.' Mem. 13-14.) The record does not support their contentions.

Under the IDEA, an IEP must include "a statement of measurable annual goals, including academic and functional goals" designed to meet the child's needs. 20 U.S.C. §

1414(d)(1)(A)(i)(II). The Student's June 2008 IEP included annual goals related to reading and writing, which were the Student's weaker academic areas, as well as goals to address his social/emotional and speech and language needs, additional recognized deficits. (See Def.'s Ex. 3 at 6-8; Def.'s 56.1 Statement ¶ 36; Tr. 125-26, 136, 148-49, 156-57.) As the SRO found, these goals were appropriate for the Student and designed to meet his needs. (See, e.g., Tr. 193-99; SRO Decision 15-16.) Notably, plaintiffs also did not state any disagreement with these goals at the IEP meeting. (See Tr. 242.)

    In addition, the goals and corresponding short-term objectives within the Student's June 2008 IEP are specific and measurable. For example, under the annual goal "[The Student] will read texts written on instructional reading level, and comprehend on a critical and inferential reasoning level," short-term objectives include: "[The Student] will describe two main characters in each of two texts including character traits and motives, with 80% accuracy" and "[The Student] will correctly state the moral of four fables, and justify this with evidence from each fable, with 75% accuracy." (Defs.' Ex. 3 at 7.) Under the goal pertaining to writing, short-term objectives include that the Student "will take notes on a given topic from an informational source, jotting down pertinent words, short phrases and quotes relevant to topic, with 80% accuracy" and "will take 10 sentences chosen by the teacher from a rough draft of a narrative being written, and rewrite for greater clarity and elaboration, with 80% accuracy." (Def.'s Ex. 3 at 6.) Under the goal pertaining to the Student's pragmatic language skills, short-term objectives include that the Student "will increase turn taking skills during discourse of up to 3 to 4 turns at least 85% of the time" and "will summarize necessary information in the context of structured conversational speech, keeping the needs of the listener in mind and reducing redundant information with 70% accuracy given moderate clinician prompting." (Id.) As one court reviewing similar goals and objectives observed, it is "difficult . . . to imagine how much more specific the District could be concerning its goals and objectives for the student's continued educational progress." W.S., 454 F. Supp. 2d at 147; see also R.R. v. Scarsdale

13

Union Free Sch. Dist., 615 F. Supp. 2d 283, 295 (S.D.N.Y. 2009) (finding that the alleged inadequacy in the annual goals on a student's IEP did not rise to the level of a denial of a FAPE). In addition, the record reflects that the goal related to improving the Student's pragmatic language skills was a speech and language goal, refuting plaintiffs' claim that the IEP lacked such goals. (See Tr. 198-99.)

In short, the goals and objectives as stated on the IEP were appropriate and did not result in a substantive violation of the IDEA. As there is no evidence in the record warranting a different conclusion, the SRO's determination regarding the sufficiency of these goals is entitled to deference. See Grim v. Rhinebeck Cent. Sch. Dist., No. 02-7483, 2003 U.S. App. LEXIS 27934, at *13 (2d Cir. Oct. 8, 2003, revised Nov. 24, 2003) ("[T]he sufficiency of goals and strategies in an IEP is precisely the type of issue upon which the IDEA requires deference to the expertise of the administrative officers.").

## 2. The Student did not require a smaller class size to receive a FAPE

Plaintiffs contend that the "large size setting of PS 32 is inappropriate to meet [the Student's] needs" (Pls.' Mem. 14),[9] specifically claiming that the Student required a "12:1:1 self contained classroom" (id. at 15). As discussed below, there is ample evidence supporting the SRO's conclusion that the offered placement was appropriate for the Student.

In the CTT class in which the Student would have been placed at Cobble Hill, the Student would have received instruction from a teacher certified in special education while being exposed to a general education curriculum and general education students. (See Def.'s 56.1 Statement ¶ 16 n.3.) He would have been grouped with students with similar academic levels, while receiving individualized instruction that was modified to meet his needs and abilities. (See id. at ¶ 43.) He would have been in a class having an overall student-to-teacher ratio of approximately 12:1, and a 7:1

_____

[9] Although plaintiffs refer to "PS 32" and "J.H.," they likely intend to refer to Cobble Hill and B.L.

ratio of students-with-IEPs to the special education teacher. (See id. at ¶ 42.) The 7:1 ratio would have allowed the Student to receive even more individualized instruction from the special education teacher. (See id.)

Plaintiffs assert that the CTT program and recommended placement were not appropriate for the Student because plaintiff T.L. found the class "too large and disruptive" and because elective classes (such as Spanish, art, and physical education) would not be co-taught by a special education teacher.[10] (See Pls.' Mem. 15.) The record, however, belies plaintiffs' contentions.

First, plaintiff T.L. testified that the proposed class was too "disruptive" based on her observation of a group of four students talking loudly during the course of a class. (See Tr. 228.) But on this basis the Student's own class at Winston Prep would likely also be described as disruptive: the record reflects that the Student's fellow classmates at Winston Prep could have difficulty with impulsivity and lack of impulse control, which could manifest in the class becoming "very vocal" with "lots of strong personalities, lively discussions," and on two separate occasions the Student himself had overturned a table in the classroom. (Tr. 118-19.)

Second, the student-teacher ratio in the proposed CTT class was roughly 12:1, the same student-teacher ratio at Winston Prep, and the ratio of students-with-IEPs to the special education teacher in the proposed CTT class was even smaller (7:1), undermining plaintiffs' claim that the recommended class was too large. (See Def.'s 56.1 Statement ¶¶ 31, 42.) Plaintiffs nonetheless assert that even with two teachers, "it would be very difficult for [the Student] to succeed in a class with twenty students," citing the testimony of Mayer Weiner, the Student's Winston Prep "Focus" teacher, and Robert Bodall, the Dean of Winston Prep. (Pls.' Mem. 15.) Mr. Weiner, however, conceded that he had not actually observed the Student in any of his classes at Winston

---

[10] Whether these were actually plaintiffs' concerns is unclear from the record, as plaintiff T.L. also testified that the reason she did not think the CTT class was appropriate for the Student was that plaintiffs' educational advocate (who also represented plaintiffs in the administrative proceedings) told her it was not appropriate for the Student. (See Def.'s 56.1 Statement ¶ 25.)

Prep (Tr. 145-46), undercutting any opinion he may have about what class size the Student required. Although Dean Bodall testified that he believed the Student would have more difficulty in a class of twenty students, his testimony was based not on the Student's specific needs, but on Dean Bodall's general belief that students benefit from small, homogenously grouped classes. (See Tr. 103.) He further testified that he had only "taught classrooms that have no more than 12-13 kids" (id.), that he had never taught or even observed a CTT class (id. at 114-15), and that he had no familiarity whatsoever with Cobble Hill (id. at 115). In short, any opinions that these witnesses have about how the Student would perform in the recommended Cobble Hill class are speculative and questionable at best.[11]

Finally, and as discussed in Point I(A)(4) above, the record reflects that the Student would have received appropriate instruction and educational benefit at Cobble Hill notwithstanding the fact that some of his courses would have been taught by general education (as opposed to special education) teachers, because the general education teachers work closely with the special education teachers and are trained in reading IEPs, in differentiating instruction, and in various methods of classroom management, instruction, and helping students. (See Def.'s 56.1 Statement ¶¶ 45-46.) Significantly, the recommended program and placement would have provided educational benefits to the Student in the least restrictive environment—as the IDEA and New York law require—because it allowed the Student to be educated with non-disabled peers. See 20 U.S.C. § 1412(5); 8 N.Y.C.R.R. § 200.1(cc); Walczak, 142 F.3d at 122.

Based on all of the evidence, the SRO concluded—after setting forth a decision that reviewed the record in detail and made frequent citation to it—that the CTT program and Cobble Hill placement offered by defendant were appropriate and that the IEP was reasonably calculated to

_____

[11] Plaintiffs also claim that the Student required a "small school environment" (e.g., Pls.' Mem. 16), but provide absolutely no evidence for their claim, and defendant is unaware of any evidentiary support for their assertion.

enable the Student to receive educational benefits. (See SRO Decision 18-21.) His decision is consistent with the record and comports with the IDEA and the case law interpreting its substantive requirements, see, e.g., Rowley, 458 U.S. at 198-99, and should be given the "due weight" to which it is entitled under the IDEA. See Cerra, 427 F.3d at 195; J.R. v. Bd. of Educ., 345 F. Supp. 2d 386, 398 (S.D.N.Y. 2004) (giving "the requisite weight to the decisions of impartial state education officers who are far better versed in educational policy and practice than this Court" in holding that an IEP was reasonably calculated to confer educational benefit). Plaintiffs should not ask this Court to engage in exactly the type of substitution of judgment that is barred by Rowley and its progeny. See, e.g., Cerra, 427 F.3d at 195; W.S., 454 F. Supp. 2d at 145 ("The problem with plaintiffs' argument is that this sort of weighing of conflicting evidence is exactly the sort of area in which I am required to defer to the SRO—the education professional—rather than pretend to transform myself into some sort of educational specialist.").

While plaintiffs may desire the private school education that they unilaterally chose for the Student, the record makes clear that this is not required in order for him to receive a FAPE. See, e.g., Walczak, 142 F.3d at 129 ("What the statute guarantees is an 'appropriate' education, 'not one that provides everything that might be thought desirable by loving parents.'"); J.R., 345 F. Supp. 2d at 399 ("[N]either our sympathy, nor more importantly the IDEA, entitles S.R. to the 'best education that money can buy' at the expenditure of the District's finite financial resources."). In short, and as the SRO found, the evidence does not reflect that the Student could not make progress in the CTT program with related services at Cobble Hill. Accordingly, DOE complied with the IDEA's substantive requirements and plaintiffs are therefore not entitled to tuition reimbursement. See, e.g., 20 U.S.C. § 1412(a)(10)(C)(i); Cerra, 427 F.3d at 195.

Based on the foregoing, it is clear that the IEP prepared for the Student was adequate and that defendant offered the Student a FAPE for the 2008-2009 school year. Accordingly, plaintiffs' motion should be denied.

## POINT II

### PLAINTIFFS' UNILATERAL PRIVATE PLACEMENT WAS INAPPROPRIATE

Because defendant offered the Student a FAPE for the 2008-2009 school year, defendant "has satisfied its obligations under the IDEA and the necessary inquiry is at an end." M.C., 226 F.3d at 66. Nonetheless, even assuming *arguendo* that defendant's recommended program was not adequate to afford the Student with an appropriate education, tuition reimbursement is still not warranted because plaintiffs cannot demonstrate that their unilateral placement is appropriate to the Student's needs. See, e.g., Walczak, 142 F.3d at 129.

As previously stated, in determining the appropriateness of plaintiffs' unilateral placement, most of "the same considerations and criteria that apply in determining whether the School District's placement is appropriate should be considered." Frank G. v. Bd. of Educ., 459 F.3d 356, 364 (2d Cir. 2006). While the "test for the parents' private placement is that it is appropriate, and not that it is perfect," M.S. v. Yonkers Bd. of Educ., 231 F. 3d 96, 105 (2d Cir. 2000) (citation omitted), the IDEA's preference for educating disabled students in the least restrictive environment to the maximum extent appropriate "remains a consideration that bears upon a parent's choice of an alternative placement," id.; see generally 20 U.S.C. § 1412(a)(5)(A).

In New York, educating students in the "least restrictive environment" requires that "placement of students with disabilities in special classes, separate schools or other removal from the regular educational environment occurs only when the nature or severity of the disability is such that even with the use of supplementary aids and services, education cannot be satisfactorily achieved." 8 N.Y.C.R.R. § 200.1(cc). The regulation further provides that placement in the least restrictive environment means educating "the student to the maximum extent appropriate to the needs of the student with other students who do not have disabilities." Id.

It is undisputed that in plaintiffs' unilaterally chosen private placement, Winston Prep, the Student had *no* exposure to non-disabled peers. (See Def.'s 56.1 Statement ¶ 32.) Given this evidence, Winston Prep did not allow the Student to be educated in the least restrictive environment. In view of the IDEA's "strong preference" for educating students as much as possible in such an environment, plaintiffs' placement is inappropriate under the IDEA. Gagliardo, 489 F.3d at 108; see Walczak, 142 F.3d at 132; Pinn v. Harrison Cent. Sch. Dist., 473 F. Supp. 2d 477, 482 (S.D.N.Y. 2007) (denying plaintiffs' request for tuition reimbursement because, among other things, the unilaterally chosen placement was not the least restrictive placement for the student).

In addition, Winston Prep was not an appropriate placement because it did not provide the special education services the Student needed during the 2008-2009 school year. Specifically, it did not and could not provide either speech and language therapy or counseling, services that even plaintiff T.L. and the Student's teachers at Winston Prep acknowledged the Student required. (See Def.'s 56.1 Statement ¶ 33; Tr. 243-44.) Because Winston Prep failed to offer these services, plaintiffs cannot sustain their burden of demonstrating that Winston Prep was an appropriate private placement. See, e.g., Gagliardo, 489 F.3d at 114 (holding that plaintiffs' unilateral placement was not appropriate because it did not provide the therapy and special education services plaintiffs' son required); Schreiber v. E. Ramapo Cent. Sch. Dist., 700 F. Supp. 2d 529, 554 (S.D.N.Y. 2010) (holding that the failure of the parents' unilaterally chosen private placement to offer necessary counseling was one of the factors precluding tuition reimbursement, and denying the parents' motion for summary judgment on that issue); Thies v. N.Y. City Bd. of Educ., 2008 U.S. Dist. LEXIS 11354, at *8-9 (S.D.N.Y. Feb. 4, 2008) (holding that plaintiffs had not met their burden of demonstrating that their private placement was appropriate where the student only received private counseling and therapeutic services outside of the placement); Werner v. Clarkstown Cent. Sch. Dist., 363 F. Supp. 2d 656, 660 (S.D.N.Y. 2005) (holding that the parents failed to sustain their

burden of showing that their placement offered their child necessary special education services where counseling was not part of the normal program of the school and had to be paid for separately).[12]

Finally, the record shows that the Student made no progress in reading and writing, his two greatest areas of academic need, during his 2008-2009 school year at Winston Prep. (See Def.'s 56.1 Statement ¶ 36.) The record also belies plaintiffs' assertions that the Student improved in submitting assignments and participating in class during the 2008-2009 school year at Winston Prep. (See, e.g., Def.'s 56.1 Resp. ¶ 54.) A student's progress (or lack thereof) at a unilateral placement, while not dispositive, is relevant to a court's review of the appropriateness of a placement, see Gagliardo, 489 F.3d at 115, and the Student's lack of progress in reading and writing in particular further supports the conclusion that Winston Prep was not an appropriate placement.

In sum, because plaintiffs cannot show that their unilaterally chosen placement was appropriate for the Student, plaintiffs' claim for reimbursement for the costs incurred at Winston Prep must be denied. See, e.g., M.S., 231 F. 3d at 105.

## POINT III

### THE EQUITIES FAVOR DEFENDANT

While the Court need not consider the equities in this case because defendant offered the Student a FAPE and because plaintiffs' unilateral placement was inappropriate, a consideration of the equitable factors also requires a finding in favor of defendant.

Under the IDEA, a request for tuition reimbursement for a unilaterally chosen private school may be reduced or denied if:

> (aa) at the most recent IEP meeting that the parents attended prior to removal of the child from the public school, the parents did not inform the IEP Team that they were rejecting the placement

---

[12] Although the SRO was not required to review the appropriateness of plaintiffs' private placement (because the SRO found that DOE had offered the Student a FAPE), he also strongly suggested that Winston Prep was not an appropriate placement because it did not provide necessary related services to the Student. (See SRO Decision 17.)

proposed by the public agency to provide a free appropriate public education to their child, including stating their concerns and their intent to enroll their child in a private school at public expense; or

(bb) 10 business days (including any holidays that occur on a business day) prior to the removal of the child from the public school, the parents did not give written notice to the public agency of the information described in item (aa).

20 U.S.C. § 1412(a)(10)(C)(iii)(I). In short, parents "cannot, in fairness, expect to recover for expenses [they] incurred prior to contacting the school board about [their] dissatisfaction with [their child's] IEP." M.C., 226 F.3d at 69 (citation omitted).

Here, the evidence plainly indicates that plaintiffs committed the Student to attend Winston Prep for the 2008-2009 school year prior even to the CSE review regarding the Student and before defendant recommended any specific placement for the Student. On April 15, 2008, plaintiffs signed an Enrollment Agreement for the Student's attendance at Winston Prep for the 2008-2009 school year, which committed them to payment of the entire year's tuition of $43,500.00 and which made no allowance for withdrawal. (See Def.'s 56.1 Statement ¶¶ 9, 10.) Plaintiffs also paid Winston Prep a reservation deposit of $4,350.00 by check dated April 11, 2008, and later made a payment of $19,575.00, the first half of the tuition fees for the 2008-2009 school year, by check dated May 26, 2008. (See id. at ¶¶ 11, 12.) Plaintiffs took all of these steps prior to the CSE review on June 10, 2008, and well in advance of receiving defendant's Final Notice of Recommendation, dated July 23, 2008, identifying Cobble Hill as the specific recommended school placement. (See id. at ¶¶ 10-13, 26.) This evidence amply demonstrates that plaintiffs intended only to unilaterally place the Student in the private school of their choosing and retroactively seek tuition reimbursement. See, e.g., Carmel Cent. Sch. Dist. v. V.P., 373 F. Supp. 2d 402, 414-15 (S.D.N.Y. 2005). This action is not what the IDEA contemplates, and should preclude any grant of relief. See, e.g., Tucker v. Bay Shore Union Free Sch. Dist., 873 F.2d 563, 567 (2d Cir. 1989) (recognizing the "danger" that plaintiffs "might have sought to exploit the [Act] by selecting Eagle Hill without first fulfilling their

obligation to work together with school officials to find a placement that was 'appropriate' within the meaning of the [Act]").

In addition, despite plaintiffs' claim that they "met the ten days notice requirement . . . by expressing her concerns regarding the recommended placement at the June 10, 2008 CSE review and submitting the August 15, 2008 letter" (Pls.' Mem. 19), there is no evidence that plaintiffs ever informed the CSE team during the June 10 CSE review that they had already enrolled the Student in Winston Prep and that they intended to seek reimbursement. (Plaintiffs also could not have expressed their concerns regarding the recommended placement at the June CSE review meeting, because such placement was not identified until July 2008.) In addition, although plaintiffs informed defendant that the Student would be attending Winston Prep in their August 15, 2008 letter, plaintiffs did not state that they were rejecting defendant's proposed placement or intending to seek reimbursement, stating instead that plaintiffs "will notify the Committee if the program placement is appropriate and if they expect to enroll the child in the recommended placement." (Pls.' Ex. E.) Plaintiffs' letter also failed to state any definitive or specific concerns, including instead a boilerplate list of "and/or" possible complaints. (See id.) Plaintiffs concede that the letter failed to state any concerns but claim that the letter "did not cause Petitioner any prejudice." (Pls.' Mem. 19.) "Prejudice" plays no role in the relevant requirement and standard, however, and plaintiffs again cite no legal or evidentiary support for their assertion. Thus, neither the letter nor plaintiffs' stated disagreement with the CTT program at the conclusion of the CSE review fulfilled the notice requirements delineated under the IDEA. See 20 U.S.C. § 1412(a)(10)(C)(iii)(I).[13]

---

[13] Plaintiffs also claim that Gail Trimmer, the Compliance Coordinator for Special Education at Cobble Hill, told the Student's parent that a CTT class "would not be appropriate for" the Student. (Pls.' Mem. 19.) Ms. Trimmer did not recall ever having met or spoken with plaintiff T.L., however (Tr. 72), and testified to the contrary that the Student would have been appropriately placed in the proposed CTT class at the recommended placement (Tr. 68).

In fact, plaintiffs did not indicate that they were rejecting the proposed placement until October 10, 2008—over a month after the beginning of the school year. (See Pls.' Ex. G; Tr. 232.) Plaintiffs did not even visit the recommended placement until October 6, 2008—the same date on which plaintiffs made the second and final tuition payment to Winston Prep—and according to plaintiff T.L., she only made that visit at the request of her educational advocate. (See Def.'s 56.1 Statement ¶¶ 28-29.) Because plaintiffs did not give proper notice of their rejection of the recommended program and placement and their intent to seek reimbursement—particularly in light of the fact that they had enrolled the Student in Winston Prep prior to the CSE review and prior to visiting the recommended placement—tuition reimbursement should be denied. See 20 U.S.C. § 1412(a)(10)(C)(iii)(I); M.C., 226 F.3d at 68-69; S.W. v. N.Y. City Dep't of Educ., 646 F. Supp. 2d 346, 364 (S.D.N.Y. 2009) (denying tuition reimbursement where plaintiff did not provide timely notice that she was rejecting defendant's placement and would be seeking tuition reimbursement for her unilateral enrollment of her child in a private placement, and where plaintiff enrolled her child in the unilateral placement prior to even visiting the recommended placement).

In a case recently decided by the Court in which the facts related to equitable considerations are virtually indistinguishable from the facts here, the Court denied tuition reimbursement solely on equitable grounds. See A.H. ex rel. J.H. v. N.Y. City Dep't of Educ., 652 F. Supp. 2d 297, 312 (E.D.N.Y. 2009), aff'd in part, rev'd in part on another ground, 2010 U.S. App. LEXIS 17173 (2d Cir. Aug. 16, 2010).[14] Like plaintiffs here, plaintiff A.H. had not informed DOE that she had committed to paying a full year of tuition at the private school she had unilaterally selected for her child prior to receiving DOE's Final Notice of Recommendation. See id. at 312-13.

---

[14] The A.H. district court had granted in part and denied in part each party's respective motion for summary judgment. See 652 F. Supp. 2d at 300. On appeal, the Second Circuit reversed to the extent that summary judgment had been granted to plaintiff A.H. and denied to defendant DOE, remanding with instructions to enter judgment in favor of defendant. See 2010 U.S. App. LEXIS 17173, at *11.

In unilaterally choosing to place her child in a private school "before DOE's process was complete," the Court found that "plaintiff demonstrated that she did not seriously intend to enroll J.H. in public school." Id. at 313. The Court further found that "[t]o permit reimbursement in such a circumstance would encourage parents to sidestep the process established by Congress and New York law to ensure that disabled children receive a free appropriate public education." Id. In a similar case, a court denied tuition reimbursement where the parents had not "reveal[ed] that they had already applied to, and been accepted at, a private school" until just before the school year at issue was to begin. See Werner, 363 F. Supp. 2d at 661. As that court noted:

> Obviously, what went on here was that the parents decided to send a troubled son to private school in September 2002, found a school they liked (with no regard whatever for what his special education needs might be, because there had as yet been no assessment and no determination about his needs), got their son accepted at the school, and then took steps to try to get the District to pay for the boy's private school education. The equities are clearly not on their side.

Id.

In sum, the evidence as a whole clearly shows that plaintiffs committed the Student to Winston Prep well before the start of the 2008-2009 school year and before defendant had even the opportunity to conduct a CSE review or recommend a placement for the Student. Because plaintiffs never intended to place the Student in or even seriously consider the public school program offered by DOE, and did not cooperate with DOE in its efforts to provide a FAPE, the equities weigh heavily against awarding plaintiffs tuition costs for the 2008-2009 school year. See, e.g., S.W., 646 F. Supp. 2d at 364; Bettinger v. N.Y. City Bd. of Educ., 2007 U.S. Dist. LEXIS 86116, at *23-24, *35 (S.D.N.Y. Nov. 20, 2007) (noting that "a major consideration" in assessing equitable factors "is whether the parents have cooperated with the City throughout the process to ensure their child receive a FAPE" and denying tuition reimbursement on equitable grounds); Carmel, 373 F. Supp. 2d at 414-15.

## CONCLUSION

Based on the foregoing, defendant respectfully requests that plaintiffs' motion for summary judgment be denied, and that the Court grant defendant such other and further relief as the Court deems just and proper.

Dated:       March 3, 2011
               New York, New York

                                 MICHAEL A. CARDOZO
                                 Corporation Counsel of the City of New York
                                 Attorney for Defendant
                                 100 Church Street, Room 2-185
                                 New York, NY 10007
                                 (212) 788-0908
                                 Fax: (212) 788-0940
                                 tgantz@law.nyc.gov

                                 By:_____s/_____
                                     Toni Gantz
                                   Assistant Corporation Counsel