UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------X
T.L. and D.L. on behalf of their child B.L.,
                              Plaintiff,


           — against —                              **MEMORANDUM & ORDER**

DEPARTMENT OF EDUCATION OF THE                      10-CV-3125 (SLT) (LB)
CITY OF NEW YORK a/k/a THE BOARD OF
EDUCATION OF THE CITY SCHOOL
DISTRICT OF THE CITY OF NEW YORK,

                              Defendant.
--------------------------------------------------------X
**TOWNES, United States District Judge:**

Parents T.L. and D.L. ("Plaintiffs"), on behalf of their child, B.L., commenced this action

on July 8, 2010, pursuant to the Individuals with Disabilities Education Act ("IDEA"). Plaintiffs

appeal from a determination from a State Review Officer ("SRO") that Defendant Department of

Education of the City of New York ("DOE," "Defendant," or "District") offered a free and

appropriate public education ("FAPE") to B.L. for the 2008-2009 school year. The SRO

accordingly found that Plaintiffs were not entitled to reimbursement of tuition for the private

school in which Plaintiffs enrolled their son. Plaintiffs appeal the SRO's determination on the

grounds that Defendant did not provide their son a free and appropriate public education. The

parties now cross-move for summary judgment pursuant to Rule 56 of the Federal Rules of Civil

Procedure. For the reasons stated below, Plaintiffs' motion is denied, and Defendant's motion is

granted.

## I.    BACKGROUND[1]

A.    The Student's Impairments

The student, B.L., was diagnosed with attention deficit hyperactivity disorder ("ADHD"),

along with "visual processing deficits, difficulty completing tasks within a time limit, and

difficulty with organizing and applying rote information to more complex processing tasks."

(State Review Officer's Decision ("SRO Dec.") at 1; Def. Ex. 7 at 1, 7.)[2] The student also had

trouble reading social cues and with self-advocacy.  (Administrative Hearing Transcripts ("Tr.")

136.)[3] The student is classified by the "other health impairment" designation, through which he

qualifies for special education programs and services.  (SRO Dec. at 1.)  This classification is not

in dispute.  (Id.)

The student underwent a private evaluation ("private neurodevelopmental evaluation") by

a developmental pediatrician and a school psychologist on April 5, 7, and 17 of 2006 in order to

establish the student's "developmental status" and "better define his education and therapeutic

needs."  (SRO Dec. at 2; Def. Ex. 7 at 1, 10).  At the time, Plaintiff was about 12.  (Def. Ex. 7 at

1.)  The psychologist utilized several evaluation methods:

> Administration of the Wechsler Intelligence Scale for Children – Fourth Edition
> (WISC – IV) yielded a full scale IQ score of 105 in the average range, a verbal
> comprehension composite score of 104 in the average range, a perceptual
> reasoning composite score of 119 in the high average range, a working memory
> composite score of 107 in the average range, and a processing speed composite
> score of 75 in the low range.  Results from administration of the Woodcock-
> Johnson Tests of Achievement – Third Edition (WJ – III ACH) revealed the
> student's "very strong" skills in all academic areas except in writing fluency, a
> task that required the student to quickly write short sentences about a picture.  The

---

[1] As described in further detail below, the SRO's well-supported findings of fact are given due deference by this Court.  "This Court therefore adopts the SRO's findings of fact as its own." *L.K. and A.K. v. Department of Education*, No. 09-CV-2266, 2011 WL 127063, *1 (E.D.N.Y. January 13, 2011) (citing *W.S. v. Rye City Sch. Dist*, 454 F.Supp.2d 134, 145 (S.D.N.Y. 2006) (adopting the SRO's well-articulated factual findings)).  In light of the SRO's very detailed recitation of the facts of this case, this decision provides only a summary.

[2] Citations to the District's exhibits 1-8 are in the form "Def. Ex. ___ at ___".  Similarly, citations to the Plaintiffs' exhibits A-P are in the form "Pl. Ex. ___ at ___".

[3] Citations to the Administrative Hearing Transcripts are in the form "Tr. ___".

private evaluators indicated that the student was challenged most when required to work on tasks within a set time limit, and indicated that the student's difficulty on the WJ – III ACH was congruent with his poor performance on the processing speed subtests of the WISC – IV. Additional formal measures of receptive and expressive vocabulary yielded average results.

(SRO Dec. at 2 (internal citations omitted); *see* Def. Ex. 7 at 1-7, 12, 16.) The evaluators described the student as "functioning in the average range of intellectual ability, although his skills ranged from high average to low." (SRO Dec. at 2; Def. Ex. 7 at 7.) The student's significant issues were in the area of processing speed, which, according to the evaluators, indicated a visual processing deficit. (Def. Ex. 7 at 7.) The student's strengths were in his "ability to recall information presented orally as well as his ability to solve mathematical calculations." (SRO Dec. at 2.) The student was found to be "within age appropriate limits" in the areas of "reading, writing, mathematics, spelling, understanding directions, and memory." (Def. Ex. 7 at 7.) The student's area of greatest challenge appeared to be his difficulty completing tasks within time limits. (SRO Dec. at 3; Def. Ex. 7 at 7.) While, as mentioned above, the student demonstrated difficulty "applying rote skills to more complex processing tasks," his visual motor skills were average and his visual spatial skills and fine motor control were "age-appropriate." (Def. Ex. 7 at 7.) The report indicated that the student had trouble maintaining attention compared to his peers, which was "characterized by teacher reports as physical restlessness," along with "some weakness in cognitive skills and attention." (SRO Dec. at 3; Def. Ex. 7 at 7.) Overall, the private evaluators determined that, based on their neurodevelopmental evaluation, the student "seem[ed] to be generally functioning well, although he require[d] some additional intervention to help him achieve his full potential." (Def. Ex. 7 at 8.)

The private evaluators recommended that the student continue to use medication for his ADHD, along with various classroom modifications, and a school with "small classes and specialized resources." (Def. Ex. 7 at 8-9; SRO Dec. at 3.) The classroom modifications included "the provision of verbal information to support visual information, provision of auditory cues, evaluation for visual tracking, provision of extended time limits on all standardized tests, and testing in a separate location." (SRO Dec. at 3; Def. Ex. 7 at 8-9.) They suggested some appropriate schools, including Winston Preparatory ("Winston Prep"), the private school that the student attended during the 2008-09 school year at issue here. (Def. Ex. 7 at 9.)

When the student was in ninth grade, a District social worker/educational evaluator completed a social history dated September 18, 2007. (Def. Ex. 6.) The report indicated that the student began attending Winston Prep during the 2006-07 school year (beginning in eighth grade). (Def. Ex. 6 at 1; *see* Tr. at 244.) At that time, the student did not have an individualized education program ("IEP"), which the District develops in order to determine the needs and placements of special education students, and did not receive related special education services such as counseling or speech therapy through Winston Prep. (Def. Ex. 6 at 1; SRO Dec. at 3.) An IEP was developed for the student's ninth grade year, however, the student still attended Winston Prep for that year. (Def. Ex. 6 at 1; Tr. at 244.) According to the social history, the student's mother reported that the student had difficulty expressing himself in writing and summarizing important points from his reading, as well as organizational issues. (Def. Ex. 6 at 1; SRO Dec. at 3-4.) The report also indicated that the student used medicine to help him avoid distractibility. (Def. Ex. 6 at 1.) Further, the mother noted that socializing was "not always easy" for the student, and his behavior necessitated "supervision during social situations so that

4

he could be prompted to connect with others in a socially mature manner." (Def. Ex. 6 at 1; SRO Dec. at 4.)

B.    Developing the IEP

On June 10, 2008, the Committee on Special Education ("CSE") met to review the student's issues and develop his IEP for the 2008-2009 school year, which would be the student's tenth grade year. (Def. Ex. 3; Pl. Ex. C.) The meeting included a district special education teacher, also acting as the district representative ("the district representative"),[4] a district regular education teacher, and a district school psychologist. (Tr. at 177-78; Def. Ex. 3 at 2; SRO Dec. at 4.) The parents, one of the student's teachers from Winston Prep, and the parents' educational advocate participated in the meeting via telephone. (*Id.*)

The June 2008 CSE recommended a change from a "special class" in a more restrictive setting to a collaborative team teaching ("CTT") class with a 14:1 student/teacher ratio with related services. (Tr. at 222-23; Def. Ex. 3 at 2, 12; SRO Dec. at 4-5) Collaborative team teaching means "the provision of specially designed instruction and academic instruction provided to a group of students with disabilities and nondisabled students." 8 NYCRR 200.6(g). The 14 student cap provides the limit for the number of students in the class with special education needs and IEPs, not the total number of students in the class, and is run by both a regular and a special education teacher. (*See* Tr. at 182.) The aforementioned related services would have included one 3:1 counseling session per week for 40 minutes, and a 1:1 speech/language therapy session two times per week for 40 minutes. (Def. Ex. 3 at 12; SRO Dec. at 5.) The CSE discussed both short term and annual goals regarding social interactions, attention to tasks, independence in completing school work, pragmatic language skills, critical

---

[4] The district representative is a special education teacher assigned to the CSE. (Tr. 174-176.) She is a licensed and certified general education and special education teacher, and has been with the Department of Education for 29 years. (Tr. 176.)

and inferential reading comprehension and informational writing. (Def. Ex. 3 at 3-9; SRO Dec. at 5.) The CSE also recommended the use of graphic organizers and prompts and reminders. (Def. Ex. 3 at 3; SRO Dec. at 5.) For standardized tests, the CSE recommended doubling the time allotted to complete the test, a separate location, and having the instructions read and re-read. (Def. Ex. 3 at 2, 12; SRO Dec. at 5.) The CSE considered both a general education class with special education teacher support services ("SETSS") along with related services, and a special class in a community school with related services. (Def. Ex. 3 at 11.) However, the CSE rejected both alternatives, determining that the SETSS would not provide the student with enough support, and the special class would be unnecessarily restrictive given the student's needs and abilities. (*Id.*) "The hearing record reflects that although they did not object to the goals and related service recommendations, the parents and their educational advocate did not agree with the June 2008 CSE's recommendation for placement in a CTT class because the student 'ha[d] ADHD,' required 'a lot of refocus,' and he 'might not be able to do his work in a CTT class.'" (SRO Dec. at 5; *see* Tr. at 203-04, 223, 242-43.)

The Final Notice of Recommendation ("FNR"), dated July 23, 2008, conveyed that the student's IEP would be implemented at Cobble Hill School of American Studies ("Cobble Hill") for the 2008-09 school year. (Pl. Ex. D; SRO Dec. at 5.) The student's mother and the parents' advocate sent a letter, dated August 15, 2008, giving the required 10-day notice that the parents were unilaterally enrolling their child in Winston Prep.[5] (Pl. Ex. E.) The letter used an "and/or" format to express the parents' reasoning:

---

[5] The IDEA "allows that reimbursement may be reduced or denied if parents do not provide notice of the unilateral placement either at the most recent CSE meeting prior to removing the student from public school, or by written notice ten business days before such removal, 'that they were rejecting the placement proposed by the [public] agency to provide a free appropriate public education [FAPE] to their child, including stating their concerns and their intent to enroll their child in a private school at public expense.'" (SRO Dec. at 6 (citing 20 U.S.C. §1412(a)(10)(C)(iii)(I)).)

Please be advised of the following: the students' [sic] parent could not observe the recommended placement because the school was not in session, and/or the Committee did not offer their child a placement; and/or the Committee failed to conduct a timely annual review and draft an IEP, and/or visited the program and did not find it appropriate.

This will serve as a 10-day notice letter as mandated by Federal law. The parent [sic] will enroll their child for the 2008-2009 school year in the Winston Prep school.

If the parent has already received or does receive a letter recommending that their child attend a specific public school they will make every effort to observe the offered program in September of 2008. They will notify the Committee if the program placement is appropriate and if they expect to enroll the child in the recommended placement. If the recommended public school placement is not appropriate, an impartial hearing will be requested in order to secure reimbursement and/or direct payment for the child's tuition for the 2008-2009 school year at Winton Prep.

(Pl. Ex E.) The student continued attending Winston Prep for 2008-09, his sophomore year. However, the student's mother visited the placement on October 6, 2008, and made a second visit two days later. (Tr. 225, 231-32.) The school year began on September 2, 2008, but the mother stated in the hearing that she was unable to visit the placement earlier because she was recovering from surgery. (Tr. 232, 254-55.) The parents sent another letter on October 10, 2008, confirming that the student's mother visited Cobble Hill and determined it was not appropriate for her son. (Pl. Ex. G.) The student's mother took issue with the class size, on the grounds that "there were much too many children in the class to enable [the student] to gain any educational benefit." (*Id.*) The student's mother further noted, through her advocate, that she "observed several instances of problem behaviors –without the adults in the class able to control outbursts and such." (*Id.*) She further testified that the special education teacher was only in the room "20 minutes" out of the approximately 45 minutes she observed. (Tr. 224-25, 229.) The letter noted that while the October 10th letter was not a request for an impartial hearing, they would be requesting one "in the near future." (Pl. Ex. G.)

C.    The Impartial Hearing

The parents filed a due process complaint notice through their educational advocate on January 15, 2009. (Pl. Ex. A.)  They requested, *inter alia*, reimbursement for the student's tuition at Winston Prep for the 2008-09 school year.  (*Id.* at 3.)  They noted that the June 2008 CSE's recommendation for a 14:1 CTT class with related services was a change from the 2007-2008 CSE's recommendation of a 12:1:1 special class with support services.  (*Id.* at 1.)  The letter conveyed that the mother had visited the recommended placement and found it "inappropriate for [the Student's] needs" because the "staff ratio [was] too large" and would not "allow [the student] to receive the individual attention that he requires in order to be appropriately educated."  (*Id.* at 2.)  The mother also alleged that she "observed several instances of problem behaviors by the students without the teacher being able to control such outbursts."  (*Id.*)  For these reasons, the parents felt that the placement was "not reasonably calculated to confer educational benefits on [the student]."  (*Id.*)

The parents also alleged that the June 2008 IEP was "procedurally improper and substantively incorrect and resulted in a defective program recommendation and denial of a FAPE," listing the following reasons as support:

1) The CSE failed to include the participation at the IEP meeting on June 10, 2008 of a related Service Provider who provided [the student] with Speech and Language Therapy.
2) The CSE failed to include a statement of [the student's] present level of academic achievement and functional performance with respect to his needs regarding Speech and Language.
3) The CSE failed to include baseline data regarding [the student's] performance on objective tests with respect to Reading, Writing and Math.
4) The CSE failed to develop appropriate and specific academic and functional goals designed to meet each of [the student's] educational needs, including goals related to his Speech and Language needs.
5) The CSE failed to develop appropriate academic and functional goals designed to meet each of [the student's] educational needs that are specific and measureable.

(Pl. Ex. A. at 2.) The parents "reserve[d] the right to challenge the appropriateness of their son's entire IEP including, but not limited to, the appropriateness of the drafted annual goals." (*Id.*) The district responded, noting that the recommendation was based on "a psychoeducational evaluation, a classroom observation, teacher progress reports and teacher estimates, an April 2006 private neurodevelopmental evaluation, and a medical record." (SRO Dec. at 8; Def. Ex. 2 at 2-3). The District also noted, as mentioned above, that the CSE had considered general education with either related services or SETSS, but found it would not have provided the student with enough support. (Def. Ex. 2 at 3.) Further, the CSE also considered a special class for the student, but determined that such a placement would have been unnecessarily restrictive. (*Id.*)

The impartial hearing, conducted by an impartial hearing officer ("IHO"), began on May 18, 2009 and concluded, after four days of testimony, on July 23, 2009. (IHO Dec. at 2.) The IHO issued a decision dated December 4, 2009, finding that the parents should be reimbursed for tuition at Winston Prep for the 2008-2009 school year. (*Id.* at 8.) In reaching this conclusion, the IHO determined that the June 2008 CSE's recommendation represented a change to a less restrictive environment for the student, but there was nothing in the record warranting such a change in setting. (*Id.* at 4.) The IHO further noted that the private neurodevelopmental evaluation recommended "small classes." (*Id.*) She further determined that, although "the student's cognitive functioning was in the average to above average range, his slow processing speed, impulsivity, distractibility, and social skills deficits required that he be placed in a small class setting" and, therefore, "[t]he CSE's recommendation that [the student] be placed in a full-time CTT program for the 2008-2009 school year was not reasonably calculated to enable[] [the student] to make meaningful educational progress." (*Id.* at 4-5.)

The IHO additionally concluded that the placement would not have provided the student

with the level of support indicated in his IEP because the student would have general education

classes for physical education as well as his electives[6]:

> [T]he impartial hearing officer concluded that although the student's June 2008
> IEP recommended that the student be placed in CTT classes for all periods, the
> recommended placement would not have provided the student with that level of
> support.  Concluding that the recommended placement would not have
> implemented the June 2008 CSE's recommendation for full-time placement in
> CTT classes, the impartial hearing officer found that the recommended placement
> would have provided the student with CTT classes for English, math, science and
> social studies.  Although the impartial hearing officer noted that the student's
> regular education teachers would have been provided with a copy of the student's
> IEP and would have had the opportunity to consult with a special education
> teacher upon request, the impartial hearing officer found that this was a "much
> lower level of support than the support mandated by the IEP."  In light of the
> foregoing, the impartial hearing officer determined that the district did not
> establish that it offered the student an appropriate program during the 2008-09
> school year.

(SRO Dec. at 9 (internal citations omitted); IHO Dec. at 5-6.)  The IHO also found that the

placement at Winston Prep was proper and "met [the student's] special education needs for the

2008-2009 school year." (IHO Dec. at 7.)  Further, the IHO determined that there was "nothing

in the Record that would preclude reimbursement on equitable grounds." (*Id.*)

D.     SRO Decision

The District appealed and requested an order "annulling the impartial hearing officer's

decision to the extent that it ordered the district to reimburse the parents for the student's

placement at Winston Prep." (SRO Dec. at 10.)  In their appeal, the District "maintained that it

offered the student a FAPE during the 2008-09 school year in the least restrictive environment

("LRE"):

> Specifically the district first contends that the June 2008 CSE's recommendation
> that the student attend a CTT class would have nurtured the student's academic

---

[6] Seven elective subjects are required for graduation. (Tr. 33.) Cobble Hill offers, among other things, art, music,
Spanish, law and technology. (*Id.*) Art and music are mandatory electives. (*Id.*)

strengths and would have offered the student frequent interaction with typically developing peers. Second, the district claims that the student would have received related services comprised of counseling and speech-language therapy, which would have addressed the student's social/emotional and language deficits. Third, the district asserts that it made a timely offer to the student of a seat in a school that would have been able to implement the student's IEP during the 2008-09 school year.

...[T]he district contends that the regular education teachers for the few non-CTT classes in which the student would have been enrolled worked closely with the special education teachers to implement their students' IEPs. The district also asserts that the student's principal areas of deficit would have been addressed by both a regular and a special education teacher in his English and social studies CTT classes had he been enrolled in the recommended placement. In light of the foregoing, the district alleges that the student's June 2008 IEP would have been substantively implemented at the recommended placement for the 2008-09 school year.

(*Id.* at 10-11.) The district also challenged the appropriateness of the Winston Prep placement,

and further argued that the equities did not favor the parents, in part because the parents had

committed financially to Winston Prep for the 2008-09 school year before the CSE had convened

and, as the district argues, had no intention of placing their son in a district school. *Id.*

The parents submitted an answer in which they argued that the IHO decision should be

upheld and alleging that the district failed to offer the student a FAPE on the grounds that:

(1) [T]he June 2008 IEP did not adequately describe the student's present levels of cognitive, social/emotional, and academic functioning needs;
(2) The June 2008 IEP did not describe the student's present levels of academic performance;
(3) The June 2008 CSE failed to develop appropriate and specific goals and objectives for the student;
(4) The goals listed in the June 2008 IEP were vague and overbroad;
(5) The June 2008 CSE did not provide any valid, individualized reasons for making significant change in the student's program;
(6) The district would not have been able to properly implement the proposed IEP.

(SRO Dec. at 12; Parents' Verified Answer at ¶¶ 115-120.) The parents also defended Winston

Prep as appropriate and argued that the equities did not weigh against reimbursement given the

parent's compliance with the process. (SRO Dec. at 12; Parents' Verified Answer at ¶¶ 121-126.)

On March 12, 2010, the SRO issued a decision in favor of the District, determining that "the June 2008 CSE's recommendation was reasonably calculated to confer educational benefits on the student." (SRO Dec. at 14.) In reaching this conclusion, the SRO first found that the IEP "accurately depicted the student's needs at the time that the IEP was developed." (*Id.*) In support of this point, the SRO cited to the IEP itself as well as relevant testimony:

> Testimony by the district's witness who participated in the June 2008 CSE and acted as both the district representative and the special education teacher…indicated that the CSE reviewed the April 2006 private neurodevelopmental evaluation report, Winston Prep Focus teacher reports, and the student's entire educational file and history (Tr. pp. 177-78.) The June 2008 IEP reflected the student's present levels of academic performance and learning characteristics consistent with results reported in his last evaluation (the April 2006 neurodevelopmental evaluation report) and current teacher estimates (compare [Def.] Ex. 7 at pp. 4-8, 11-16 with [Def.] Ex. 3 at p. 3). Consistent with testimony by the district representative, the June 2008 IEP indicated that at that time, the student functioned in the average range of intelligence, with variability among skill areas (Tr. pp. 183, 186; [Def.] Ex. 3 at p. 3)….According to teacher estimates at the time of the June 2008 CSE meeting, the student was at a "grade level" instructional level in decoding, an eighth grade instructional level in reading comprehension, a ninth grade instructional level in written language, and at or above a grade level…in math [Def. Ex. 3 at 3]….Testimony by the district representative regarding the student's then present levels of academic performance and learning characteristics was consistent with the information included in the June 2008 IEP. (Tr. pp. 186-91.)
>
> …[T]he June 2008 IEP indicated that the student reportedly struggled with reading social cues and that his social skills were weak (Tr. pp. 187-88; [Def.] Ext. 3 at p. 4)….Lastly, the June 2008 IEP indicated that the student's behavior did not seriously interfere with instruction and could be addressed by a regular and/or special education classroom teacher….[Def. Ex. 3 at p. 4].

(SRO Dec. at 14.) The SRO also underscored that the June 2008 CSE "incorporated strategies, supports and testifying modifications into the student's IEP" such as "graphic organizers, prompts, and reminders to structure and organize his writing, to address his organization and

time management difficulties and to address his attention difficulties." (*Id.* at 15; Tr. 190-91; Def. Ex. 3 at 3.) The CSE further adjusted the student's testing environment by recommending that test directions be read and re-read in order to "focus the student," and make sure the student understood the directions and could ask questions. (Tr. 204-05; Def. Ex.3 at 12.)

Next, the SRO evaluated the enumerated goals, finding that "a review of the annual goals and short-term objectives shows that they were aligned with the student's present levels of performance and needs, and the short-term objectives delineated multiple sub-skills that when combined, would likely result in the student achieving the broader skills stated in the annual goals (see [Def.] Ex. 3 at pp. 6-9)." (SRO Dec. at 15.) The SRO examined the annual goals and how they would be met through specified short term objectives:

> For example, one annual goal addressed the student's need to read texts written on his instructional reading level and comprehend what he read on a critical inferential reasoning level. The goal's corresponding short-term objectives focused on the student describing two main characters in each of two texts including character traits and motives; explaining the main idea of five short teacher selected texts; predicting a possible next event occurring after reading five texts; predicting the effect given a cause in five texts, drawing [two] conclusions in each of five texts, and underlining the pertinent information in the text that led to these conclusions; correctly stating the moral of four fables, and justifying the moral with evidence from each fable; comparing two characters or events in two different texts and using evidence from the text as support; summarizing two texts, both in writing and then verbally, including only the most essential details.

(SRO Dec. at 15 (internal citations omitted); Def. Ex. 3 at 6-9). Additional annual goals and their short term objectives addressed the student's need to improve his information writing and task attention. (SRO Dec. at 15-16; Def. Ex. 3 at 6, 9.) The goals also addressed his need to develop and maintain appropriate peer interactions, through short-term objectives that focused on the student using socially appropriate language and facial expressions. (SRO Dec. at 15-16; Def. Ex. 3 at 6.) Remaining goals and objectives addressed improvement of pragmatic language skills and increased independence in school assignments. (SRO Dec. at 16; Def. Ex. 3 at 6, 9.) The

13

SRO further relied on the testimony of the district representative/ special education teacher, who noted that the short-term objectives were "very focused" and would "help [the student] be able to tackle more sophisticated books and material on age and grade level" and develop "skills that he would need…to move on in high school." (SRO Dec. at 16; Tr. 194-95.) The SRO also noted that the information provided by the student's Winston Prep teacher, who participated in the CSE meeting, was included in the IEP. (SRO Dec. at 16; Tr. 205-06; Def. Ex. 3 at 3.) In light of the hearing record, the SRO determined that "at the time that it was created, the June 2008 IEP accurately portrayed the student's needs and contained annual goals and short-term objectives designed to address those needs, which were developed with meaningful parental participation." (SRO Dec. at 16.)

The SRO further found that the record supported the district's argument that the recommended related services would have "appropriately addressed the student's speech-language needs and social/emotional functioning." (*Id.*) The district representative testified that the CSE recommended counseling to address the student's academic and social/emotional difficulties and speech-language therapy to address the "more abstract language processing skills" with which the student struggled. (Tr. 188; SRO Dec. at 16.) The district representative testified that the 3:1 counseling would provide the student with an opportunity to "work out some of his social issues with a guidance counselor or a psychologist, or a social worker" in a small group setting. (Tr. 191-92; SRO Dec. at 17.) The district representative further testified that the CSE recommended twice weekly, individual speech-language therapy sessions because "[the student] was so close on some of the academic areas in terms of being able to reach his grade level that [the district] wanted to give him very focused help in some of the…more abstract language processing[] issues that might be affecting his reading and writing." (Tr. 192-93.)

The SRO also noted that "the hearing record reflects the student's long standing need for related services." (SRO Dec. at 17.) For example, the April 2006 private neurodevelopmental evaluation report conveyed one evaluator's opinion that the student's private school at the time of the evaluation was a "poor fit" as it lacked "appropriate resources" such as a school psychologist. (Def. Ex. 7 at 1; SRO Dec. at 17.) Further, one of the student's Winston Prep teachers testified that the student had social/emotional and pragmatic language deficits that needed to be addressed, although the student did not receive such services through Winston Prep. (Tr. 104; 156-57.)

The SRO continued to the issue of whether the student's IEP would have been substantively implemented at Cobble Hill, finding that "the student's special education needs would have been addressed in his CTT core academic classes and in his general education elective classes, and that the lack of a special education teacher in the student's elective classes did not rise to a denial of FAPE in this case." (SRO Dec. at 18.) The SRO reviewed the record for details on how the IEP would have been implemented:

> Here, the district asserts that the few regular education teachers that the student would have had at the recommended placement worked closely together to implement their students' IEPs. In her description of a tenth grade CTT class at the recommended placement, the assistant principal [of Cobble Hill] testified that a regular education teacher and a special education teacher collaboratively planned and co-taught the class (Tr. p. 30). She also noted that she was familiar with the tenth grade CTT teachers for the 2008-09 school year (id.). The assistant principal testified that the CTT setting was provided for the subjects of math, science, English, and social studies (Tr. pp. 31, 33). The students in the tenth grade CTT class were together for all classes taught in the CTT setting, and usually were together if they were scheduled for the same electives (Tr. pp. 36-37). She also explained that for other required or elective classes such as Spanish, there would be a general education tenth grade class in which the student would be provided with support (Tr. p. 34).

(SRO Dec. at 18.) Based on the testimony from the assistant principal and the Cobble Hill School's compliance coordinator,[7] the SRO found that the support provided to the student in his general electives would be sufficient:

> For example, the assistant principal testified that the regular education teacher for Spanish would have a copy of every special education student's IEP and would meet regularly with the special education department to structure lessons and to assist special education students in meeting their IEP goals [Tr. p. 34]....The compliance coordinator also indicated that the regular education teachers communicated with the special education teacher about the special education students in their classes on a regular basis (Tr. p. 76). All of the regular education teachers had copies of the special education students' IEPs and discussed with the special education teacher accommodations or any other management needs to which a student was entitled (Tr. p. 77).

(*Id.*) Therefore, the SRO held that "the student would have been provided with personalized instruction with sufficient support to permit him to benefit educationally...by ensuring the substantial implementation of the June 2008 CSE's recommendations in the few non-CTT classes that the student would have attended." (*Id.*)

The SRO also determined that the hearing record supported the district's argument that "a CTT class would have nurtured the student's academic strengths and offered him frequent interaction with typically developing peers, thereby conveying educational benefits to him." (SRO Dec. at 18-19.) The district representative testified that the CTT class with related services was best for the student because the CSE "saw a profile of a child with average, if not in some areas even higher, superior intelligence...." (Tr. 183.) The district representative also conveyed that the placement would be beneficial to the student's social and emotional development because it would expose him to "kids who are on his level, who have the same interests" and provide him with "role models...to interact with" and learn from socially. (*Id.* at 185.) She

---

[7] The duties of the Cobble Hill High School compliance coordinator include "review[ing] all the IEPs that the teachers write to make sure they are in compliance" and "mak[ing] sure all the mandates on all students' IEPs are implemented by the related service providers." (Tr. 48-50.)

noted that, given the student's intelligence, he "would not benefit from a program where everyone is evenly on a lower level because he does have these spikes, these highs...." (*Id.*) Also, as the assistant principal testified, Cobble Hill had "a lot of special education students" and practically all of the school's teachers had training in reading IEPs, in differentiating instruction based on students' needs, and classroom management. (*Id.* at 27.) The assistant principal also testified that she regularly met with the teachers, monitored the curriculums and implementation of the curriculums, and the teachers all received at least two formal observations. (*Id.* at 26-27.) Further, the related service providers and teachers communicated informally "almost every day" because the "related service providers provide instruction to the students within the classroom and outside the classroom." (*Id.* at 29.)

The compliance coordinator also testified that the CTT class would have benefitted the student.[8] The SRO relied on the compliance coordinator's 11 years of experience as a special education teacher, and the fact that it was her duty to make sure every student's IEP is in compliance and appropriately implemented. (SRO Dec. at 20; Tr. 48-50.) He further relied on the her additional role as the Transition Coordinator for the special education department, preparing special education students to transition from school to adult living in the community. (Tr. 49-50.) Prior to her current position, she was in charge of "mainstreaming special ed[ucation] students into the general ed[ucation] population." (*Id.* at 50-51.) As the SRO articulated:

> In consideration of what she knew about the student from reviewing his June 2008 IEP, the compliance coordinator opined that the student would have been appropriately placed in the proposed high school's CTT class based upon his

---

[8] The student's mother asserts that she spoke with the compliance coordinator on one of her visits to Cobble Hill, but there is some dispute over whether they met, and if it they did, what they discussed. (*Compare* Tr. 225-27 *with* Tr. 72.) The student's mother alleged that the coordinator told her that a CTT class would not be appropriate for the student. (Tr. 227.) However, the compliance coordinator's actual testimony was that the placement would be appropriate, and the coordinator had no recollection of meeting with the student's mother. (Tr. 58-59, 72.)

levels of functioning and his specific needs (Tr. p. 68). In reference to the student's proposed tenth grade CTT class, the compliance coordinator testified that at the beginning of the 2008-09 school year, the class was comprised of 22 students (Tr. p. 52). Nineteen of the students were general education students and the remaining three students had IEPs and were eligible for special education as students with a learning disability (Tr. pp. 52-53). The compliance coordinator opined that upon her review of the student's June 2008 IEP, the student would have fit into the proposed CTT class and would have received [] meaningful educational benefits in the proposed program because his reading and math functioning levels were similar to the classroom group to which he would have been assigned (Tr. pp. 58-59, 67-[68]). The compliance coordinator testified that students were functionally grouped in the CTT class and opined that they individually benefited from such groupings because lessons were differentiated according to the abilities and interests in the classroom and the teacher was able to respond to students' needs more readily (Tr. pp. 54-55). She stated that the classroom curriculum addressed State standards and it was "adapted and modified" according to each student's IEP (Tr. p. 55).

(SRO Dec. at 20-21.) At the time of the impartial hearing, there were 25 students in the CTT class, 7 of whom had IEPs. (Tr. 71-72.) Although, as mentioned above, the CTT class could have up to 14 students with IEPs, the record reflects that the class the student would have been placed in actually contained far fewer students with IEPs. (*Id.* at 71-72, 182.) According to the district representative, fewer students with IEPs offered the opportunity for more "individualized instruction." (*Id.* at 183.) The SRO noted that "the compliance coordinator's testimony was consistent with the district representative's testimony regarding the CTT classes offered" at Cobble Hill. (SRO Dec. at 21.) He also found their testimony consistent regarding the student's "deficit areas," "the appropriateness of the annual goals and short-term objectives included in the student's June 2008 IEP, and implementation of classroom modifications and related services to address the student's needs." (SRO Dec. at 21; Tr. 58-68.)

Having concluded, for all the reasons discussed above, that the student's IEP addressed his needs and would have been substantially implemented, the SRO found that the IHO "erred in determining that the district failed to offer the student a FAPE." (SRO Dec. at 21.) In light of

his finding that the district provided a FAPE, the SRO ended his inquiry there and did not reach the question of whether Winston Prep was an appropriate placement. (*Id.*)

## II. DISCUSSION

### A. The Individuals with Disabilities Act

"The purpose of IDEA is 'to bring previously excluded handicapped children into the public education systems of the States and to require the States to adopt procedures which would result in individualized consideration of and instruction for each child.'" *Connor v. New York City Dep't of Educ.*, No. 08-CV-7710, 2009 WL 3335760, at \*2 (S.D.N.Y. Oct. 13, 2009) (quoting *Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist. v. Rowley*, 458 U.S. 176, 189 (1982). Congress grants funding to "those states that 'develop plans to assure all children with disabilities the right to a free appropriate public education.'" *Id.* (quoting *Walczak v. Florida Union Free Sch. Dist.*, 142 F.3d 119, 122 (2d Cir. 1998)). A FAPE must "consist of 'educational instruction specially designed to meet the unique needs of the handicapped child, supported by such services as are necessary to permit the child to benefit from the instruction.'" *Id.* (quoting *Rowley*, 458 U.S. at 188-89).

"[T]he IDEA's guarantee of a free appropriate public education for children with disabilities reimburses parents for unilateral private school placement under certain conditions." *L.K. and A.K.*, 2011 WL 127063, at \*4 (citing *Sch. Comm. Of Burlington, Mass. v. Dep't of Educ. Of Mass.*, 471 U.S. 359 (1985)). Under *Burlington*, the school district may be required to reimburse a parent for educational services the parent obtained for the student if: "(1) the services offered by the board of education were inadequate or inappropriate, (2) the services selected by the parent were appropriate, and (3) equitable considerations support the parents'

claim." *Id.* (citing *Cerra v. Pawling Cent. Sch. Dist.*, 427 F.3d 186, 192 (2d Cir. 2005)). "Under the first *Burlington* factor, two issues are relevant to a tuition reimbursement determination: '(1) whether the state complied with the procedural requirements of IDEA, and (2) whether the challenged IEP was reasonably calculated to enable the child to receive educational benefits.'" *L.K. and A.K.*, 2011 WL 127063, at *5 (citing *Walczak*, 142 F.3d at 129).

### B.    Standard of Review

"Summary judgment in this context involves more than looking into disputed issues of fact; rather, it is a 'pragmatic procedural mechanism' for reviewing administrative decisions." *A.C. ex rel. M.C. v. Bd. of Educ. of the Chappaqua Central Sch. Dist.*, 553 F.3d 165, 171 (2d Cir. 2009) (citing *Lillbask ex. Rel. Mauclaire v. Conn. Dep't of Educ.*, 397 F.3d 77, 83 n. 3 (2d Cir. 2005). "Cross-motions for summary judgment in IDEA cases are 'in substance an appeal from an administrative determination, not summary judgment.'" *L.K. and A.K.*, 2011 WL 127063, at *5 (citing *Capistrano Unified Sch. Dist. v. Wartenberg*, 59 F.3d 884, 892 (9th Cir. 1995)). "'The role of the federal courts in reviewing state educational decisions under IDEA is circumscribed'" and "[w]hile the district court must base its decision 'on [the] preponderance of the evidence,' it 'must give due weight to the administrative proceedings, mindful that the judiciary generally lacks the specialized knowledge and experience necessary to resolve persistent and difficult questions of educational policy.'" *A.C. ex rel. M.C.*, 553 F.3d at 171 (citing *Gagliardo v. Arlington Cent. Sch. Dist.*, 489 F.3d 105, 112-13 (2d Cir. 2007); 20 U.S.C. § 1415(i)(2)(C)(iii)) (internal citation omitted). Therefore, "district courts may not 'substitute their own notions of sound educational policy for those of the school authorities which they review.'" *Id.* (quoting *Rowley*, 458 U.S. at 206).

When, as here, a district court's determination is "based solely on the administrative record," "[t]he deference paid to administrative proceedings is particularly warranted…." *Id.* (citing *Frank G. v. Bd. of Educ. of Hyde Park*, 459 F.3d 356, 367 (2d Cir. 2006)). Additionally, the Second Circuit has determined that courts should "'defer to the final decision of the state authorities,' even where 'the reviewing authority disagrees with the [IHO].'" *Id.* (citing *Karl ex rel. Karl v. Bd. of Educ. of Geneseo Cent. Sch. Dist.*, 736 F.2d 873, 877 (2d Cir. 1984). Therefore, when the SRO's determination conflicts with that of the IHO, the court defers to the SRO. *Id.* When, as here, "the state hearing officers' review has been thorough and careful," deference is especially appropriate. *Walczak*, 142 F.3d at 129.

In evaluating whether the district should reimburse the parents for tuition costs, we first "examine whether the state has complied with the procedures set forth in the IDEA," and then "we consider whether the proposed IEP is substantively appropriate in that it is 'reasonably calculated to enable the child to receive educational benefits.' Only if the IEP is procedurally or substantively deficient do we…ask whether the private schooling obtained by the parents is appropriate to the child's needs" and consider the equities of reimbursement. *A.C. ex rel. M.C*, 553 F.3d at 171 (quoting *Cerra*, 427 F.3d at 192) (internal citations omitted). The district "bears the burden of persuasion as to the appropriateness of the IEP and Plaintiff[s] bear[] the burden as to the appropriateness of the private placement." *D.D-S. v. Southhold Union Free Sch. Dist.*, No. 09-CV-5026, 2011 WL 3919040, at *9 (E.D.N.Y. Sept. 2, 2011) (citing N.Y. Educ. Law § 4404(1)(c)).

## C.    Analysis

This Court has conducted a thorough, independent review of the record, and determined that the SRO decision warrants deference. The SRO issued a 21-page, single spaced, well-

reasoned analysis. His decision was comprised of detailed findings well supported by frequent

citations to the record, and his determination, therefore, warrants deference under *Walczak*.

Further, this Court bases its decision entirely on the administrative record, and therefore,

deference is "particularly warranted." *A.C. ex rel. M.C.*, 553 F.3d at 171.

### 1. *Procedural Compliance*

Plaintiffs assert the following procedural flaws: (1) failure to include "a related service

provider who provided the student with speech/language therapy" in the CSE meeting; (2) failure

to implement the IEP; (3) failure to review "a sufficient amount of evaluative data"; and (4)

improperly changing the placement from the previous year's recommendation of a class with a

12:1:1 staff ratio to the 2008-09 recommendation of a class with 14:1 staff ratio. (Plaintiff's

Memorandum of Law In Support of His Motion for Summary Judgment ("Pl. Mem.") at 10-13.)

However, as discussed below, even if these allegations were true, they would not necessarily

render the IEP legally inadequate.

"The initial procedural inquiry in an IDEA case 'is no mere formality,' as 'adequate

compliance with the procedures prescribed would in most cases assure much if not all of that

Congress wished in the way of substantive content in an IEP.'" *A.C. ex rel. M.C.*, 553 F.3d at

172 (quoting *Walczak*, 142 F.3d at 129). Nonetheless, "it does not follow that every procedural

error in the development of an IEP renders that IEP legally inadequate under the IDEA." *Id.*

(citing *Grim v. Rhinebeck Cent. Sch. Dist.*, 346 F.3d 377, 381 (2d Cir. 2003). Instead, "'[a]

procedural violation may lead to the conclusion that a child was denied a FAPE only where the

procedural inadequacies (a) impeded the student's right to a FAPE, (b) significantly impeded the

parents' opportunity to participate in the decision-making process regarding the provision of a

FAPE to the student, or (c) caused a deprivation of educational benefits.'" *D.D-S.*, 2011 WL

3919040, at *9 (quoting *W.S. v. Nyack Union Free Sch. Dist.*, No. 09-CV-10139, 2011 WL 1332188, at *6 (S.D.N.Y. Mar. 30, 2011)); *see* 20 U.S.C. § 1415(f)(3)(E)(ii). "The Second Circuit has described the procedural side of the inquiry as 'focus[ed] on whether the [student's parents] had an adequate opportunity to participate in the development of [the] IEP.' Parental participation requires an opportunity to examine records, participate in meetings, and to obtain an independent evaluation." *Z.D. v. Niskayuna Cent. Sch. Dist.*, No. 06-CV-1190, 2009 WL 1748794, *3 (N.D.N.Y. June 19, 2009) (quoting *Cerra*, 427 F.3d at 192) (internal citation omitted); *see* 20 U.S.C. § 1415(b)(1).

The record demonstrates that Plaintiffs' procedural complaints neither impeded the creation of a FAPE nor deprived the student of any educational benefits. The Plaintiffs argue that a speech/language therapist who provided services to the student should have been present at the CSE meeting. (Pl. Mem. 10.) However, the record indicates that while the student was receiving counseling outside of Winston Prep at the parents' expense, the student did not have a speech/language provider at that time. (Tr. 104; 126-27; 252-53.) The student's mother testified that the student only received counseling outside of Winston Prep:

[Q]: Is [the student] receiving counseling at Winston Prep?

[A]: No.

[Q]: Is [the student] receiving speech and language therapy at Winston Prep?

[A]: No

…

[Q]: And [the student] is receiving counseling outside Winston Prep, correct?

[A]: Yes.

[Q]: And how often does he receive that counseling?

[A]: Once a week

…

[Q]: And is he receiving any other services outside of school?

[A]: No.

(Tr. 252- 253.) In light of the evidentiary record, it is unclear who the district could have obtained since the student was not receiving any speech/language services. Additionally, there is no indication that the parents requested the inclusion of a provider who was excluded from the meeting. Further, the Plaintiffs allege that the District failed to implement the IEP, but this argument fails. "'[A] party challenging the implementation of an IEP must show more than a de minimis failure to implement all elements of that IEP, and, instead, must demonstrate that the school board or other authorities failed to implement substantial or significant portions of the IEP.'" *D.D-S.*, 2011 WL 3919040, at *13 (quoting *Houston Indep. Sch. Dist. v. Bobby R.*, 200 F.3d 341, 349 (5th Cir. 2000), *cited in A.P. v. Woodstock Bd. of Educ.*, 370 Fed. Appx. 202, 205 (2d Cir. 2010)). The record supports the District's argument that the placement would have substantially implemented the elements of the IEP despite the student taking certain classes as general education classes. The CTT classes would have been held in the core subjects of math, science, English, and social studies. (Tr. 31, 33.) For those classes where there was only a general education teacher, the teacher would have been provided with a copy of the student's IEP, and would have had training in reading it, as well as regular assistance implementing it. (Tr. 27, 34, 76-77.) Finally, and importantly, the SRO discussed in great detail how the IEP would have been implemented at Cobble Hill and found it would have been appropriate for the student. (*See ante* 15-18.) The Court defers to the SROs finding on this point, which is adequately supported by the record.

Also, the parents were given significant opportunities to contribute to the development of the IEP. The student's mother was present at all hearing dates and both parents participated in the CSE meeting, along with the parents' educational advocate, and one of the student's Winston Prep teachers. (Def. Ex. 3 at 1-2; Tr. 4, 46, 84, 218.) The student underwent a private evaluation, which is the April 2006 neurodevelopmental evaluation used by the June 2008 CSE in developing the IEP. (Def. Ex. 7.) The CSE relied on, among other things, the private neurodevelopmental report and reports submitted by Winston Prep, the parents' chosen placement. (Tr. 178.) The student's mother visited the school twice and openly expressed her opinions on a CTT class for her son. (Tr. 203-04, 223, 230-32, 241.) The preponderance of the evidence indicates that the parents "had an adequate opportunity to participate in the development of [the] IEP." *Cerra*, 427 F.3d at 192.

Further, the parents raised these issues at the administrative level, including Plaintiffs' challenges to the appropriateness of the data and the District's change in the class-size recommendation. In spite of these arguments, the SRO found that "at the time that it was created, the June 2008 IEP accurately portrayed the student's needs and contained annual goals and short-term objectives designed to address those needs, *which were developed with meaningful parental participation*." (SRO Dec. at 16 (emphasis added).) He additionally held that the student had been provided a FAPE and that "the June 2008 CSE's recommendation was reasonably calculated to confer educational benefits on the student." (SRO Dec. at 14, 21.) Accordingly, this Court finds that these alleged procedural flaws would not render the IEP legally inadequate.

2. *Substantive Adequacy*

"'[A] school district fulfills its substantive obligations under IDEA if it provides an IEP that is likely to produce progress, not regression, and if the IEP affords the student with an opportunity greater than mere trivial advancement.'" *A.C. ex rel. M.C.*, 553 F.3d at 173 (citing *Cerra*, 427 F.3d at 195). Although the IEP must be personalized for the student, "[s]chool districts are not required to furnish 'every special service necessary to maximize each handicapped child's potential.'" *Id.* (quoting *Rowley*, 458 U.S. at 199). "The education provided need only be 'appropriate'...and 'not one that provides everything that might be thought desirable by loving parents.'" *D.D-S.*, 2011 WL 3919040, at *11 (quoting *Walczak*, 142 F.3d at 132). "[T]hus, it seeks more to 'open the door of public education to handicapped children on appropriate terms than to guarantee any particular level of education once inside'" and "does not require perfection." *Connor*, 2009 WL 3335760, at *5-6 (quoting *Walczak*, 142 F.3d at 130).

It is important to note that, when determining where to place a student, "there is 'a strong preference for children with disabilities to be educated, to the maximum extent appropriate, together with their non-disabled peers.'" *A.C. ex rel. M.C.*, 553 F.3d at 173 (quoting *Walczak*, 142 F.3d at 122). To review the adequacy of an IEP without "'impermissibly meddling in state educational methodology, the Court must examine the record for any objective evidence indicating whether the child is likely to make progress or regress under the proposed plan.'" *D.D-S.*, 2011 WL 3919040, at *12 (quoting *Omidian v. Bd. of Educ.*, 05-CV-0398, 2009 WL 890625, at *25 (N.D.N.Y. Mar. 31 2009)); *Walczak*, 142 F.3d at 130. However, "'[b]ecause administrative agencies have special expertise in making judgments concerning student progress, deference is particularly important when assessing an IEP's substantive adequacy.'" *A.C. ex rel. M.C.*, 553 F.3d at 173 (quoting *Cerra*, 427 F.3d at 195).

Plaintiffs argue that the IEP was not substantively adequate because 1) the IEP did not contain appropriate goals and objectives and 2) the large class size was inappropriate for the student. (Pl. Mem. 13-14.) However, the record demonstrates that the annual goals and their short-term counterparts were very detailed and focused to the student's needs. (*See ante* 13-14.) Further, the district's CTT recommendation was in accordance with the strong policy preference to educate students in the least restrictive environment appropriate to the student's needs and abilities. The record reflects that the student would have benefitted socially and academically from exposure to general education students, but would also have been provided with sufficient support to make the placement "likely to produce progress." (*See ante* 14-18.) Given the student's intelligence as reflected in the record, the Court agrees with the SRO that the placement would have "nurtured the student's academic strengths and offered him frequent interaction with typically developing peers." (SRO Dec. at 18-19.) In short, the record reflects that the student could have made meaningful, non-trivial progress in the recommended placement. Further, this Court defers to the SRO's finding that the IEP and recommended placement would have adequately and appropriately addressed the student's needs.

### D.    Further Considerations

The Court finds that the IEP developed for the 2008-09 school year was neither procedurally nor substantively flawed, and therefore, need not address the appropriateness of the Winston Prep placement, or the impact of the equities on reimbursement.

## III.    CONCLUSION

For the foregoing reasons, the Court affirms the SRO's decision denying tuition reimbursement for the Plaintiffs for the 2008-2009 school year. Accordingly, Plaintiffs' motion for summary judgment is denied, and Defendant's cross motion for summary judgment is granted. The Clerk of Court is directed to enter judgment for Defendant and close this case.

**SO ORDERED.**

S/

/SANDRA L. TOWNES
United States District Judge

Dated: March  30 , 2012
          Brooklyn, New York